















JPP    3/22/05    15:24

3:05-CV-00171   GONZALES V. ARROW FINANCIAL

*8*

*DECL.*

1  LAW OFFICE OF ELIZABETH J. ARLEO, PLC
   ELIZABETH J. ARLEO (CASB NO. 201730)
2  10085 Carroll Canyon Road, Suite 210A
   San Diego, CA 92131
3  Telephone: 858/547-9800
   858/547-9880 (fax)
4
   ROBERT L. ARLEO, ESQ (NYSB NO. 7506)
5  225 East 79th Street, 2B
   New York, NY 10021
6  Telephone: 212/517-9967
   212/517-2919 (fax)
7
   Attorneys for Plaintiff
8

FILED

05 MAR 21  PM 3: 26

CLERK. US. DISTRICT CT.
DISTRICT OF CALIFORNIA

ORIGINAL  DEPUTY

9                    UNITED STATES DISTRICT COURT

10                  SOUTHERN DISTRICT OF CALIFORNIA

11

12  JOHNNY GONZALES, on Behalf of Himself  )   Case No. 05-CV-0171 JAH (RBB)
    and All Others Similarly Situated,          )
                                                )   CLASS ACTION
13                              Plaintiff,       )
                                                )   DECLARATION OF ELIZABETH J. ARLEO
14    vs.                                        )   IN SUPPORT OF PLAINTIFF'S
                                                )   OPPOSITION TO DEFENDANT'S MOTION
15  ARROW FINANCIAL SERVICES LLC,               )   TO DISMISS
                                                )
16                              Defendant.       )   DATE: April 7, 2005
                                                )   TIME: 3:00 pm
17                                               )   DEPT: F
                                                )
18  _____        )   Hon. John A. Houston

19

20

21

22

23

24

25

26

27

28




DECL. OF E. ARLEO IN SUPPORT OF PLTF'S OPP                    Case No. 05-CV-0171 JAH(RBB)

1          I, Elizabeth J. Arleo, declare as follows:

2           1.  I am the principal attorney of The Law Office of Elizabeth J. Arleo, PLC, and counsel

3 of record for plaintiff, Johnny Gonzales. I make this declaration in support of Plaintiff's Opposition

4 to Defendant's Motion to Dismiss. I have personal knowledge of, or am informed and believe, the

5 facts set forth herein and, if called as a witness, would and could competently testify the truth

6 thereof.

7           2.  Exhibit A is a true and correct copy of Brinckerhoff, FTC Informal Staff Opinion

8 Letter, dated July 26, 1985.

9           3.  Exhibit B is a true and correct copy of Brinckerhoff, FTC Informal Staff Opinion

10 Letter, dated July 30, 1985.

11         4.  Exhibit C is a true and correct copy of Brinckerhoff, FTC Informal Staff Opinion

12 Letter, dated September 24, 1985.

13         5.  Exhibit D is a true and correct copy of Brinckerhoff, FTC Informal Staff Opinion

14 Letter, dated November 6, 1985.

15         6.  Exhibit E is a true and correct copy of Brinckerhoff, FTC Informal Staff Opinion

16 Letter, dated April 30, 1987.

17         7.  Exhibit F is a true and correct copy of Brinckerhoff, FTC Informal Staff Opinion

18 Letter, dated May 7, 1987

19         8.  Exhibit G is a true and correct copy of Brinckerhoff, FTC Informal Staff Opinion

20 Letter, dated October 8, 1995.

21         9.  Exhibit H is a true and correct copy of Brinckerhoff, FTC Informal Staff Opinion

22 Letter, dated September 17, 1985.

23        10. Exhibit I is a true and correct copy of FTC Official Staff Commentary §605(a)(4)

24 item 1.

25        11. Exhibit J is a true and correct copy of Lamb, FTC Informal Staff Opinion Letter,

26 dated December 23, 1997.

27        12. Exhibit K is a true and correct copy of Amasan, FTC Informal Staff Opinion Letter,

28 dated February 15, 2000.

1        13. Exhibit L is a true and correct copy of Fitzpatrick, FTC Informal Staff Opinion Letter,

2 dated March 8, 1985.

3        14. Exhibit M is a true and correct copy of Peeler, FTC Informal Staff Opinion Letter,

4 dated August 8, 1979.

5        15. Exhibit N is a true and correct copy of the Order re: Defendant's Motion to Dismiss,

6 *Redd v. Arrow Fin. Servs.*, No. 03 C 1341 (July 23, 2003).

7       Executed under penalty of perjury under the laws of the United States and the State of

8 California this 21st day of March, 2005 at San Diego, California.

9

10

11

12                                 ELIZABETH J. ARLEO

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28 M:\05-1009 Gonzales v Arrow\Pleadings\05-1009 Decl of EJA for MTD SUPP DOCS.doc

A law firm may not obtain the credit report of an individual simply because he or she is a participant in civil litigation. None of the purposes under section 604 of the FCRA, discussed in the previous paragraph, exists to permit the law firm to obtain a credit report.

I hope that this information is helpful to you. These comments constitute an informal staff opinion, which is not binding on the Commission.

Sincerely,

Kim M. Garman, Attorney
Division of Credit Practices

July 26, 1985

Dear _____:

This letter is in reference to your telephone conversation and visit with Beverly Childs of this Division, and your letter to her. You requested us to provide you with our opinion as to when the seven year period begins to run for reporting information under the Fair Credit Reporting Act ("FCRA"), if (1) a creditor does not report the status of an account to the credit bureau and delays reporting to the credit bureau for a year or more, and/or (2) the account is later paid off.

Section 605(a)(4) of the FCRA states that a consumer reporting agency may not make a consumer report containing any information on accounts "placed for collection" or "charged to profit and loss" which antedates the report by more than seven years, with certain exceptions. It is the Commission staff's position that the seven year period would begin to run when the account is subject to collection activity or is charged off, whichever comes first. The fact that either (1) the creditor reports the account to the credit bureau, or (2) the consumer makes a partial or complete payment on a delinquent account, at a later date, would not change the allowable reporting period. Therefore, if an account was placed for collection in 1980, reported to a credit bureau in 1981, and paid off in 1982, the seven year period would begin to run from the 1980 date. For your information, I have enclosed a copy of the Fair Credit Reporting Act and a brochure which you may find helpful.

This is an informal staff opinion and is not binding on the Commission.

Sincerely yours,

Clarke Brinckerhoff,
FCRA Program Advisor
Division of Credit Practices

July 29, 1985

Mr. Roger H. Schmedlen
World Investigations & Security
  Engineers, Inc.
21819 West Nine Mile Road
Southfield, Michigan  48075

Dear Mr. Schmedlen:

This response to your letter dated June 5, 1985, in which you ask whether you, and your insurance company client, have a permissible purpose to obtain consumer reports on insurance claimants under the Fair Credit Reporting Act (the "Act"). You suspect that certain claimants are "employed performing activities inconsistent with the claim." You state your belief that a credit report would help your investigation, and that you

would be able to obtain a report under the Act because it would be for "insurance reasons - or at the least for legitimate business purposes."

Section 604(3)(C) of the Act provides that a consumer report may be provided where the user "intends to use the information in connection with the underwriting of insurance involving the consumer" (emphasis added). This would clearly not cover your situation, because you would be using the report to investigate insurance claims, not for underwriting purposes (e.g., whether or not a policy should be provided, or what premium should be charged).

Section 604(3)(E) of the Act permits a consumer report to be provided to a party that "otherwise has a legitimate business transaction involving the consumer." It has been staff's position that this subsection does not provide a permissible purpose for a consumer reporting agency to issue a consumer report to an insurer to investigate claims. See discussion in our "Compliance with the Fair Credit Reporting Act" manual (top of page 47), a copy of which is enclosed. If section 604(3)(E) were interpreted to cover insurance claims purposes, it would render meaningless the limitation in section 604(3)(C) to the underwriting of insurance, along with the similar reference to a consumer's "eligibility for . . . insurance" (emphasis added) in the definition of "consumer report" in section 603(d)(1). In other words, our view is that an insurer (or its agent) has a permissible purpose to obtain a consumer report for underwriting purposes, but not to evaluate a claim. This analysis was adopted in Cochran v. Metropolitan Life Ins. Co., 472 F. Supp. 827, 831 (N.D. Ga. 1979). However, one early court decision expressed a contrary conclusion. See Beresh v. Retail Credit Co., 358 F. Supp. 260 (C.D. Cal. 1973).

For the reasons stated above, it is the FTC staff's opinion that an insurer, or an investigator for the insurer, does not have a permissible purpose to receive (and that a consumer reporting agency may not provide) a consumer report for the purpose of investigating an insurance claim, under section 604 of the Fair Credit Reporting Act.

The views expressed in this letter constitute informal staff opinion and are not binding on the Commission.

Sincerely yours,

Clarke Brinckerhoff
FCRA Program Advisor
Division of Credit Practices

July 30, 1985

Dear _____:

This responds to your letter dated June 24, 1985, to Beverly Childs of this Division. You report that you owed approximately $4200 for a student loan upon graduation from college in 1976 (which was guaranteed by the Massachusetts Higher Education Office Assistance Program), that you fell behind in your payments because of a period of unemployment from July 1977 through July 1978, and that the loan was placed with a collection agency in June 1978. You also report that a copy of your credit history from the Credit Bureau, Inc. of Washington, D.C. (which you obtained in November 1984) shows this as a bad debt, and that you were turned down for a $2,000 consumer loan by a local bank in May 1985 because of a poor credit rating. Specifically, you asked our opinion as to

when the seven year period begins to run for reporting adverse information under the Fair Credit Reporting Act (the "Act").

As you know from the research you have already done on the Act, section 605(a)(4) states that a consumer reporting agency may not make a consumer report containing any information on accounts "placed for collection" or "charged to profit and loss" which antedate the report by more than seven years, in most cases. In our view, the seven year period begins when the account is actually charged off or placed for collection, whichever comes first. Therefore, since your educational loan account was placed with an outside agency for collection in June 1978, the seven year period would begin to run from the June 1978 date, if not earlier. (If there was significant collection activity on the account or it was charged off before it was turned over to the collection agency, the date of the charge-off or earlier collection activity would start the seven year period.) In other words, the account is now "obsolete" under section 605(a)(4).

You should note, however, that under section 605(b) there is no time limit on reporting adverse information if the consumer report is made in connection with a credit or insurance transaction of $50,000 or more, or employment at an annual salary of $20,000 or more. Because section 605 only prohibits reporting adverse information more than seven years old in most cases, a credit reporting agency may retain adverse information in its files beyond that time, so that the information may be reported in the excepted circumstances (e.g., where the consumer applies for a credit amount in excess of $50,000).

In sum, the credit bureau may no longer report information about your educational loan account when you apply for consumer loans such as the $2,000 bank loan you sought in May 1985, although it may retain the item in your file for reporting in regard to situations permitted by the Act.

The views expressed in this letter constitute informal staff opinion, and are not binding on the Commission.

I hope this information has been helpful to you. If you have any further questions, please feel free to call me at 724-1144.

Sincerely yours,

Clarke Brinckerhoff
FCRA Program Advisor
Division of Credit Practices

[N.B. Two separate letters of same date by same author were issued].

July 30, 1985

Dear _____:

This responds to your recent inquiry that (1) attached a letter dated May 31, 1985, from TRW Information Services Division ("TRW") refusing to include information you had submitted about a credit account not shown in your TRW credit file, and (2) alleged that TRW was thereby violating the Fair Credit Reporting Act (the "Act").

In our opinion, the Act does not require a credit bureau (such as TRW), upon a consumer's request, to add information about accounts that are not included in that consumer's credit file. Section 611 of the Act does require a consumer reporting agency to reinvestigate when a consumer disputes (in good faith) the accuracy or

completeness of a particular "item" of information in his or her credit file, but it does not require the addition of information about new accounts not included in the file. No provision of the Act requires that a consumer report include all possible information about a consumer. It is my understanding that some credit bureaus will amend a consumer's file upon request to include information about new accounts, for which service they are entitled to charge a reasonable fee.

Another regulation, issued under the Equal Credit Opportunity Act, requires a creditor, when it considers credit history in evaluating an application, to also consider any information presented by the consumer tending to indicate that the credit history being considered does not accurately reflect his or her creditworthiness [Regulation B § 202.6(b)(6)(ii)]. This regulation, a copy of which is enclosed, may assist you in dealing with any creditor who questions your credit record. The creditor is not required to revise its decision, but it is required to consider the additional information you offer, such as the account you wanted TRW to add to your file.

The views expressed in this letter constitute informal staff advice and are not binding on the Commission.

Sincerely yours,

Clarke Brinckerhoff, Attorney
Division of Credit Practices

[N.B.: Two separate letters of same date by same author were issued].

August 14, 1985

Dear _____:

This responds to your letter dated July 1, 1985, in which you ask whether you, as a licensed private investigator, would have a permissible purpose under Section 604 of the Fair Credit Reporting Act (FCRA) to obtain consumer reports from credit bureaus, under two sets of circumstances.

First, you ask whether the FCRA permits you to obtain a consumer report on an individual, who is a judgment debtor, to assist an attorney, who is your client, in recovering the amount owed by the debtor to the judgment creditor, who is the attorney's client.

The answer is yes. Section 604(3)(A) of the FCRA permits a consumer reporting agency to furnish a consumer report to a party for its use in collecting an amount owed by the report subject in connection with a credit transaction. Entry of a judgment that includes an award of damages creates a creditor-debtor relationship that permits a party to obtain a consumer report on the judgment debtor for the party's use in collecting the judgment for the judgment creditor.

Second, you ask whether the FCRA permits you to obtain a consumer report on an individual, who has suffered a personal injury, for use by an attorney in preparing to defend a claim relating to the injury that has been or may be filed by that individual against the attorney's client.

The answer is no. The possibility that a party may be involved in litigation involving a consumer does not provide a permissible purpose for that party (or anyone acting on its behalf) to receive a consumer report on the consumer, because litigation is not a "business transaction" involving the consumer under Section 604(3)(E) and

an account is delinquent.  Different ratings are
used for denoting the severity of delinquent
accounts (e.g., the number of late payments or
missed payments).  The frequency with which
creditors report changes in account status to
credit bureaus may vary, and the Act does not
specify how frequently such changes must be
reported.

    2.   How is the effective date of this seven
year period determined?

Credit bureaus' reporting of accounts placed
for collection or charged for profit and loss is
subject to Section 605(a)(4) of the FCRA.  The
seven year reporting period provided by this
subsection begins to run when collection activity
commences on the account or the account or the
account is charged off, whichever comes first.

Reporting of delinquent accounts that have not
been placed for collection or charged to profit
and loss is subject to Section 605(a)(6), which
prohibits the reporting of "Any other adverse item
of information which antedates the report by more
than seven years."  The seven year allowable
reporting time provided by this regularly
scheduled payment on the account.

The seven year reporting period for any
delinquent account (whether or not placed for
collection or charged off) is not extended by the
time it takes the creditor to report the status of
the account to a credit bureau, or by any other
subsequent occurrence.

    3.   Can you fill me in on the specifics
concerning effective dates in question
and subsequently, how do I have these
credit ratings expunged from my report
should I find the seven year statute
expired?

The FCRA does not require that consumer
reporting agencies delete adverse information from
their files upon expiration of the period for
which it may be reported under Section 605(a) of
the FCRA, although some do so as a matter of
practice.  Because Section 605 only prohibits
reporting adverse information more than seven
years old in most cases, a consumer reporting
agency may retain adverse information in its files
beyond that time and report it in the excepted
circumstances (e.g., where the consumer applies
for credit in a principal amount at least equal
to $50,000).

    4.   Doesn't my earnest effort and
accomplished -0- balances merit some type
of "Good Faith" rating?

Consumer reporting agencies may report the
fact that an account has been delinquent at any
point in its history, regardless of the consumer's
efforts to pay as agreed, and regardless of
whether the consumer has other accounts that are
not delinquent.  However, if the consumer has
brought a particular reported account current (or
paid it off entirely), that fact should be
reported.

I hope this discussion provided will be of
assistance.  The views set forth are staff opinion
that is advisory in nature and not binding upon
the Commission.

                   Sincerely,

                   David G. Grimes, Jr.
                   Attorney
                   Division of Credit Practices

---

                   September 24, 1985

Dear _____:

This responds to your letter dated September
6, 1985, in which you pose several questions
concerning the proper interpretation of section
605(a)(4) of the Fair Credit Reporting Act (the
"Act").

You report that your account with Chase
Manhattan Bank (the "bank") was closed in October
1979 and that the bank's in-house staff undertook
collection activities at that time, that the bank
charged the account off to profit and loss in
August 1983, and that the bank placed the account
with an outside collection agency in August 1983
or shortly thereafter.  In response to your recent
inquiries, the bank and at least one of three
credit bureaus are reporting this account as part
of your credit history contended that the item
could be reported for seven years from the date
the account was placed with an outside collection
agency, notwithstanding the earlier collection
activity on the account.

Section 605(a)(4) of the Act provides that, in
most cases, a credit bureau may not report
"accounts placed for collection or charged to
profit and loss which antedate the report by more
than seven years."  In the FTC staff's opinion,
the seven year period starts to run when either
collection activity begins or the account is
charged off, whichever comes first.  Furthermore,
it is our view that an account on which collection
activity was undertaken by an in-house unit would
be considered "placed for collection" under this
section, if the collection action consisted of
more than a simple "reminder" notice that was sent
by the creditor when a payment was missed.
Therefore, if your statement that the bank
undertook collection activities on the account in
October 1979 is accurate, a credit bureau would
violate section 605(a)(4) if it reported the
account after October 1986, in most cases.
Neither of the two subsequent events you described
-- the "charge off" or the assignment to an
outside debt collector -- would extend that date.

You should note that section 605(b) of the Act
provides an exception to the foregoing, in that
there is no time limit on reporting adverse
information if the consumer report is made in
connection with a credit or insurance transaction
of $50,000 or more, or employment at an annual
salary of $20,000 or more.  Because section 605
only prohibits reporting adverse information more
than seven years old in most cases, a credit
reporting agency may retain adverse information in
its files beyond that time, so that the
information may be reported in the excepted
circumstances (e.g., where the consumer applies
for credit in a principal amount at least equal to
$50,000).

I hope this information is of assistance to
you.  You should feel free to circulate this
letter to the bank and any or all of the three
credit bureaus listed in your letter.

The views expressed in this letter constitute
informal staff opinion and are not binding on the
Commission.

                   Sincerely yours,

                   Clarke Brinckerhoff
                   FCRA Program Advisor
                   Division of Credit Practices

There is no requirement under section 606 of the FCRA that the Secret Service disclose to [your client] that it was obtaining a report concerning him unless the report was an investigative consumer report (i.,e. a report containing certain information obtained through personal interviews, as specified in section 603(e)). Further, even if the Secret Service sought an investigative consumer report on [your client], section 606(a)(2) provides that it was not required to make any disclosure to him if the report was to be used for employment purposes for which he had not specifically applied.

The Commission staff does not intervene on behalf of individual consumers, who have the right to sue and recover damages under section 616 or 617, for noncompliance by consumer reporting agencies or users of consumer reports. We will retain the information you have furnished for reference in connection with the Commission's administrative enforcement responsibilities under the FCRA. The views expressed are staff opinion that is advisory in nature and not binding upon the Commission. I hope the discussion will be helpful.

Sincerely,

David G. Grimes, Jr.
Attorney
Division of Credit Practices

November 6, 1985

Dear _____:

This responds to your letter dated October 22, 1985, to Beverly Childs of this office, concerning the time limitations imposed by Section 605 of the Fair Credit Reporting Act on reporting of credit account information by consumer reporting agencies. You ask, "When does the 'clock start to run' on the 7 year limitation on the reporting of obsolete information?" You report, "Some credit bureaus believe that the 'clock starts to run' from the 'date of last activity' on the account or from the 'date the credit grantor reported the item.'"

Section 605(a)(4) provides that, in most cases, a consumer reporting agency may not make a consumer report containing any information on accounts "placed for collection" or "charged to profit and loss" that antedate the report by more than seven years. It is the Commission staff's opinion that the seven year period would begin to run when collection activity commences on the account or the account is charge off, whichever comes first. The fact that at a later date either (1) the creditor reports (or reconfirms the state of) the account to the credit bureau, or (2) the consumer makes a partial or complete payment on a delinquent account, would not change the allowable reporting period.

Section 605(a)(6) provides a seven year reporting period for "any other adverse item of information," which would include a credit account if there was no charge off or placement for collection. In that case, the allowable reporting time would normally be measured from the date of the last regularly scheduled payment on the account, not necessarily the "date of last activity" as you appear to have been informed by one or both of the credit bureaus you have contacted.

In sum, the FTC staff does not agree with the contention you attribute to certain credit bureaus that the "date of last activity" or "date the credit grantor reported the item" constitutes the

start of the allowable 7 year reporting period for a credit account. If the amount has been (1) placed for collection or (2) charged off, the actual date of that event controls. If neither of these two events occurred, the date of the last regularly scheduled payment would start the period.

You should note that section 605(b) provides an exception to the foregoing, in that there is no time limit on reporting adverse information if the consumer report is made in connection with a credit or insurance transaction of $50,000 or more, or employment at an annual salary of $20,000 or more. Because section 605 only prohibits reporting adverse information more than seven years old in most cases, a credit reporting agency may retain adverse information in its files beyond that time, so that the information may be reported in the excepted circumstances (e.g., where the consumer applies for credit in a principal amount at least equal to $50,000).

I hope this information is of assistance to you. You should feel free to circulate this opinion to either of the two credit bureaus listed in your letter.

The views expressed in this letter constitute informal staff opinion, and are not binding on the Commission.

Sincerely yours,

Clarke Brinckerhoff
FCRA Program Advisor
Division of Consumer
  Practices

November 15, 1985

Dear _____:

This responds to your letter dated November 7, 1985, in which you asked the FTC staff's view of the length of time a consumer bankruptcy may be reported under section 605 of the Fair Credit Reporting Act (the Act), assuming the report does not fall within any of the exceptions listed in section 605(b) of the Act.

In our opinion, the date the consumer files a voluntary bankruptcy petition starts the ten year reporting period permitted by the Act. Section 605(a)(1) of the Act measures the period from the date of "entry of the order for relief or the date of adjudication" (emphasis added). Since the Bankruptcy Act (11 U.S.C. § 301) states specifically that a voluntary bankruptcy filing "constitutes an order for relief," the date of that filing of the petition starts the period provided by section 605(a)(1) of the Act. The fact that a voluntary bankruptcy is thereafter dismissed on the consumer's motion would not change the permissible reporting period, because the Act permits the reporting of the filing (order for relief) for ten years.

To the extent that the FTC staff's manual or prior informal opinions are contrary to the foregoing, they do not represent the present staff's views on this issue.

This letter is an informal staff opinion, and therefore is not binding on the Commission.

Sincerely yours,

Anne P. Fortney
Associate Director
  for Credit Practices

*Informal FTC Letters*                                    **Appx. D Apr. 30, 1987**

David G. Grimes, Jr.
Attorney
Division of Credit Practices

April 16, 1987

Dear _____:

This is in reply to your correspondence requesting a staff opinion concerning the requirement in Section 611(c) of the Fair Credit Reporting Act (FCRA), 15 U.S.C. 1681i(c), that a consumer reporting agency clearly note that information is disputed.

Section 611 sets forth required procedures to be followed by consumer reporting agencies in connection with cases of disputed accuracy. The initial procedures appear in Section 611(a). Section 611(a) requires that whenever a consumer conveys a dispute of the completeness or accuracy of an item of information contained in his file to a consumer reporting agency, the agency must, unless it has reason to believe that the dispute is frivolous or irrelevant, reinvestigate and record the current status of the disputed item. That section also requires that the consumer reporting agency promptly delete information that, after reinvestigation, is found to be inaccurate or can no longer be verified.

Additional procedures are contained in Section 611(b) and Section 611(c). Section 611(b) states that if reinvestigation does not resolve the dispute, the consumer may file a brief statement of the nature of the dispute. Section 611(c) provides that:

> whenever a statement of a dispute is filed, unless there is a reasonable grounds to believe that is frivolous or irrelevant, the consumer reporting agency shall, in any subsequent consumer report containing the information in question, *clearly note that it is disputed* and provide either the consumer's statement or a clear and adequate codification of summary thereof. (emphasis added)

You have inquired whether the underlined language in Section 611(c) requires _____ and _____ [credit bureaus], two consumer reporting agencies, to report items for which such dispute statements have been filed as "Dispute Litigation Pending" (DLP) or "Dispute Resolution Pending" (DRP), two categories that you state that agencies use to denote only neutral ratings (not positive or negative ratings).

In our view, the phrase "clearly note that it is disputed" in Section 611(c) requires, when a consumer has filed dispute statement concerning an item of information, that the consumer reporting agency include a clear notation that such item has been disputed in any subsequent consumer report containing that item (in addition to including the consumer's statement or a codification or summary of it). However, that provision neither requires that an item covered by such a dispute statement be rated neutral, nor precludes a consumer reporting agency from assigning that item a negative rating. Furthermore, Section 611(c) does not require that any particular terminology (such as "DLP" or "DRP") be used to denote that an item is disputed. Accordingly, we conclude that while consumer reporting agencies must clearly note that such items have been disputed, they may assign negative ratings to such items and may use any terminology that clearly notes that these items have been disputed.

The views set forth in this letter constitute staff opinion that is advisory in nature and not binding upon the Commission.

Sincerely,

David G. Grimes, Jr.
Attorney
Division of Credit Practices

April 17, 1987

Dear _____:

This is in reply to your letter of April 7, 1987, inquiring whether the Fair Credit Reporting Act (FCRA) prohibits a creditor that obtains consumer reports from a consumer reporting agency for use in making credit decisions, from regularly releasing consumer reports to those report subjects who have been denied credit. You also asked whether the creditors would incur other obligations under the FCRA by releasing such reports. The creditor obtains consumer reports only for its own use in making credit decisions involving the report subjects and does not disseminate consumer reports, except as described above.

In the staff's view, the FCRA does not prohibit the creditor from releasing consumer reports (e.g., by providing copies or allowing consumer to see reports) to the subjects of the reports. Furthermore, we believe that this activity would not render the creditor a "consumer reporting agency," because that term is defined in Section 603(f) of the FCRA to include only those that assemble or evaluate information for the purpose of furnishing consumer reports to "third parties." We do not construe the term "third parties" in Section 603(f) to include subjects of consumer reports.

The creditor would not incur additional obligations under the FCRA by virtue of releasing copies of consumer reports to report subjects. It would not, however, thereby be released from any other applicable requirements of the FCRA. For example, Section 615 states, inter alia, that a report user must provide specified information to a consumer who is the subject of adverse credit action, based in whole or in part on information in a consumer report from a consumer reporting agency.

The Commission has not addressed the issues you have raised. The views set forth in this letter constitute staff opinion that is advisory in nature and not binding upon the Commission.

Sincerely,

David G. Grimes, Jr.
Attorney
Division of Credit Practices

April 30, 1987

Dear _____:

Your letter dated April 7, 1987, to our Cleveland Regional Office has been referred to me for reply. You asked when the seven year limitation on reporting adverse credit account information by credit bureaus, as set forth in section 605 of the Fair Credit Reporting Act (FCRA), would start to run.

Section 605(a)(4) states that a consumer reporting agency may not make a consumer report containing any information or accounts "placed for collection" or "charged to profit and loss" that antedate the report by more than seven years. It is the Commission staff's opinion that the seven year period would begin to run on (1) the date that dunning notices or other collection efforts

are first initiated on the account, if it is reported as a "collection," or (2) the date the account is written off, if it is reported as a "charge off."

Section 605(a)(6) provides a seven year reporting period for "any other adverse item of information," which would include a credit account that had not been placed for collection or charged off. In that case, it is our opinion that the allowable reporting time would normally be measured from the date of the last regularly scheduled payment on the account.

In either case, the fact that at a later date either (1) the creditor reports the account to the credit bureaus or (2) the consumer makes a partial or complete payment on a delinquent account, would not change the allowable reporting period.

Of course, we realize that the foregoing analysis does not always provide a way for you to know for sure whether an item in one of your client's credit files is obsolete. Unless the consumer has independent evidence of the relevant date (i.e., dunning letters from the creditor or debt collector on a "collection" account), it will often be necessary to contact the creditor in order to get information to ascertain that date.

You should note that section 605(b) provides an exception to the foregoing, in that there is no time limit on reporting adverse information if the consumer report is made in connection with a credit or insurance transaction involving a principal amount of $50,000 or more, or employment at an annual salary of $20,000 or more. Because section 605 only prohibits reporting adverse information more than seven years old in most cases, a credit reporting agency may retain adverse information in its files without any time limitation, so that the information may be reported in the expected circumstances (e.g., where the consumer applies for credit in a principal amount at least equal to $50,000).

Please feel free to call me (202-326-3208) if you have any questions. We would be most interested in receiving any evidence you may have concerning violations of section 605 of the FCRA.

I hope this information is of assistance to you. The views expressed in this letter constitute informal staff opinion and are not binding on the Commission.

Sincerely yours,

Clarke W. Brinckerhoff
FCRA Program Advisor
Division of Credit Practices

May 1, 1987

Dear _____:

This responds to your letter dated April 15, 1987. You described a sequence of events in which a bank (1) receives a credit application that is referred by a retail store, (2) obtains a credit report to aid its evaluation of the consumer's application, (3) rejects the application as not up to its credit standards, providing required notice to the consumer, and (4) returns the application to the store so that it may decide whether to extend credit directly to the consumer. You ask whether, if the bank transmits its copy of the credit report to the retail store when it returns the application, it may become a "consumer reporting agency" under section 603(f) of the Fair Credit Reporting Act ("FCRA").

A creditor may well be classed as a "consumer

reporting agency", under the definition provided in section 603(f) of the FCRA if it regularly conveys consumers' credit reports to another creditor without the consumer's request after it has rejected their applications. However, if a rejected applicant specifically requests that his or her credit report obtained by one creditor (i.e., the bank, in your case) be forwarded to another creditor (i.e., the store), we would view the store as a "joint user" of the information with the forwarding creditor, so that the latter party would not be considered a "consumer reporting agency."

The foregoing analysis benefits the consumer, at the same time it realistically reflects the roles of the creditors involved in the evaluation process. The contrary view could result in a consumer's paying the second creditor to do a repeat credit check or being inconvenienced by delay in the follow-up application, even though the consumer was willing to have the first creditor pass the application file (including his or her credit report) along to the second creditor.

The views expressed in this letter constitute informal staff opinion and are not binding on the Commission.

Sincerely yours,

Clarke W. Brinckerhoff
FCRA Program Advisor
Division of Credit Practices

May 4, 1987

Dear Ms. _____:

This responds to your letter dated April 15, 1987, in which you asked about the applicability of the Fair Credit Reporting Act ("FCRA") to a situation where a lender obtains consumer reports for business or commercial purposes, or where information collected for commercial purposes is furnished in a report to be used for consumer purposes.

Where information in an individual's consumer report file is included in a report for use in connection with a commercial purpose such as the extension of business credit, it is the FTC staff's view that the FCRA would not be applicable, although we realize the authorities are not unanimous on this point. We believe that Congress' intent in enacting the FCRA was to protect consumers, not business debtors, as indicated by the legislative history:

"The purpose of the fair credit reporting bill is to protect consumers from inaccurate or arbitrary information in a consumer report, which is used as a factor in determining an individual's eligibility for credit, insurance or employment. It does not apply to reports utilized for business, commercial or professional purposes." Conference Report on H.R. 15073, 116 Cong. Rec. 36572 (Oct. 13, 1970).

I have enclosed an FTC staff letter dated April 9, 1984, which deals with the question of the applicability of the FCRA to information collected for consumer purposes but used for commercial purposes (specifically, reports on individuals used in connection with loans to businesses controlled by such parties). It cites court cases in addition to legislative history on the issue, in support of the view that the provision of information in this context should not be

*Informal FTC Letters*

considered the furnishing of a "consumer report"
under section 603(d) of the FCRA.

Where information about an individual's
business practices is reported for consumer
purposes, the item will normally be a "consumer
report" under section 603(d), which covers all
communications "by a consumer reporting agency
(concerning a consumer's credit worthiness, etc)
which is used . . . for the purpose of serving as
a factor in establishing the consumer's
eligibility for . . . credit" (or other consumer
purposes). Of course, an exception would occur if
the report was made by a party that was not a
"consumer reporting agency" under the definition
set forth in section 603(f) (e.g., this type of
report was not made "regularly"), because a report
is only a "consumer report" under the quoted
definition if it was made by such an agency.

The views set forth in this letter constitute
informal staff opinion and are not binding on the
Commission.

Sincerely yours,

Clarke W. Brinckerhoff
FCRA Program Advisor
Division of Credit Practices

May 5, 1987


Dear _____:

This responds to your letter dated April 28,
1987, in which you asked the FTC staff's opinion
as to what constitutes the "date of entry" of a
satisfied judgment under section 605(a)(2) of the
Fair Credit Reporting Act (FCRA). You stated that
it was your opinion that the operative date is the
date the judgment was entered on the court record,
but others had informed you that it was the date
it is paid in full.

In most cases, section 605(a)(2) prohibits the
reporting of "(s)uits and judgments which, from
date of entry, antedate the report by more than
seven years or until the governing statute of
limitations has expired, whichever is the longer
period." In the FTC staff's opinion, the "date of
entry" of a judgment is the date the court
rendered the judgment, not the date of payment.
Therefore, a satisfied judgment may usually not be
reported after seven years from the date the court
rendered the judgment, regardless of when it was
paid. Of course, if the judgment is not paid, the
section specifically provides that the item may be
reported longer than seven years if the operative
statute of limitations has not expired.

You should note that section 605(b) provides
an exception to the foregoing, in that there is no
time limit on reporting adverse information if the
consumer report is made in connection with a
credit or life insurance transaction in an amount
of $50,000 or more, or employment at an annual
salary of $20,000 or more. Because section 605
only prohibits reporting adverse information more
than seven years old in most cases, a consumer
reporting agency may retain adverse information in
its files without any time limitation, so that the
information may be reported in the excepted
circumstances (e.g., where the consumer applies
for credit in a principal amount at least equal to
$50,000).

We would be most interested in receiving any
evidence you may have concerning violations of
section 605 of the FCRA, if you would be kind
enough to forward it to us.

I hope this information is of assistance to
you. The views expressed in this letter
constitute informal staff opinion and are not
binding on the Commission.

Sincerely yours,

Clarke W. Brinckerhoff
FCRA Program Advisor
Division of Credit Practices

May 7, 1987


Dear Mr._____:

This responds to your letter to our Los
Angeles office dated April 8, 1987. You attached
a copy of your credit profile on the described as
"pd chg off" and another as "pd coll acc" -- on
your form. You asked our interpretation of
section 605 of the Fair Credit Reporting Act as to
the length of time the items may be reported.

Section 605(a)(4) states that a consumer
reporting agency may not make a consumer report
containing any information on accounts "placed for
collection" or "charged to profit and loss" that
antedate the report by more than seven years. It
is the Commission staff's opinion that the seven
year period would begin to run on (1) the date
that dunning notices or other collection efforts
are first initiated on the account, if it is
reported as a "collection," or (2) the date the
account is written off, if it is reported as a
"charge off." In either case, the fact that at a
later date some other event occurs -- such as (1)
the creditor reports the account to the credit
bureau, or (2) the consumer makes a partial or
complete payment on a delinquent account -- would
not change the allowable reporting period. Of
course, reports furnished for purposes set forth
in section 605(b) are not subject to these
limitations.

Please feel free to call me (202-326-3208) if
you have any questions about our position on these
issues.

I hope this information is of assistance to
you. The views expressed in this letter
constitute informal staff opinion and are not
binding on the Commission.

Sincerely yours,

Clarke W. Brinckerhoff
FCRA Program Advisor
Division of Credit Practices

May 12, 1987


Dear _____.

This is in reply to your letter of April 17,
1987, to Mr. Brinckerhoff, raising a number of
questions concerning application of the Fair
Credit Reporting Act (FCRA).

You inquired whether Section 604 would permit
businesses to obtain reports from consumer
reporting agencies on corporations and their
principals, for the businesses' use in connection
with business transactions involving the
corporations or use in connection with judgments
the businesses have obtained against the
corporations. Reports on corporations, rather
than individuals, are not "consumer reports" and
therefore their dissemination is not restricted by

Your first question is whether the bureau would be subject to the FCRA. The answer is "yes." The bureau would be a "consumer reporting agency" as defined in section 603(f) of the Act, and the information furnished on individuals to prospective employers would constitute "consumer reports" as defined in section 603(d) of the FCRA.

Your second question is whether the reports would constitute "investigative consumer reports," as defined in section 603(e) of the FCRA. The reports would be investigative consumer reports only if some (or all) of the information in the reports related to the subjects' character, general reputation, personal characteristics or mode of living, and was obtained through personal interviews.

Your third question concerns the meaning of section 606(a)(2) of the Act. Section 606(a) provides that a person may not procure or cause to be prepared an investigative consumer report on any consumer unless certain disclosures set out in section 606(a)(1) are made to the consumer except when, as provided in section 606(a)(2), "the report is to be used for employment purposes for which the consumer has not specifically applied." The term "employment purposes" is defined in section 603(h). Reading these provisions together, the disclosures set out in section 606(a)(1) must be furnished to the consumer whenever an investigative consumer report is procured or caused to be prepared, unless the report is to be used for employment purposes (e.g., evaluating a consumer for employment, promotion, or reassignment) in connection with a position for which the consumer has not specifically applied.

Your next question is whether the requirements of section 613 apply to public record information in a consumer report furnished for employment purposes, regardless of the source from which the consumer reporting agency obtained that information. The answer is "yes." Section 613 refers to the reporting of "items . . . which are matters of public record," regardless of the actual source used by the agency to compile the data. Therefore, employment reports containing public record information obtained from secondary sources (e.g., from a newspaper that reports "matters of public record"), are subject to its requirements.

By telephone call of September 30, 1985, Mr. _____ of your office requested that we also answer the question whether an employer that obtained a consumer report on a job applicant who was subsequently rejected solely on the basis of information not in a consumer report, would have to provide that applicant the notice described in Section 615(a) of the FCRA. The answer is "no." Under the language of Section 615(a), the notice would be required only when the rejection was "either wholly or partly because of information contained in a consumer report from a consumer reporting agency."

I hope the views provided will be helpful. They constitute staff opinion that is advisory in nature and not binding upon the Commission.

Sincerely,

David G. Grimes, Jr.
Attorney
Division of Credit Practices

October 8, 1985

Dear _____:

This responds to your letter dated September

27, 1985, to Beverly Childs of this Office, in which you asked about the length of time _____ [credit bureau] could legally report your auto loan account with [finance company]. You state that the loan was made to you and your wife in October 1976, but that you separated and divorced shortly after that time, and she retained the car without paying the loan.

Section 605 of the Fair Credit Reporting Act says how long an item can be reported. With respect to debts such as your _____ [finance company] account, different rules apply depending on whether or not the account has been either charged off or placed for collection.

Section 605(a)(4) states that a consumer reporting agency may not make a consumer report containing any information on accounts "placed for collection" or "charged to profit and loss" that antedate the report by more than seven years. It is the Commission staff's opinion that the seven year period would begin to run when collection activity commences on the account or the account is charged off, whichever comes first. Your letter does not indicate whether the account was placed for collection or charged off, but in the normal case it would have been. The seven year date would be measured from the date of such action, which would have probably occurred sometime in 1977 if (as you imply) the loan went into default quickly. The credit bureau's assertion that the operative date is April 1983 because that is the "last transaction" is hard to understand if the account was placed for collection or written off. Certainly, the fact that at a later date either (i) the creditor reports (or reconfirms the status of) the account to the credit bureau, or (2) the consumer makes a partial or complete payment on a delinquent account, would not change the allowable reporting period.

Section 605(a)(6) provides a seven year reporting period for "any other adverse item of information," which would include your [finance company] account if there was no charge off or placement for collection. In that case, the allowable reporting time would normally be measured from the date of the last regularly scheduled payment on the account, not necessarily the "last transaction" as you were informed by the credit bureau. Based on your letter, that would also probably be sometime in 1977 (and not the April 1983 date reported by the credit bureau), although we cannot be certain without reviewing the history of the account in detail.

In sum, we can not say for sure that information about your [finance company] account would be "obsolete" under section 605 of the Act, because you did not provide all the background facts and we therefore don't know the payment or collection history of the account. However, it seems likely that the seven-year period has expired and the item could not be reported, in most cases.

You should note that section 605(b) provides an exception to the foregoing, in that there is no time limit on reporting adverse information if the consumer report is made in connection with a credit or insurance transaction of $50,000 or more, or employment at an annual salary of $20,000 or more. Because section 605 only prohibits reporting adverse information more than seven years old in most cases, a credit reporting agency may retain adverse information in its files beyond that time, so that the information may be reported in the excepted circumstances (e.g., where the consumer applies for credit in a principal amount at least equal to $50,000).

I hope this information is of assistance to you. I am enclosing a copy of the Act and a brochure that describes it more fully, which may help you in correcting some errors you say exist in your credit file.

The views expressed in this letter constitute informal staff opinion and are not binding on the Commission.

Sincerely yours,

Clarke Brinckerhoff
FCRA Program Advisor
Division of Credit Practices

October 17, 1985

Dear _____ :

This responds to your letter dated September 30, 1985, concerning a complaint by Mr. _____ against _____ [credit bureau] for failing to (1) "respond to requests for corrections of incorrect file information" and (2) provide a free copy of Mr. _____ 's credit report.

The various pieces of recent correspondence enclosed with your letter indicate that Mr. _____ was rejected for an American Express Gold Card on July 31 based on a _____ [credit bureau] credit report that he was involved in a lawsuit, that he made two requests to [credit bureau] on August 12 and August 27 for a disclosure on his file, that _____ [credit bureau] made an oral disclosure to Mrs. _____, or September 4 of the file including reference to a 1980 suit against Mr. _____ by _____ [car dealership], that she advised _____ [credit bureau] on September 5 that the suit involved a $125 disputed repair bill that was resolved by the court in favor of Mr. _____, that [credit bureau] insisted on assessing a $10 charge to provide an actual copy of the credit report, that the fee was paid by Mrs. _____ on September 5 under protest, and that [credit bureau] had not provided the report when you wrote to us.

The Fair Credit Reporting Act (the "Act"), which became effective in 1971, was designed to protect consumers against the circulation of inaccurate or obsolete credit information. Enclosed for your information is a copy of that Act and a brochure that explains it more fully.

1. Section 611(a) of the Act provides that consumers may dispute the "completeness or accuracy" of any item in their credit file (which the _____ did by letter to _____ [credit bureau] dated September 5, enclosing a copy of the judgment in Mr. _____ 's favor), and requires that the _____ [credit bureau] must "record the current status" of the item after reinvestigating the matter. Therefore (assuming there is no genuine question about the judgment document submitted), if _____ [credit bureau] continues to report the litigation with the car dealership, it must state that the court ruled for the consumer, Mr. _____.

2. Section 609 of the Act provides that consumers have the right to be told the nature, substance, and sources of the information in their file at the credit bureau. Section 612 requires that the disclosure must be made without charge if it is requested within 30 days after the consumer receives notice of adverse action based on a report from that _____ [credit bureau]. However, the Act does not require that the consumer be provided with (or shown) an actual copy of the file. Therefore, it appears that

credit bureau fulfilled its basic obligation by making a free disclosure to Mrs. _____ over the telephone on September 4, and did not violate the FCRA by charging to provide a copy of the written report file to the _____ after it had made that disclosure. Of course, having accepted the _____ 's $10 check, it must now provide the copy.

Summing up the law with respect to the two issues you raised, the Act requires that _____ [credit bureau] must report that Mr. _____ prevailed in the _____ [car dealership] lawsuit, if it continues to report that item from his file, but it does not require that _____ [credit bureau] must provide an actual copy of Mr. _____ 's credit file without charge.

The views expressed in this letter constitute informal staff opinion, and are not binding of the Commission.

Sincerely yours,

Clarke W. Brinckerhoff
FCRA Program Advisor
Division of Credit Practices

October 23, 1985

Dear _____ :

This is in reply to your letter of October 8, 1985, stating that the Secret Service and _____ [credit bureau], may have violated the Fair Credit Reporting Act (FCRA) in connection with a report obtained by the Secret Service from _____ [credit bureau] concerning your client, Mr. _____, now a former employee of the Secret Service Uniformed Division. While you express the concern that the Secret Service and _____ [credit bureau], may have violated various provisions of the FCRA, the facts you have supplied (that the Secret Service obtained the report, and that your client was not notified of that fact) appear to relate to sections 604 and 606.

The Secret Service would have to have a permissible purpose under section 604 or the FCRA to obtain a complete consumer report on [your client] (Of course, as a governmental agency, the Secret Service may receive the consumer's name and present and former addresses and place of employment, as described in section 608 of the FCRA, from a consumer reporting agency, regardless of whether it has a permissible purpose to obtain a report under section 604.) If _____ [your client] was an employee at the time the Secret Service obtained a consumer report on him -- apparently April 25, 1984, according to the portion of his _____ [credit bureau] file submitted with your letter -- the Secret Service had a permissible purpose to obtain the report if the report was sought for "employment purposes" (as provided in section 604(3)(B)), which are defined (in section 603(h)) to include promotion, reassignment or retention as an employee. In other words, if the Secret Service was considering the possibility of terminating your client's employment (or promoting him or assigning him to another position), it could properly obtain a consumer report on him. If [your client] was not a Secret Service employee (or an applicant for such a position) when the Secret Service sought that report, the Secret Service would have needed another permissible purpose under section 604 to obtain the report, if the report contained more than the identifying information described in section 608.

no other permissible purpose exists under Section 604 of the FCRA.

I regret the delay in responding to your inquiry. I hope the views provided will be of assistance. They constitute informal staff opinion that is advisory in nature and not binding upon the Commission.

Sincerely,

David G. Grimes, Jr.
Attorney
Division of Credit Practices

August 29, 1985

Dear _____:

This responds to your letter dated August 19, 1985, to our Chicago Regional Office, in which you ask whether a creditor is forbidden "to disclose any information to an applicant regarding his/her credit report (because it is) not a consumer reporting agency." You attached a memorandum that referred to a letter by C. Lee Peeler, formerly with the Division, answering that there was no such prohibition under federal law.

The Fair Credit Reporting Act does not prohibit a lender from supplying a credit report to the loan applicant who is the subject of the report. I have enclosed the complete text of Mr. Peeler's letter (which was dated July 26, 1979) to which reference was made in the attachment to your letter, for your information.

This opinion is informal and not binding on the Commission.

Sincerely yours,

Clarke Brinckerhoff
Attorney
Division of Credit Practices

September 17, 1985

Dear _____:

This responds to your note to Bessie Wiley of the Correspondence Branch of the Secretary's office, postmarked July 30, 1985, in which you asked about the length of time an obligation can be reported on you by a credit bureau. In a previous letter dated July 1, 1985, you had indicated that you had a dispute with [credit bureau] about the reporting of your Diners Club account. As you know from our response to that letter, the Fair Credit Reporting Act applies to your question.

Section 605 of the Act says how long an item can be reported. With respect to debts such as your Diner Club account, different rules apply based on whether the account has been (1) charged off or placed for collection, (2) subject to litigation, or (3) falls into neither of those two categories.

1.    Section 605(a)(4) states that a consumer reporting agency may not make a consumer report containing any information on accounts "placed for collection" or "charged to profit and loss" that antedate the report by more than seven years. It is the Commission staff's opinion that the seven years period would begin to run when collection activity commences on the account or the account is charged off, whichever comes first. The fact that either (1) the creditor reports the account to the credit bureau, or (2) the consumer makes a partial or complete payment on a delinquent

account, at a later date would not change the allowable reporting period.

2.    Section 605(a)(2) states that "suits and judgments" may not be reported for more than seven years from the date of entry for until the governing statute of limitations has expired" if that is longer. In the staff's opinion, paid judgments cannot be reported for more than seven years after the judgment was entered, because in such circumstances there is no "governing statute of limitations" under this subsection that could lengthen the period.

3.    Section 605(a)(6) provides a seven year reporting period for "any other adverse item of information," which would include your Diners Club account if situation 1 or 2 was not applicable. In that case, the allowable reporting time would normally be measured from the date of the last regularly scheduled payment on the account.

You should not that section 605(b) provides an exception to the foregoing, in that there is no time limit on reporting adverse information if the consumer report is made in connection with a credit or insurance transaction of $50,000 or more, or employment at an annual salary of $20,000 or more. Because section 605 only prohibits reporting adverse information more than seven years old in most cases, a credit reporting agency may retain adverse information in its files beyond that time, so that the information may be reported in the excepted circumstances (e.g., where the consumer applies for credit in a principal amount at least equal to $50,000).

I hope this information is of assistance to you.

The views expressed in this letter constitute informal staff opinion and are not binding on the Commission.

Sincerely yours,

Clarke Brinckernoff
Attorney
Division of Credit Practices

September 24, 1985

Dear _____:

This is in reply to your letter of August 14, 1985, in which you set forth four specific questions concerning _____ [credit bureau] reporting of delinquent credit account ratings.

As noted in the Commission staff pamphlet enclosed with your letter, the Fair Credit Reporting Act (FCRA) limits the periods for which adverse information may be included in consumer reports, except for reports furnished in connection with a credit or life insurance transaction involving a principal or face amount of $50,000 or more, or employment at an annual salary of $20,000 or more. Except for bankruptcies, which may be reported for ten years, Section 605(a) of the FCRA sets out seven year periods for the reporting of adverse information.

Your questions are listed and discussed below:

1.    When exactly is an account considered and reported delinquent?

Generally, creditors who provide information to credit bureaus report the status of all their consumer accounts. The most favorable rating is assigned to accounts that are "paid as agreed." If any payment in full is not made when due, then

lief" under this subsection. just like a filing under the Bankruptcy Act (11 U.S.C. 301).

*Section 605(a)(2)—"Suits and judgments which, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period."*

1. Operative Date

For a suit, the term "date of entry" means the date the suit was initiated. A protracted suit may be reported for more than seven years from the date it was entered, if the governing statute of limitations has not expired. For a judgment, the term "date of entry" means the date the judgment was rendered.

2. Paid Judgments

Paid judgments cannot be reported for more than seven years after the judgment was entered, because payment of the judgment eliminates any "governing statute of limitations" under this subsection that might otherwise lengthen the period.

*Section 605(a)(3)—"Paid tax liens which, from date of payment, antedate the report by more than seven years."*

1. Unpaid Liens

If a tax lien (or other lien) remains unsatisfied, it may be reported as long as it remains filed against the consumer, without limitation, because this subsection addresses only paid tax liens.

*Section 605(a)(4)—"Accounts placed for collection or charged to profit and loss which antedate the report by more than seven years."*

1. Placement for Collection

The term "placed for collection" means internal collection activity by the creditor, as well as placement with an outside collector, whichever occurs first. Sending of the initial past due notices does not constitute placement for collection. Placement for collection occurs when dunning notices or other collection efforts are initiated. The reporting period is not extended by assignment to another entity for further collection, or by a partial or full payment of the account. However, where a borrower brings his delinquent account to date and returns to his regular payment schedule, and later defaults again, a consumer reporting

agency may disregard any collection activity with respect to the first delinquency and measure the reporting period from the date the account was placed for collection as a result of the borrower's ultimate default. If an consumer's repayment agreement with a collection agency can be treated as a new account that has its own seven year period.

2. Charge to Profit and Loss

The term "charged to profit and loss" means action taken by the creditor to write off the account, and the applicable time period is measured from that event. If an account that was charged off is later paid in part or paid in full by the consumer, the reporting period of seven years from the charge-off is not extended by this subsequent payment.

3. Reporting of a Delinquent Account That is Later Placed for Collection or Charged to Profit and Loss

The fact that an account has been placed for collection or charged to profit and loss may be reported for seven years from the date that either of those events occurs, regardless of the date the account became delinquent. The fact of delinquency may also be reported for seven years from the date the account became delinquent.

*Section 605(a)(5)—"Records of arrest, indictment, or conviction of crime which, from date of disposition, release, or parole, antedate the report by more than seven years."*

1. Records

The term "records" means any information a consumer reporting agency has in its files relating to arrest, indictment or conviction of a crime.

2. Computation of Time Period

The seven year reporting period runs from the date of disposition, release or parole, as applicable. For example, if charges are dismissed at or before trial, or the consumer is acquitted, the date of such dismissal or acquittal is the date of disposition. If the consumer is convicted of a crime and sentenced to confinement, the date of release or placement on parole controls. (Confinement, whether continuing or resulting from revocation of parole, may be reported until seven years after the confinement is terminated.) The sentencing date

controls for a convicted consumer whose sentence does not include confinement. The fact that information concerning the arrest, indictment, or conviction of crime is obtained by the reporting agency at a later date from a more recent source (such as a newspaper or interview) does not serve to extend this reporting period.

*Section 605(a)(6)—"Any other adverse item of information which antedates the report by more than seven years."*

1. Relation to Other Subsections

This section applies to all adverse information that is not covered by section 605(a)(1)–(5). For example, a delinquent account that has neither been placed for collection, nor charged to profit and loss, may be reported for seven years from the date of the last regularly scheduled payment. (Accounts placed for collection or charged to profit and loss may be reported for the time periods stated in section 605(a)(4).)

2. Non Tax Liens

Liens (other than paid tax liens) may be reported as long as they remain filed against the consumer or the consumer's property, and remain effective (under any applicable statute of limitations). (See discussion under section 605(a)(3), *supra*.)

**Section 606—Disclosure of Investigative Consumer Reports**

*"(a) A person may not procure or cause to be prepared an investigative consumer report on any consumer unless—*

*(1) it is clearly and accurately disclosed to the consumer that an investigative consumer report including information as to his character, general reputation, personal characteristics, and mode of living, whichever are applicable, may be made, and such disclosure (A) is made in a writing mailed, or otherwise delivered, to the consumer, not later than three days after the date on which the report was first requested, and (B) includes a statement informing the consumer of his right to request the additional disclosures provided for under subsection (b) of this section; or*

*(2) the report is to be used for employment purposes for which the consumer has not specifically applied.*

*(b) Any person who procures or causes to be prepared an investigative consumer report on any consumer shall, upon written*

report is received. It would help ensure compliance if the consumer reports contain a clear and conspicuous reference to the fact that the summary of rights must be associated with each report as required by Section 604(b)(1)(B). In this scenario, the consumer reporting agency complies with Section 604(b)(1)(B) because it "provides (the summary) with the report" by ensuring that it is attached to the report upon receipt.

Please note that the consumer reporting agency is responsible for ensuring that the consumer report is joined with the summary of rights when its customer receives the report. The agency must ensure that its customers understand the duties imposed by Section 604(b) and will comply as appropriate.

I hope that this information is helpful to you. The views I have expressed constitute informal staff opinions and are advisory in nature and not binding on the Commission.

Sincerely,

William Haynes
Attorney
Division of Credit Practices

December 23, 1997

Jack Harvey, III
Regulatory Analyst
ALLTEL Information Services
Financial Services Division
4001 Rodney Parham Road
Little Rock, AR 72212-2496

Re: Sections 623(a)(3) and 623(a)(5) of the Fair Credit Reporting Act

Dear Mr. Harvey:

This is in response to your letter dated September 4, 1997 concerning the responsibilities of furnishers of information to consumer reporting agencies.

First, you ask whether a furnisher of information may cease reporting information disputed by a consumer until the furnisher and consumer have resolved the dispute. You note that ALLTEL believes it best to cease reporting disputed information until a resolution of the dispute is reached in order to be fair to the consumer and to supply the most accurate information for use by others in making business decisions concerning that consumer.

Section 623(a)(3) of the Fair Credit Reporting Act ("FCRA") concerns the reporting of information to consumer reporting agencies once the consumer has notified the furnisher that information is disputed. That section states that when a consumer disputes the completeness or accuracy of any information furnished to a consumer reporting agency, the information in question may not then be furnished without notice that it is disputed by the consumer. That provision addresses the furnisher's obligation only when the furnisher continues to report disputed information. The statute is silent on the matter of the furnisher ceasing to report information while it is investigating the dispute. It is thus the opinion of the Commission staff that a furnisher that temporarily ceases to report disputed information while it investigates the matter, and then either (1) corrects the information if its investigation results in

agreement with the consumer or (2) reports the item as disputed by the consumer where that is the result of the investigation, would comply with Section 623(a).

Second, you ask for clarification of the requirements concerning the reporting of delinquent accounts, specifically the requirement that the furnisher report the date of the commencement of the delinquency that immediately precedes a collection action, charge to profit or loss or other similar action. You note that compliance with this provision presents problems for data processing systems, particularly where an account has been delinquent for several payment periods prior to being placed for collection or similar action. Further, you note that it is your understanding that an alternate date, such as the due date or paid-to date at the time of the collection activity, would be sufficient for compliance purposes. I understand from my discussion with you that you define the "paid-to date" as the due date of the *last* paid periodic installment.

Section 623(a)(5) of the FCRA concerns the duty of furnishers to provide a notice of the delinquency date of accounts to consumer reporting agencies. This section provides that persons who furnish "information to a consumer reporting agency regarding a delinquent account being placed for collection, charged to profit or loss, or subjected to any similar action shall . . . notify the agency of the month and year of the commencement of the delinquency that immediately preceded the action." The provision is clear that furnishers must provide to consumer reporting agencies the month and year of the *commencement* of the delinquency that immediately preceded placement for collection, charge to profit and loss, or similar action. Thus, under the plain language of the statute there is no allowance for the use of an alternate, later date; you must use the statutory date for reporting. Use of the "paid-to-date" as that term is used in your accounting system is not acceptable.[1]

The legislative history indicates that Congress included the requirement of Section 623(a)(5) so that there would be a uniform date certain by which all consumer reporting agencies would compute the seven-year reporting period for adverse items of information. It was the intent that the seven year reporting period begin with the commencement of the delinquency rather than any other date.[2]

The views set forth in this letter are the views of the staff and are not binding on the Commission.

Yours truly,

Cynthia S. Lamb
Division of Credit Practices
Bureau of Consumer Protection

---

1  On the other hand, we would not challenge a decision, driven by administrative convenience, to use a date certain that was always earlier than the commencement of the delinquency, as there would be no consumer injury resulting.

2  H.R. Rep. No. 103-486, 103d Cong., 2d Sess. 35, 51 (1994); S. Rep. No. 103-209, 103d Cong., 1st Sess. 15, 25 (1993); H.R. Rep. No. 102-692, 102d Cong., 2d Sess. 28, 71 (1992).

in the decision to reject the job application. The two legal issues raised by your letter are whether Section 615(a)(2)(B) should be interpreted either (1) to require an employer to include statutory language in the notice when that terminology clearly misdescribes the particular way in which the employer and CRA interact in the hiring process, or (2) to prohibit a CRA from making hiring decisions on behalf of an employer. We believe that neither interpretation is appropriate, for the reasons set forth below.

1. In our view, an employer is not required to include the statement required by Section 615(a)(2)(B) when it is factually incorrect. Section 615(a) is designed to require consumer report users to provide consumers with a notice that informs them of what has occurred, and of certain rights they have under the FCRA. As originally enacted in 1970, Section 615(a) required only a very brief notice saying that the adverse action resulted from a CRA report, and providing the name and address of the CRA. The legislative history of the legislation that changed this provision, the Consumer Credit Reporting Reform Act of 1996,[2] shows that Congress considered the brief notice to be insufficient information for consumers.[3] Thus, it added several items to the required notice:

- The CRA's phone number (toll-free for nationwide credit bureaus)[§ 615(a)(2)(A)]
- The statement quoted in the previous paragraph, that the CRA "did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken," which describes the usual sequence of events where a CRA provides a report to its business client and has nothing to do with the action taken by its client [§ 615(a)(2)(B)]
- Disclosure of the most significant consumer rights provided by the FCRA (to obtain a free file disclosure from the CRA by requesting it within 60 days, and to dispute inaccurate or incomplete information in the file) [§ 615(a)(3)]

Congress therefore expanded the content of the adverse action notice to provide more information to consumers. If Section 615(a)(2)(B) is construed as requiring the report user to supply misinformation (that the CRA did not participate in the decision) about the role of the CRA, consumers would be misled rather than informed. We do not believe that Congress intended this provision, which is clearly designed to *inform* consumers, to be interpreted in a manner that causes consumers to be *misinformed*.

2. We do not believe that Section 615(a)(2)(B) should be interpreted to prohibit CRAs from making employment decisions for employers. The provision is aimed exclusively at *users* of consumer reports, requiring them to provide specific information to consumers when they take adverse action. In crafting the FCRA, Congress has included many provisions in Sections 604–614 that forbid (or require) certain specific acts by *CRAs*. In contrast, Section 615(a)(2)(B) *imposes no duties at all on CRAs*. Rather, it requires in the *user's* adverse action notice a description of the usual sequence of events, where a CRA provides a credit report to a business client and has nothing to do with the action taken by its client. Please note that we are stating here only that Section 615(a)(2)(B) should not be construed to prohibit CRAs from making employment decisions on behalf of employers, not commenting on the merits of that practice.

The opinions set forth in this informal staff letter are not binding on the Commission.

Sincerely yours,

Clarke W. Brinckerhoff

---

1 See footnote 3 and accompanying text of the enclosed letter (*Schieber*, 3/3/98).
2 Title II, Subchapter D, Chapter 1, Section 2411 of Public Law 104-208 (September 30, 1996).
3 S. Rept. No. 185, 104th Cong., 1st Sess. 22 (1995); S. Rept. No. 209, 103rd Cong., 1st Sess. 46 (1993).

February 15, 2000

Ms. Alaina K. Amason
14155 Shire Oak
San Antonio, TX 78247

Dear Ms. Amason:

This responds to your letter concerning the time limitations imposed by the Fair Credit Reporting Act ("FCRA") on the reporting of chargeoff accounts by a consumer reporting agency ("CRA," usually a credit bureau). We list your inquiries on this topic below in italics, with our replies immediately following each item.

*1. What reporting limits does the FCRA provide with respect to chargeoffs, and how long have they been in effect?*

Section 605(a)(4), which has been in effect since the FCRA became effective in April 1971, has always prohibited CRAs from reporting chargeoffs that are more than seven years old.[1] Section 623(a)(5), which became law in September 1997, requires a creditor that reports a chargeoff to a CRA to notify the agency (within 90 days of reporting the account) of "the month and year of the commencement of the delinquency that immediately preceded" the chargeoff. Section 605(c)(1) provides that the seven year period begins 180 days from that date. Both provisions were part of the major revision to the FCRA that were enacted in 1996.[2]

*2. Is the reporting period extended if (A) the original creditor sells or transfers the account to another creditor, (B) the consumer responds to post-chargeoff collection efforts by making a payment on the debt, or (C) the consumer disputes the account with a CRA? Does it matter whether the 7-year period has expired when any of these events occurs?*

No. In enacting the new provisions discussed above, Congress intended to establish a date certain—180 days after the start of the delinquency that led to the chargeoff—to begin the obsolescence period. It did so to correct the often lengthy extension of the period that resulted from later events under the original FCRA. Enclosed are two staff opinion letters (*Kosmerl*, 06/04/99; *Johnson*, 08/31/98) that discuss the impact of these provisions, and the legislative history relating to their enactment, in more detail. Because the commencement of the seven year period is now described with some precision by the statute, it is our opinion that none of the subsequent events you listed—sale of the charged off account by the creditor, or a payment on or dispute about the account by the consumer—changes the allowable period for a CRA to report a chargeoff.

*Informal FTC Letters*

Since Sections 623(a)(5) and 605(c)(1) provide new rules for calculating the 7-year period that became effective in 1997, do chargeoff accounts now have different obsolescence periods depending on when the chargeoff occurred?

Yes. Section 605(c)(2) states that the section "shall apply only to items of information added to the (CRA) file of a consumer on or after" 455 days after enactment, or December 29, 1997. Therefore, a chargeoff reported to a CRA on or after that date is subject to the new commencement-of-the-delinquency method of calculating the obsolescence period set forth in Sections 623(a)(5) and 605(c)(1). On the other hand, a chargeoff reported to a CRA before December 29, 1997, is not covered by the new provisions, as discussed in one of the enclosed letters (Kasmerl, 06/04/99). If a credit account was reported as a chargeoff before that date. the Commission's view has been that it can be reported for seven years from the date the creditor actually charged it off.[3]

The opinions set forth in this informal staff letter are not binding on the Commission.

Sincerely yours,

Clarke W. Brinckerhoff

[1] Section 605(b) provides that there is no time limit applicable to a report made in connection with credit involving a principal amount (or insurance with a face amount) of $150,000 or more, or employment for a salary of $75,000 or more. Prior to September 1997, those amounts were $50,000 and $20,000, respectively.

[2] The Consumer Credit Reporting Reform Act of 1996 (Title II, Subchapter D, of Public Law 104-280, signed into law on September 30, 1996), made many other changes to the FCRA.

[3] Commentary on the Fair Credit Reporting Act, 16 CFR Part 600 Appendix, comment 605(a)(4)-2. 55 Fed. Reg. 18804, 18818 (May 4, 1990).

Mr. Joe Boynton, Esq.
Glickman, Sugarman, Kneeland & Gribouski
11 Harvard Street
Post Office Box 2917
Worcester, MA 01613-2917

February 15, 2000

Re: Responsibilities of furnishers of information to consumer reporting agencies—FCRA § 623(a)

Dear Mr. Boynton:

This is in response to your correspondence concerning the Fair Credit Reporting Act ("FCRA"). You state that "[i]t frequently occurs that after filing a bankruptcy petition and receiving a discharge, a borrower will continue to make payments on a secured loan to retain possession of his home, his automobile, or other collateral." You inquire: "If the borrower later becomes delinquent in payments following the bankruptcy case, is the creditor prohibited from reporting such delinquencies on the secured loan to credit reporting agencies?" We believe that a creditor may report delinquencies in the scenario you describe.

Section 623(a) of the FCRA delineates the responsibilities of furnishers of information to consumer reporting agencies. It requires that furnishers report accurate (Section 623(a)(1)), complete

and updated information (Section 623(a)(2)). When a consumer continues or resumes payments on an obligation discharged in bankruptcy, a creditor may report delinquencies subsequent to the bankruptcy, as long as the information provided to the credit reporting agency is accurate, complete, and updated, in accordance with those provisions. Of course, the creditor is then also subject to the notice and dispute procedures of Section 623(a) and (b) with respect to its reporting.

I hope that this information is helpful to you. The views expressed in this letter are those of the staff and do not necessarily represent the views of the Commission or of any individual Commissioner.

Sincerely,

Helen G. Foster

Mr. James M. Ball
Vorys, Sater, Seymour and Pease LLP
50 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008

March 1, 2000

Re: Fair Credit Reporting Act—Request for Interpretation

Dear Mr. Ball:

This will respond to your letter concerning the use of consumer reports in the underwriting of insurance. In your letter, you state that your client, an insurance company (the "Company"), is introducing a new program (the "Good Credit Discount Program") under which consumers who satisfy certain credit scoring criteria will be entitled to purchase property and casualty insurance policies ("P&C Policies") at a discounted premium rate. Historically, the Company has not taken into consideration any information relevant to the consumer's credit history or status. You have several questions that arise under the Fair Credit Reporting Act ("FCRA") with respect to the implementation and operation of the Good Credit Discount Program.

1. Is the Company legally entitled—pursuant to § 604(a)(3)(C) of the FCRA, 15 U.S.C. § 1681b(a)(3)(C)—to obtain consumer reports on existing P&C Policyholders for the purpose of determining whether such existing P&C Policyholders will be entitled to a discount under the Good Credit Discount Program upon renewal of existing P&C Policies?

Section 604(a)(3)(C) of the FCRA states that any consumer reporting agency may furnish a consumer report under the following circumstances:

To a person which it has reason to believe . . . intends to use the information in connection with the underwriting of insurance involving the consumer.

Further, Comment 604(3)(C)-1 of the Federal Trade Commission Commentary on the FCRA states:

An insurer may obtain a consumer report to decide whether or not to issue a policy to the consumer, the amount and terms of coverage, the duration of the

*Informal FTC Letters*                                        **Appx. D Mar. 8, 1985**

an account. (As I explained in a previous letter to you, a consumer who takes the initiative to obtain this type of benefit can be viewed as having triggered the loss of his right to privacy that section 604 seeks to protect.) Therefore, although there is no credit involved--in which case section 604(3)(A) would apply--it is our opinion that there is a permissible purpose for a report to be issued in these circumstances.

As you requested, I have enclosed copies of several prior staff interpretations involving section 604(2) of the Act, the provision that permits a consumer reporting agency to issue a consumer report pursuant to "the written instructions of the consumer to whom it relates." As I read your inquiry, you are concerned about a situation where a consumer executes a consumer report, without understanding that he is "waiving his rights under the FCRA." (Of course, if that party had a permissible purpose because it had a business need for the report, it would not be necessary to obtain such an authorization from the consumer.) The enclosed letters provide no formula responsive to your general inquiry as to "what written form" the authorization should take; however, we would be happy to consider any specific inquiry you might make on this point.

The volume you asked about (and which I mentioned in my last letter) is published by Warren, Gorham & Lamont (Boston, Massachusetts) and is updated annually.

The above comments represent the informal opinion of the staff, which is advisory in nature and is not binding on the Commission.

Sincerely yours,

Clarke Brinckerhoff, Attorney
Division of Credit Practices

March 8, 1985

Dear _____:

Thank you for your letter of January 11, 1985 outlining your concerns regarding the presence of adverse information contained in your file at the credit bureau and in your credit file at the National Bank of Odessa.

You state in your letter that the First National Bank of Odessa wrote off your loan on August 30, 1977. They subsequently filed suit in 1981 to recover the balance but the litigation was settled out of court and you repaid the remainder of the debt in 1981. You state that the credit bureau continues to report the charge-off because the bank reported the last payment that was made by you in 1981 to the credit bureau. You believe you have been denied credit unfairly on this account because of the information reported by the credit bureau.

You also indicate that the bank officer in a conversation with you alluded to items in your credit file in front of him and you ask whether the bank can keep such a dossier and you surmise the bank is probably sharing this information with other creditors.

Under the Fair Credit Reporting Act (Act), as a general rule, even though consumers have repaid a credit account that was previously delinquent, the credit bureau may continue to report the fact that they were behind in their payments. Once the delinquent account has been paid, the credit bureau should also reflect that the account has been paid. Although a credit report showing a

debt repaid after it became delinquent is usually considered to be adverse information by creditors, it is not as adverse as a credit report indicating that the debt has not been repaid.

Under the Act, in most cases, the credit bureau can only report adverse information for a period of seven years. (There are some exceptions to this rule. Those include reports used for credit transactions over $50,000 or for employment at an annual salary of more than $20,000.)

Your letter does not indicate just what information is set out in your credit bureau report. Based on a reading of your letter there may be two possible factual situations regarding what entries are contained in your credit bureau report.

First, the entries in your credit bureau report may show (a) that the debt was charged off in 1977, (b) that a suit was filed against you on the balance of the debt in 1981, and (c) a final payment by you in settlement of the debt in 1981. Section 605(a)(2) of the Act provides that a suit that is settled may be reported for seven years from the date the suit was filed (i.e., 1981). Accordingly, the credit bureau may only report the suit for seven years from the date it was entered in 1981.

Second, in a situation where the entries in the credit bureau report reflect no suit, but indicate (a) the debt was charged off in 1977, and (b) a final payment entry was made in 1981, Section 605(a)(4) of the Act provides that the credit bureau may continue to report this adverse information for seven years from the date the debt was charged off (i.e., 1977), not from the date of last payment.

In both of the above instances, when derogatory information such as suit being filed, or a charge-off to profit and loss has been entered on the credit bureau report, the fact that a consumer later made payment on the account should not begin a new seven-year reporting cycle. To do so would create a situation where the paying consumer has a derogatory item on the credit bureau history longer than the consumer who makes no effort at all to repay.

Concerning your allegations that you have been denied credit, it is not clear from your letter whether the bank or other creditors denied you further credit because of information contained in a credit bureau report. You should know that the Act provides that if a creditor uses information in a credit report to deny you credit, the creditor must notify you of the fact and supply the name and address of the credit bureau. Once you receive such a notification from a creditor rejecting your credit application, you can go to the credit bureau and obtain a disclosure of the information in your file.

In the event you believe a credit bureau is reporting erroneous information, you may exercise your rights under the Act to file a dispute with the credit bureau to have any erroneous information reinvestigated and corrected. The credit bureau, within a reasonable amount of time, has to reinvestigate disputed information. If the reinvestigation doesn't resolve the dispute, you are entitled to have your own version of what happened placed in the credit file and included in any future reports by the bureau.

You are concerned that the bank may transmit information about matters in your account to other creditors. A creditor, reporting to other creditors information based solely on its own transactions or experiences with a consumer, is

507

**Appx. D April 23, 1985**    *Fair Credit Reporting Act*

not subject to the Fair Credit Reporting Act. However, such reporting by the creditor to others may be contrary to state consumer credit laws, and you may wish to make inquiry with the state consumer protection officials within your state. In the event you desire to contact your state consumer protection officials, you should direct your inquiry to:

> Victoria Esson
> Assistant Attorney General
> Consumer Protection Division
> Office of the Attorney General
> 806 Broadway, Suite 312
> Lubbock, Texas  79401
> Telephone:  808/747-5238

I am enclosing for your information consumer pamphlets which should assist you in understanding your rights under the law when applying for credit and when dealing with a consumer reporting agency.

I should also note that if you have had loan applications rejected by the bank, any further inquiries concerning your rights should be directed to the agency having jurisdiction over banks. The address is:

> Consumer, Community and Fair Lending
> Examination Division
> Comptroller of the Currency
> Department of the Treasury
> Washington, D.C.  20219
> Telephone:  202/447-1600

Please note these comments are unofficial staff opinions which are not binding upon the Commission. They do, however, represent the current enforcement position of the staff. I hope this information will be helpful.

Please forgive the tardiness of this reply. I have been in extensive travel since receiving your letter and have been unable to reply prior to this time. Thank you for your patience.

> Sincerely,
>
> Roger J. Fitzpatrick, Attorney
> Division of Credit Practices

April 23, 1985

David G. Shafton, Esq.
1052 Main Street
P.O. Box 182
Stevens Point, Wisconsin  54481

Dear Mr. Shafton:

This responds to your letter dated April 1, 1985, in which you inquired about the application of the Fair Credit Reporting Act to your client, a lending institution that obtains credit reports to decide whether to finance credit sales of consumer goods to individuals based on referrals from dealers. Specifically, you report that the dealers frequently request copies of credit reports on consumers to whom your client has declined to extend credit, in order to aid the consumer to obtain credit elsewhere, but that the institution does not want to become a consumer reporting agency by responding affirmatively.

A creditor may well be classed as a "consumer reporting agency" under the definition provided in section 603(f) of the Fair Credit Reporting Act if it conveys consumers' credit reports to a dealer (or other creditor) after it has rejected their applications, if it does so without their request. However, if a rejected applicant specifically requests the creditor to forward his

ur her credit report to the dealer, we would view the dealer as a "joint user" of the information with the forwarding creditor, so that the latter party would not be considered a consumer reporting agency.

A recent staff opinion letter that dealt with the issue you posed (dated October 31, 1983) is enclosed, along with a copy of our "Compliance With the Fair Credit Reporting Act" manual, which may be of use to you [sic] and your client.

The views expressed in this letter constitute informal staff opinion and are not binding on the Commission.

> Sincerely,
>
> Clarke Brinckerhoff, Attorney
> Division of Credit Practices

May 1, 1985

Mr. Robert William Jewett
Corporate Counsel and Secretary
HOOPER HOLMES, INC.
170 Mt. Airy Road
Basking Ridge, N.J.  07920

Dear Mr. Jewett:

This responds to your inquiry about "pre-screening" services provided by your company, a consumer reporting agency, in which you state your "understanding that prescreening is not governed by the Fair Credit Reporting Act." You propose to permit certain service bureaus access to your files to assist them in performing prescreening services on behalf of their clients, and asked our opinion on the legality of this proposal.

The Commission has issued an Interpretation (16 C.F.R. § 600.5, copy attached) which deals with the applicability of the Fair Credit Reporting Act (the "Act") to prescreening. The Interpretation does not provide that such a service is "not governed" by the Act, as you suggest. However, it does sanction the common process whereby a consumer reporting agency assists in the development of lists of qualified consumers to be solicited by its clients (merchants or creditors) who market their products or services by direct mail solicitations. The consumer reporting agency's service involves using the client's criteria for creditworthiness to either (1) delete names that do not qualify from a list provided by the client, or (2) create a list of creditworthy individuals for solicitation. The merchant or creditor that uses the consumer reporting agency's service agrees in advance that each consumer whose name is on the list after the "prescreening" will receive a solicitation, with the result that a "permissible purpose" for the service (which amounts to a service of consumer reports) is deemed to exist under section 604(3)(A) of the Act. Because the list is used only for the purpose of solicitation (not at any future date as a basis for denying credit) and because the user receives only a list of names (not written consumer reports on individuals), the Commission concluded that the Act was not intended to bar this minimum intrusion on consumers' privacy. We assume that the service bureau that you would permit to use your files (which would be operating as a consumer reporting agency), and your own company, both perform prescreening services in accord with the Act, as explained by the attached Interpretation.

It has been the staff's view that one consumer reporting agency may provide a consumer report to another consumer reporting agency that had a

508

account arise for purposes of the Fair Credit Reporting Act. Thus Section 604(3)(A) does not appear to permit disclosures of consumer reports to child support agencies seeking to establish paternity or the duty to pay support. The Commission staff has had occasion to address similar questions arising in the context of private litigation. A copy of that letter is enclosed.

In your letter, you suggest Section 604(3)(E) as an alternative permissible purpose for releasing consumer reports to state and local child support enforcement agencies. This provision allows the resale of consumer reports to a person who has a "legitimate business need for the information in connection with a business transaction involving the consumer." The staff believes that a proceeding to determine paternity or child support obligations would not constitute a "business transaction" as that term is commonly understood. This position is consistent with that taken by the staff on the question of access to consumer reports by private litigants. See enclosed letter. See also Foer, What Every Lawyer Should Know About Consumer Reports, 61 Am. Bar Asso., p. 857 (1975).

As noted above, however, agencies would still be free to obtain limited identifying information under Section 608 to assist the full consumer report on an individual would be permissible if the agency obtained an order from a court having jurisdiction to issue such an order. See Section 604(1). In the staff's opinion, however, an order would not be effective for Section 604 purposes unless it is issued by a court as opposed to an administrative tribunal of limited jurisdiction.

State and local agencies should be aware that when they request consumer reports for a permissible purpose pursuant to Section 604, they will be required under Section 607(a) to "certify the purposes for which the information is sought, and certify that the information will be used for no other purpose."

Certification is particularly important in the case of local agencies that have responsibilities in areas which are not related to child support but in which consumer report information on absent parents might profitably be used. A good example is the district attorney's office that also functions as a child support agency. To support reasonable assurance that the district attorney's requests for consumer reports fall within a permissible purpose, the staff believes the district attorney should provide a Section 607(a) certification with each request. See In the Matter of The Credit Bureau of Columbus, 81 F.T.C. 938 (1972) (copy enclosed). A report could not for example be ordered for the purpose of initiating criminal prosecutions.

The preceeding comments represent informal staff opinions and are not binding on the Commission. I hope these comments are responsive to your inquiries but if you have additional questions please do not hesitate to contact us.

Sincerely,

Scott Morris, Attorney
Division of Credit Practices

August 8, 1979

Re: Fair Credit Reporting Act
    Section 605

Dear Ms. Swinney:

Thank you for your letter concerning the

credit reporting practies of the Credit Bureau of Greater Houston.

Your letter states that you paid a past due account two years after it was placed for collection or charged to profit and loss. You have been informed by the Credit Bureau of Greater Houston that the subsequent payment extends the seven year period for which the account may be reported.

Secton 605(a)(4) provides that accounts placed for collection or charged to profit and loss may not be reported for if they antedate the report by more than seven years. There is no exception to that prohibition for accounts which are subsequently paid and such an interpretation would have the effect of punishing consumers who repay their indebtedness while rewarding those who do not. Therefore, it has been the staff opinion that subsequent repayment of an account placed for collection or charged to profit and loss does not extend the period for which it may be reported. We will therefore be contacting the Credit Bureau of Greater Houston to obtain additional information concerning this practice.

The FTC, however, does not represent individual consumers to resolve disputes between them and credit bureaus. If you believe the law has been violated, in your particular case, however, you may wish to pursue the private clause of action granted under Section 616 and 617 of the Act, copies enclosed.

Sincerely,

C. Lee Peeler
FCRA Program Manager
Division of Credit Practices

January 11, 1980

John Koch, Esquire
Luize Zubrow, Esquire
Covington & Durling
888 16th Street, N.W.
Washington, D.C. 20006

Re: Westinghouse Credit Corp.
    C-2999

Dear John and Luize:

This letter will confirm our response to your request for a staff interpretation of certain notification requirements of the Fair Credit Reporting Act and the Equal Credit Opportunity Act. During our meeting on January 8, 1980, you asked what notifications, if any, we believe are required when a creditor denies a credit application because the primary applicant's accommodation party has a bad credit history.

As we have stated to you, whenever credit has been denied in part because of information from an outside source, Section 615 of the Fair Credit Reporting Act requires creditors to provide consumers with certain disclosures which will enable them to determine whether the information from the outside source is accurate and to take steps to correct any inaccuracies. To concur with the position taken in the joint guidelines adopted by the FRB, Comptroller, FDIC and FHLBB*/ that the Section 615 Notices should be given to the accommodation party rather than to the primary applicant where the information from the outside source relates to the accommodation party. We believe that the language of Section 615 could also be interpreted to require that the disclosures be

---

*/ 5 Cons. Cred. Guide (CCH) ¶ 11,202

sts Order Form (0697)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1341 | **DATE** | July 23, 2003 |
| **CASE TITLE** | Georgia Redd vs. Arrow Financial | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion to Dismiss

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]

For the foregoing reasons, the defendant's motion to dismiss pursuant to FRCP 12(b)(6) is [9-1] denied.

(11) ■ [For further detail see order on the reverse side of the original minute order.]

| | | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | JUL 24 2003 | | 27 |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | courtroom deputy's initials | | date mailed notice | | |
| TSA | | Date/time received in central Clerk's Office | mailing deputy initials | | |

U.S. DISTRICT COURT

03 JUL 25 PM 4:34

(Reserved for use by the Court)

# ORDER

This case is before the Court on the motion of the defendant to dismiss the plaintiffs' complaints pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion to dismiss is denied.

These actions seek redress for the allegedly illegal practices of defendant Arrow Financial Services LLC, in connection with the collection of debts, in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and its Maine counterpart, the Maine Fair Debt Collections Practices Act, 32 MRSA § 11001 *et seq.* As alleged in the complaint, on or about October, 2002, the defendant sent plaintiffs Georgia Redd and Stewart Maxwell letters seeking payment of past due debts. Each of the letters stated that, if the recipient settled the debt, "the appropriate credit bureaus will be notified that this account has been settled." The letters continued by indicating that "When my funds clear, the appropriate credit bureaus will be notified of this settlement."

In ruling on a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Szumny v. Am. Gen. Fin., Inc.*, 246 F.3d 1065, 1067 (7th Cir. 2001). The purpose of a motion to dismiss is not to decide the merits of the challenged claims but to test the sufficiency of the complaint. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 n. 1 (7th Cir. 1996). A court will grant a motion to dismiss only if it is impossible for the plaintiff to prevail under any set of facts that could be proven consistent with the allegations. *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000).

The FDCPA was designed to "protect consumers from abusive, deceptive, and unfair debt collection practices . . . In the most general terms, the FDCPA prohibits a debt collector from using certain enumerated collection methods in its effort to collect a debt from a consumer." *Jenkins v. Heintz*, 124 F.3d 824, 828 (7th Cir. 1997); *see also* 15 U.S.C. § 1692(e). The portion of the statute the plaintiffs reference in their complaints forbids debt collectors to "use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The plaintiffs allege that the defendant's statement that, if they paid money on account of the debt, credit bureaus would be notified is misleading in that it suggests to the unsophisticated consumer that a credit bureau could report the payment, when that is not currently permissible under the law. (Complt. at ¶ 15.) Accepting this allegation as true for purposes of this motion, it is clear that the letter could be construed as deceptive, misleading, or false under the FDCPA. Therefore, the complaints state a claim under the statute and the motion must be denied.

For the foregoing reasons, the defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is denied.

It is so ordered.

_Wayne R. Andersen_
Wayne R. Andersen
United States District Court

Dated: _July 23, 2003_

## DECLARATION OF SERVICE BY OVERNIGHT DELIVERY

I, the undersigned, declare:

1.  That declarant is and was, at all times herein mentioned, a citizen of the United States, employed in the City and County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 10085 Carroll Canyon Rd, Suite 210-A, San Diego, California 92131.

2.  That on March 21, 2005, declarant served the **DECLARATION OF ELIZABETH J. ARLEO IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** by depositing a true copy thereof to be placed for UPS collection and delivery at San Diego, California addressed to the parties listed on the attached Service List.

3.  I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of March, 2005, at San Diego, California

KELLY M. RICKARD

SERVICE LIST
*Gonzales v. Arrow Financial Services, Inc.*
U. S. District Court for the Southern District of California
Case No. 05-CV-0171 JAH (RBB)


Attorneys for Plaintiff
LAW OFFICE OF ELIZABETH J. ARLEO
ELIZABETH J. ARLEO
10085 Carroll Canyon Road, Suite 210-A
San Diego, CA 92131
Telephone: 858/547-9800
858/547-9880 (fax)


ROBERT L. ARLEO, ESQ.
225 East 79th Street, 2B
New York, NY 10021
Telephone: 212/517-9967
212/517-2919 (fax)


Attorneys for Defendant

Abraham J. Colman
BUCHALTER NEMER FIELDS & YOUNGER
601 South Figueroa Street, Suite 2400
Los Angeles, CA 90017-5709
Telephone: 213/891-0700
213/630-5712 (fax)

Russell Allyn
BUCHALTER NEMER FIELDS & YOUNGER
601 South Figueroa Street, Suite 2400
Los Angeles, CA 90017-5709
Telephone: 213/891-5105
213/630-5706 (fax)