















R1R    8/14/06    8:53

3:05-CV-00171    GONZALES V. ARROW FINANCIAL

*94*

*DECL.*

1   Desmond Hinds (CASB No. 105831)
    Linda Streeter (CASB No. 105950)
2   HINSHAW & CULBERTSON LLP
    11601 Wilshire Blvd., Suite 800
3   Los Angeles, CA  90025
    Telephone: 310-909-8000
4   Facsimile: 310-909-8001

5   David M. Schultz (Illinois SBN 6197596)
    HINSHAW & CULBERTSON LLP
6   222 N. LaSalle Street
    Suite 300
7   Chicago, IL 60601-1081
    Telephone: 312-704-3000
8   Facsimile: 312-704-3001
    Attorneys for Defendant
9

10

11

12              UNITED STATES DISTRICT COURT

13          SOUTHERN DISTRICT OF CALIFORNIA                **BY FAX**

14
    JOHNNY GONZALES, on Behalf of Himself   )   Case No. 05-CV-0171 JAH (RBB)
15  and All Others Similarly Situated,      )
                                            )   **DECLARATION OF DAVID M. SCHULTZ**
16              Plaintiff,                  )   **IN SUPPORT OF DEFENDANT'S**
                                            )   **MOTION FOR SUMMARY JUDGMENT**
17          vs.                             )
                                            )   Date:     September 14, 2006
18  ARROW FINANCIAL SERVICES LLC,           )   Time:     3:00 pm
                                            )   Place:    Courtroom 11
19              Defendant.                  )
                                                Honorable John A. Houston
20

21

22

23

24

25

26

27

28

ORIGINAL

1    I, David M. Schultz, declare as follows:

2        1.      I am a partner in the Chicago offices of Hinshaw & Culbertson LLP, and one of the

3    attorneys of record for the Defendant, Arrow Financial Services, LLC. I make this my declaration in

4    support of the Defendant's Motion for Summary Judgment. The facts stated in this declaration are

5    known to me personally, and I could competently testify thereto if called as a witness.

6

7        2.      Exhibit A, a true and correct copy of Plaintiff's First Amended Complaint, filed on

8    October 18, 2005 (Court Docket No. 31), is attached hereto.

9        3.      Exhibit B, a true and correct copy of Johnny Gonzales' deposition taken April 7,

10   2006, is attached hereto.

11       4.      Exhibit C, a true and correct copy of Ishmael Robles' deposition taken July 19, 2006,

12   is attached hereto.

13

14       5.      Exhibit D, a true and correct copy of Brian Cutler's deposition taken July 20, 2006, is

15   attached hereto.

16       6.      Exhibit E, a true and correct copy of a page from Experian's website with the

17   electronic address of www.experian.com/ask_max/max012605d.html is attached hereto.

18       7.      Exhibit F, a true and correct copy of a page from Equifax's website with the

19   electronic address of www.econsumer.equifax.com/consumer/sitepage.ehtml is attached hereto.

20

21       8.      Exhibit G, a true and correct copy of pages 10-12 of the United States Government

22   Accountability Office's ("GAO), Report to Congressional Committees, *Credit Reporting Literacy*,

23   March 2005, is attached hereto.

24

25

26

27

28

1    Executed under penalty of perjury under the laws of the United States and the State of

2   California this 11th day of August, 2006, at Chicago, Illinois.

3

4   Dated:  August 11, 2006                          By: Hinshaw & Culbertson LLP

5

6

7                                                    David M. Schultz (Illinois SBN 6197596)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6086237v1 867705
05-CV-0171 JAH (RBB)

## TABLE OF CONTENTS FOR ATTACHED EXHIBITS

Exhibit <u>A</u>, Pages 1-17:       Plaintiff's First Amended Complaint

Exhibit <u>B</u>, Pages 1-15:       Deposition of Johnny Gonzales, April 7, 2006

Exhibit <u>C</u>, Pages 1-22:       Deposition of Ismael Robles, July 19, 2006

Exhibit <u>D</u>, Pages 1-18:       Deposition of Brian Cutler, July 20, 2006

Exhibit <u>E</u>, Pages 1-2:        Webpage from Experian's Website

Exhibit <u>F</u>, Pages 1-5:        Webpage from Equifax's Website

Exhibit <u>G</u>, Pages 1-4         United States Government Accountability Office's Report to
                                   Congressional Committees, *Credit Reporting Literacy*, March
                                   2005 (cover page and pages 10-12)

05-CV-0171 (JAH) (RBB)
6086597v1 867705

# EXHIBIT A

 **ORIGINAL** 

1  LAW OFFICE OF ELIZABETH J. ARLEO, PLC
   ELIZABETH J. ARLEO (CASB No. 201730)
2  10085 Carroll Canyon Road, Suite 210-A
   San Diego, CA 92131
3  Telephone: 858/547-9800
   858/547-9880 (fax)
4
   O. RANDOLPH BRAGG (Pro Hac Vice)
5  HORWITZ, HORWITZ & ASSOCIATES
   25 East Washington St., Ste. 900
6  Chicago, IL 60602
   Telephone: 312/372-8822
7  312/372-1673 (fax)

8  Attorneys for Plaintiff



F!LED

05 OCT 18 PM 3: 12

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

9

10              UNITED STATES DISTRICT COURT

11            SOUTHERN DISTRICT OF CALIFORNIA

12
   JOHNNY GONZALES, on Behalf of Himself )   CASE NO: 05-CV-0171 JAH (RBB)
13 and All Others Similarly Situated,        )
                                             )   CLASS ACTION
14                            Plaintiff,      )
                                             )   FIRST AMENDED COMPLAINT FOR
15          vs.                              )   VIOLATION OF THE FEDERAL AND
                                             )   CALIFORNIA FAIR DEBT COLLECTION
16 ARROW FINANCIAL SERVICES LLC,             )   PRACTICES ACTS
                                             )
17                            Defendant.     )   DEMAND FOR JURY TRIAL
                                             )
18

19

20

21

22

23

24

25

26

27

28
                              31

## INTRODUCTION

1.    Plaintiff Johnny Gonzales ("Plaintiff"), on behalf of himself and all other similarly-situated persons which he seeks to represent, brings this action seeking redress for the illegal practices of defendant Arrow Financial Services LLC ("Arrow" or "Defendant"), in connection with the collection of debts in violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.* (the "FDCPA") and California Civil Code §1788 (the "CA FDCPA"). The FDCPA regulates the behavior of collection agencies attempting to collect a debt on behalf of another.   The CA FDCPA regulates collection agencies and original creditors attempting to collect debts on their own behalf.   Plaintiff and the purported class seek statutory damages, attorney's fees, costs, and equitable relief pursuant to the FDCPA and the CA FDCPA.   Plaintiff requests that the practices of Arrow, as described below, be declared to violate the FDCPA and the CA FDCPA and that Arrow be enjoined from such conduct in the future.   Further, Plaintiff requests that he and the class members be awarded statutory damages payable by the Defendant.

## PARTIES, JURISDICTION AND VENUE

2.    Plaintiff, Johnny Gonzales, is a natural person residing in Poway, California.

3.    Plaintiff is and was at all times relevant, a "consumer" within the meaning of 15 U.S.C. §1692a(3) and Cal. Civil Code §1788.2, in that Defendant sought to collect from Plaintiff an alleged debt incurred for non-business purposes.

4.    Defendant Arrow is a Delaware limited liability company headquartered in Illinois and doing business in the State of California through a "San Diego Call Center" in San Diego County.

5.    Arrow is engaged in the business of (i) acting as a collection agency; and (ii) purchasing allegedly delinquent debts and attempting to collect them.   Arrow uses the mail in a business whose principle purpose is the collection of consumer debts and regularly attempts to collect debts due another throughout the State of California and within the Southern District of California.   Arrow therefore, is and was at all times relevant a "debt collector" as defined by the

A - 2



1   FDCPA, 15 U.S.C. §1692a(6) and Cal. Civil Code §1788.2 (as incorporated by Cal. Business &

2   Professions Code §6077.5).

3       6.      This Court has jurisdiction over this action pursuant to 15 U.S.C. §1692k(d), and

4   28 U.S.C. §1331.   Declaratory relief is available pursuant to 28 U.S.C. §§2201 and 2202.

5   Supplemental jurisdiction for the state law claims arises pursuant to 28 U.S.C. §1367.   Venue is

6   proper in this district under 28 U.S.C. §1391(b) and (c) since a substantial part of the events

7   giving rise to this claim arose in this district and because Arrow and Plaintiff reside in this

8   district.

9                               **FACTUAL ALLEGATIONS**

10      7.      This case involves money, property or other equivalent, due or owing or alleged

11  to be due or owing from a natural person by reason of a consumer credit transaction.   As such,

12  this action arises out of a "consumer debt" and "consumer credit" as those terms are defined by

13  Cal. Civil Code §1788.2(f).

14      8.      Plaintiff allegedly incurred a financial obligation for primarily personal, family or

15  household purposes that is therefore a "debt" as that term is defined by 15 U.S.C. §1692a(5).

16      9.      Upon information and belief, the original creditor for the alleged debt was Bally

17  Total Fitness Corporation which merged with Holiday Spa Health Clubs of California.   The

18  alleged debt was charged off on or about December 1992.

19      10.     On or about April 30, 2004, Defendant sent or caused to be sent to Plaintiff via

20  the United States Mail, the collection letter attached hereto as <u>Exhibit A</u> which is a

21  "communication" made in an attempt to collect a debt as that term is defined by 15 U.S.C.

22  §1692a(2). Plaintiff received it shortly thereafter.

23      11.     On or about July 8, 2004, Defendant sent or caused to be sent to Plaintiff via the

24  United States Mail, the collection letter attached hereto as <u>Exhibit B</u> which is a "communication"

25  made in an attempt to collect a debt as that term is defined by 15 U.S.C. §1692a(2).   Plaintiff

26  received it shortly thereafter.

27      12.     <u>Exhibits A and B</u> are standard form letters mass mailed by Defendant as shown by

28  the numbers at the lower right hand corners of <u>Exhibits A and B</u>.

-2-

A-3




1    13.    <u>Exhibits A and B</u> seek to collect an alleged debt incurred by Plaintiff for personal,
2    family and/or household purposes.

3    14.    <u>Exhibits A and B</u> offer to settle the debt and state that "[u]pon receipt of the
4    settlement amount and clearance of funds, and if we are reporting the account, the appropriate
5    credit bureaus will be notified that this account has been settled." This is followed by another
6    reference to credit bureau reporting.

7    15.    The reference to credit bureaus is misleading because under the Fair Credit
8    Reporting Act, a credit bureau cannot report a debt charged off more than 7 years previously.
9    The "promise" to notify credit bureaus cannot legally be carried out. Furthermore, the references
10   to credit bureau reporting are misleading because they tell the unsophisticated consumer that
11   payment or nonpayment of the claimed debt may impact the consumer's credit rating, when that
12   is not true.

13   16.    The statements contained in <u>Exhibits A and B</u> violate §1692e(5) and §1692e(10)
14   of the FDCPA, which prohibit

15        *False or misleading representations*

16        *A debt collector may not use any false, deceptive, or misleading*
17        *representation or means in connection with the collection of any*
          *debt. Without limiting the general application of the foregoing, the*
18        *following conduct is a violation of this section ...*

19        *(5) The threat to take any action that cannot legally be taken or that*
          *is not intended to be taken.*
20

21        *(10) The use of any false representation or deceptive means to*
          *collect or attempt to collect any debt or to obtain information*
22        *concerning a consumer.*

23

24   17.    The foregoing acts and/or omissions by Defendant constitute numerous and
25   multiple violations of the CA FDCPA, Cal. Civil Code §1788 (and as incorporated by Cal.
26   Business & Professions Code §6077.5), including but not limited to, §1788.13 and §1788.17, by
27   failing to comply with 15 U.S.C. §1692, *et seq.* as set forth above.

28

-3-

A-4




## DEFENDANT'S POLICIES AND PRACTICES

18.   It is the standard policy and practice of Defendant to threaten to take any action that cannot legally be taken or that is not intended to be taken.

19.   It is the standard policy and practice of Defendant to use any false representation or deceptive means to collect or attempt to collect any debt or obtain information concerning a consumer.

## CLASS ALLEGATIONS

20.   Plaintiff brings this action on behalf of a class.  For both the FDCPA and CA FDCPA claims, the class period is one year prior to the filing of the original complaint.  The class consists of all natural persons with California addresses who meet the following criteria:

   a.   Defendant sent them a letter in the form represented by Exhibits A and B;

   b.   On or after a date one year prior to the filing of this action;

   c.   Seeking to collect a debt allegedly owed to Bally Total Fitness Corporation and/or Holiday Spa Health Clubs of California that was charged off more than 7 years previous to the date of the letter;

   d.   Which was not returned by the Postal Service.

21.   The identities of all class and subclass members are readily ascertainable from the records of Arrow.

22.   Excluded from the class are all managers and directors of Arrow and members of their immediate families, and legal counsel for either side and all members of their immediate families.

23.   This action has been brought and may properly be maintained as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation:

-4-

 

a. *Numerosity:* The class is so numerous that joinder of all members is impractical. On information and belief there are more than 40,000 members of the class.

b. *Common Questions Predominate:* There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members. The principal issues are:

    i. Whether Exhibits A and B violate the FDCPA and CA FDCPA by threatening to take any action that cannot legally be taken or that is not intended to be taken; and

    ii. Whether Exhibits A and B violate the FDCPA and CA FDCPA by using any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

c. *Typicality:* Plaintiff's claims are typical of the claims of the members of the plaintiff class. Plaintiff and all members of the plaintiff class have claims arising out of Defendant's common course of conduct complained of herein.

d. *Adequacy:* Plaintiff will fairly and adequately protect the interests of the members of the class. Plaintiff is committed to vigorously litigating this matter. Plaintiff has retained counsel experienced in handling class claims and claims involving unlawful collection practices. Neither Plaintiff nor Plaintiff's counsel have any interests which might cause them not to vigorously pursue this claim.

e. *Superiority:* A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members would be impracticable. Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would

A-6




engender. Furthermore, since individual class member's claims for damages are relatively modest, the expenses and burdens of litigating individual actions would make it difficult or impossible for individual members of the class to redress the wrongs done to them. An important public interest will be served by addressing the matter as a class action, substantial economies to the litigants and to the judicial system will be realized, and the potential for inconsistent or contradictory adjudications will be avoided.

24.     Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate in that Defendant has acted on grounds generally applicable to the class, thereby making appropriate declaratory relief with respect to the class as a whole.

25.     Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

(a)     The questions of law and fact common to the members of the class predominate over any questions affecting an individual member.

(b)     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

26.     Plaintiff requests certification of a hybrid class combining the elements of Rule 23(b)(3) for monetary damages and Rule 23(b)(2) for equitable relief.

### FIRST CAUSE OF ACTION

**(The Fair Debt Collection Practices Act)**

27.     Plaintiff incorporates the foregoing paragraphs.

28.     Defendant violated 15 U.S.C. §1692e(5) by sending to Plaintiff and class members collection letters that threaten to take any action that cannot legally be taken or that is not intended to be taken.

29.     Defendant violated 15 U.S.C. §1692e(10) by sending Plaintiff and class members collection letters that use any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

WHEREFORE, relief is requested as set forth below.

-6-

A-7




## SECOND CAUSE OF ACTION

### (The California Fair Debt Collection Practices Act)

30.   Plaintiff incorporates the foregoing paragraphs.

31.   Defendant violated Cal. Civil Code §1788 (and as incorporated by Cal. Business & Professions Code §6077.5), including but not limited to §1788.13, and §1788.17 by failing to comply with 15 U.S.C. §1692 *et seq.*, as set forth in the First Cause of Action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief from Defendant

32.   First Cause of Action:

    A.  Declaratory judgment that Defendant's practices violate the FDCPA;

    B.  The maximum amount of statutory damages provided under 15 U.S.C. §1692k;

    C.  Attorney's fees, litigation expenses, and costs; and

    D.  Such other or further relief as the Court deems appropriate

33.   Second Cause of Action:

    E.  Statutory damages;

    F.  Attorney's fees, litigation expenses, and costs; and

    G.  Such other or further relief as the Court deems appropriate.

### DEMAND FOR JURY TRIAL

34.   Plaintiff demands a trial by jury.

DATED:  October 18, 2005

Respectfully submitted,
LAW OFFICE OF ELIZABETH J. ARLEO, PLC
ELIZABETH J. ARLEO

ELIZABETH J. ARLEO

10085 Carroll Canyon Road, Suite 210-A
San Diego, CA 92131
Telephone: 858/547-9800
858/547-9880 (fax)

-7-

A-B



1

2    O. RANDOLPH BRAGG
     HORWITZ, HORWITZ & ASSOCIATES
3    25 East Washington Street, Suite 900
     Chicago, IL 60602
     Telephone: 312/372-8822
4    312/372-1673 (fax)

5    Attorneys for Plaintiff Johnny Gonzales

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF FDCPA AND CA FDCPA                    05-cv 0171 JAH (RBB)

A-9

# EXHIBIT A



**ARROW**
FINANCIAL SERVICES

| OFFICE HOURS: PT | |
| --- | --- |
| Monday thru Thursday : | 8:00am – 9:00pm |
| Friday : | 6:00am – 9:00pm |
| Saturday : | 7:00am – Noon |
| Sunday : | 2:00pm – 8:00pm |
| Phone Number : | 800-989-4093 Ext 4400 |

5996 W Touhy Ave, Niles, IL 60714.
Pay online at www.arrow-financial.com

14414302 - 2107
JONNY GONZALES

| ID Number : | Re : HOLIDAY SPA OF CALIF | |
| --- | --- | --- |
| Account # : | | Total Current Balance : $ 552.96 |

April 30, 2004

## PAST DUE BALANCE

Dear JONNY GONZALES,

At this time we are willing to settle your past due account for 50% of the full balance and accept this amount as settlement of the referenced account. The settlement amount must be made in one payment and received by our office on or before May 28, 2004.

### *** Settlement Amount $ 276.48 You Save $ 276.48 ***

Upon receipt of the settlement amount and clearance of funds, and if we are reporting the account, the appropriate credit bureaus will be notified that this account has been settled. Please mark the appropriate box below.

1. [ ]   Enclosed find payment for the above-stated settlement amount. By depositing this payment in the sum of $ 276.48, you have accepted this as settlement. When my funds clear, and if you are reporting the account, you will notify the appropriate credit bureaus of this settlement.

2. [ ]   I have enclosed a payment of $ _____ which will be sent (check one box)
   [ . ]   Weekly   [ ]   Every two weeks   [ ]   Monthly until the full balance is paid in full.

Should you have any questions please feel free to contact me at 800-989-4093 ext. 4400.

**Important notice required by law:** This agency is engaged in the collection of debts. This communication is an attempt to collect a debt and any information obtained will be used for that purpose.

Sincerely,

*Mike Ortega*
MIKE ORTEGA
Account Representative

### Please see reverse side for important information

2915674604/30/04ARRR2107-E

✂ PLEASE RETURN THIS PORTION WITH YOUR PAYMENT. THANK YOU!   ✂

Please see reverse side if you would like to pay by credit card

| ID Number : | Re : HOLIDAY SPA OF CALIF | |
| --- | --- | --- |
| Account # : | | Total Current Balance : $ 552.96 |

P.O. BOX 469005
CHICAGO, IL 60646-9005
ADDRESS SERVICE REQUESTED

☐ Please check here if there is a new phone # or address change and enter information on reverse side

April 30, 2004

14414302 - 2107   257248
JONNY GONZALES

ARROW FINANCIAL SERVICES LLC
21031 NETWORK PLACE
CHICAGO, IL 60678-1031

0014414302 0000000033212019 2107 0000055296 0

A - 11

**NOTICE TO CALIFORNIA RESIDENTS:**

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

To authorize a payment through a third-party payment service using your credit card, please fill out the following and return in the enclosed envelope. Pay online at www.arrow-financial.com

Check One: ☐ Visa   ☐ MasterCard   ☐ Discover   ☐ American Express

For security purposes, please provide the 3-digit or 4-digit CVV (Customer Verification Value): If you are using an American Express card the 4-digit CVV can be found on the front-right section of your card above the account number. If you are using a Discover, Visa or MasterCard the 3-digit CVV can be found after the account number on the back side of your card.

Card Number 

CVV#

Payment Amount                    Expiration Date

Card Holder Name        Signature of Card Holder        Date

Address                        City, State, Zip

Daytime Phone :                    Evening Phone :

Make changes to your address and phone number below.

Name

Address

City                State        Zip Code

Daytime Phone            Evening Phone

A-12

**EXHIBIT B**

A-13

PO Box 1205
Oaks, PA 19456-1206
2919144143022107070804



5996 W Touhy Ave, Niles, IL 60714
Pay online at www.arrow-financial.com

**OFFICE HOURS: Pacific Time**
Monday thru Thursday: 6:00 am - 9:00 pm
Friday: 6:00 am - 9:00 pm
Saturday: 7:00 am - Noon
Sunday: 2:00 pm - 8:00 pm
Phone Number : 800-989-4093 Ext 4400

July 8, 2004

14414302 - 2107
JONNY GONZALES
13217 DANA VISTA ST # 124
POWAY CA 92064-5740

ID Number:
Account:
Total Current Balance: $560.42

## PAST DUE BALANCE

Dear JONNY GONZALES,

At this time we are willing to settle your past due account for 50% of the total current balance and accept this amount as settlement of the referenced account. The settlement amount must be made in one payment and received by our office on or before August 5  2004.

### *** Settlement Amount $280.21 You Save $280.21 ***

Upon receipt of the settlement amount and clearance of funds, and if we are reporting the account, the appropriate credit bureaus will be notified that this account has been settled. If you accept this settlement offer, please mark the appropriate box below.

[  ]  Enclosed find payment for the above-stated settlement amount.  By depositing this payment in the sum of $280.21, you have accepted this as settlement. After my funds clear, you will notify the appropriate credit bureaus of this settlement if you are reporting the account.

If you do not accept the above settlement offer, you may elect to make payments weekly, every two weeks, or monthly until the account is paid in full. If you choose to remit payment in this manner, please mark and complete the appropriate boxes below.

[  ]  I have enclosed a payment of $_____ which will be sent (check one box)
[  ]  Weekly   [  ]  Every two weeks   [  ]  Monthly until the full balance is paid in full.

After the account has been paid in full and my funds have cleared, you will notify the appropriate credit bureaus of this payment in full if you are reporting the account.

Should you have any questions please feel free to contact me at 800-989-4093 ext. 4400.

Important notice required by law: This agency is engaged in the collection of debts. This communication is an attempt to collect a debt and any information obtained will be used for that purpose.

Sincerely,

*MIKE ORTEGA*

MIKE ORTEGA
Account Representative

**Please see reverse side for important information**
✂  PLEASE RETURN THIS PORTION WITH YOUR PAYMENT. THANK YOU!  ✂          2919-28273

July 8, 2004

☐  Please check here if there is a new phone # or
address change and enter information on reverse side

ID Number:
Account:
Total Current Balance: $560.42

14414302 - 2107
JONNY GONZALES
13217 DANA VISTA ST # 124
POWAY CA 92064-5740

660 CA
ARROW FINANCIAL SERVICES
21031 Network Place
Chicago, IL 60678-1031

A-14

To authorize a payment through a third-party payment service using your credit card, please fill out the following and return in the enclosed envelope. Pay online at www.arrow-financial.com

Check One: ☐ Visa   ☐ MasterCard   ☐ Discover   ☐ American Express

For security purposes, please provide the 3-digit or 4-digit CVV (Customer Verification Value): If you are using an American Express card the 4-digit CVV can be found on the front-right section of your card above the account number. If you are using a Discover, Visa or MasterCard the 3-digit CVV can be found after the account number on the back side of your card.

Card Number | | | | | | | | | | | | | | | | | |

CVV# | | | | |

Payment Amount _____     Expiration Date _____

Card Holder Name _____     Signature of Card Holder _____     Date _____

Address _____     City, State, Zip _____

Daytime Phone : _____     Evening Phone: _____

Make changes to your address and phone number below.

Name

Address

City          State          Zip Code

Daytime Phone          Evening Phone

A-15

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the
      United States employed in the City and County of San Diego, over the age of
      18 years, and not a party to or interest in the within action; that declarant's
      business address is 10085 Carroll Canyon Rd, Suite 210-A, San Diego,
      California 92131.

2.    That on October 18, 2005, declarant served the **FIRST AMENDED
      COMPLAINT** by depositing a true copy thereof in a United States mailbox at
      San Diego, California in a sealed envelope with postage thereon fully prepaid
      and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing
      and the places so addressed.

4.    I declare under penalty of perjury that the foregoing is true and correct.
      Executed this 18th day of October, 2005, at San Diego, California.

                                    ELLEN DEWAN

A-16




## SERVICE LIST

*Gonzales v. Arrow Financial Services, Inc.*
U. S. District Court for the Southern District of California
Case No. 05-CV-0171 JAH (RBB)

<u>Attorneys for Plaintiff</u>

LAW OFFICE OF ELIZABETH J. ARLEO, PLC
ELIZABETH J. ARLEO
10085 Carroll Canyon Road, Suite 210-A
San Diego, CA 92131
Telephone: 858/547-9800
858/547-9880 (fax)

O. RANDOLPH BRAGG
HORWITZ, HORWITZ & ASSOCIATES
25 E. Washington St., Ste. 900
Chicago, IL 60602
Telephone: 312/372-8822
312/372-1673 (fax)

<u>Attorneys for Defendant</u>

Russell Allyn  (via 2nd day overnight delivery)
Abraham J. Colman
BUCHALTER NEMER, APC
1000 Wilshire Blvd., 15th Floor
Los Angeles, CA 90017
Telephone: 213/891-0700
213/630-5712 (fax)

A-17

# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JOHNNY GONZALES, on Behalf of )
Himself and All Others Similarly )
Situated, )
)
                    Plaintiff, )   CASE NO.
                              )  05-CV0171 JAH (RBB)
        vs.                   )
                              )
ARROW FINANCIAL SERVICES LLC, )
                              )
                    Defendant. )
                              )

_____ )

        Deposition of Johnny Gonzales taken on behalf
of Defendant, at 850 Main Street, Suite 200, Ramona,
California 92065, at 10:10 a.m., Friday, April 7, 2006,
before Thomas R. McPhail, CSR No. 12544, pursuant to
notice.

CONDENSED TRANSCRIPT
COMPLIMENTS OF

pq Benchmark

The Definitive Deposition Company

(310) 556-0595

Page 1

B-1

Gonzales, Johnny: 04-07-06

**Page 2**

1   APPEARANCES
2
3   FOR THE PLAINTIFF:
4
5   ARLEO LAW FIRM
    BY: ELIZABETH J. ARLEO, ATTORNEY AT LAW
6   850 Main Street
    Ramona, California 92065
    (760) 789-8000
7
8   FOR THE PLAINTIFF:
9
10  HORWITZ, HORWITZ & ASSOCIATES
    BY: O. RANDOLPH BRAGG, ATTORNEY AT LAW
    25 East Washington St., Suite 900
11  Chicago, Illinois 60602
    (312) 372-8822
12
13  FOR THE DEFENDANT:
14
15  REED SMITH
    BY: DAVID S. REIDY, ATTORNEY AT LAW
    335 South Grand Ave., Suite 2900
16  Los Angeles, California 90071
    (213) 457-8000
17
18
19
20
21
22
23
24
25

**Page 3**

1   INDEX
2
3   WITNESS        EXAMINATION        PAGE
4   JOHNNY GONZALES    MR. REIDY        4
5
6
7   EXHIBITS
8
9   NUMBER     DESCRIPTION        PAGE
10  A Letter to Mr. Gonzales 4-30-04     32
11  B Letter to Mr. Gonzales 7-08-04     32
12  C Notice of Deposition         32
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1   RAMONA, CALIFORNIA, FRIDAY, APRIL 7, 2006
2             10:10 a.m.
3
4        THE VIDEOGRAPHER: Good morning. We are on
5   the video record, ladies and gentlemen at 10:10 a.m. My
6   name is Lance Roberts from Benchmark Deposition
7   Reporter's in Los Angeles, California. Phone number is
8   (800) 992-9280. This matter is pending before the
9   court, the United States District Court the Southern
10  District of California. The case caption Johnny
11  Gonzales, on behalf of himself and all other similarly
12  situated, versus Arrow Financial Services, LLC. The
13  case number is 05-CV-0171 JAH (RBB).
14       This is the beginning of tape 1, volume 1 of
15  the deposition of Johnny Gonzales on April 7, 2006. We
16  are located at 850 Main Street, Suite 200, Ramona,
17  California. This is taken on behalf of the defendant.
18  Counsel would you please identify yourselves for the
19  record.
20       MR. REIDY: David Reidy for the defendant
21  Arrow Financial Services.
22       MS. ARLEO: Elizabeth Arleo, Arleo Law Firm on
23  behalf of the Plaintiff Johnny Gonzales.
24       MR. BRAGG: Randolph Bragg on behalf of Johnny
25  Gonzales.

**Page 5**

1        THE VIDEOGRAPHER: Would the court reporter
2   please swear in the witness? You may proceed.
3
4             Johnny Gonzales,
5   called as a witness, and having been first duly sworn by
6   the Certified Shorthand Reporter, was examined and
7   testified as follows:
8
9             EXAMINATION
10
11  BY MR. REIDY:
12       Q   Good morning, Mr. Gonzales. As you heard I am
13  David Reidy, I represent the defendant Arrow Financial
14  Services in this case. Can you state your full name for
15  the record, please?
16       A   My name is Johnny Gonzales.
17       Q   Have you ever had your deposition taken
18  before, Mr. Gonzales?
19       A   No.
20       Q   Okay. Before we get started I would like to
21  go over some ground rules. As you can see the questions
22  that I ask and the answers you give are being taken down
23  by the court reporter and they will be reproduced in
24  transcript form. Obviously the court reporter can only
25  take one person down at a time, so please wait for me to

2 (Pages 2 to 5)

B-2

Gonzalez, Johnny: 04-07-06

**Page 6**

1  finish my question before you answer. Is that okay?
2  A. Yes.
3  Q. And like you just answered, yes and no is
4  better than uh-huh or gestured, because it reads better
5  in the transcript. Although this is a somewhat informal
6  setting here, this is in every sense a formal
7  proceeding. You have been sworn to tell the truth and
8  you are under penalty of perjury. Do you understand
9  what that means?
10  A. Yes.
11  Q. Okay. When this deposition is over the
12  transcript will be made available for you to read and
13  review and sign. If there is anything in your testimony
14  that you think is inaccurate you can make changes to the
15  transcript when you get the transcript.
16  I just want you to know that I can comment on
17  any changes that you make, particularly substantial
18  changes from a yes to a no, and I can comment on those
19  changes to undermine your credibility at trial. Do you
20  understand that?
21  A. Yes.
22  Q. Okay. Are you under the influence of any
23  medications or alcohol today?
24  A. No.
25  Q. Is there any reason you can think of why we

**Page 7**

1  can't have your best testimony today?
2  A. No.
3  Q. Okay. Have you ever seen your credit report
4  before?
5  A. Yes.
6  Q. When is the last time you saw it?
7  A. I would say maybe three months ago.
8  Q. What were the circumstances under which you
9  saw it?
10  A. My wife and I were looking to refinance our
11  house.
12  Q. So, you own a house?
13  A. Yes.
14  Q. Where is it?
15  A. In Poway, California.
16  Q. Can you spell that?
17  A. P-O-W-A-Y.
18  Q. And how long have you lived there?
19  A. Five years.
20  Q. And before that where did you live?
21  A. In San Diego; in the Mira Mesa area.
22  Q. Did you rent or own there?
23  A. My wife owned a condo.
24  Q. Okay. And how long did you live there?
25  A. Six years.

**Page 8**

1  Q. So, that takes us back to about 1995?
2  A. Yes. Yes.
3  Q. And before that, where did you live?
4  A. In Mira Mesa.
5  Q. For how long?
6  A. There it was a year.
7  Q. Where were you living in 1992?
8  A. 1992?
9  Q. In or around that time. You know, '91 or '92?
10  A. It was in San Diego.
11  Q. In the San Diego area?
12  A. Yes.
13  Q. Were you owning or renting?
14  A. Renting.
15  Q. Okay. What is the address of the Poway
16  residence?
17  A. It is 13217 Dana Vista, D-A-N-A, number 124.
18  And its in Poway 92064.
19  Q. Before you saw your credit report three months
20  ago, had you seen it before?
21  A. Yes.
22  Q. Did you only see it when you applied for a
23  loan or has it been in your practice to routinely check
24  your credit report?
25  A. I checked it once before when I received -- it

**Page 9**

1  was a letter from San Diego State that their records had
2  been hacked, I think, and some of my information was
3  taken along with it. So, I was checking the credit
4  report.
5  Q. Is that San Diego State University?
6  A. Uh-huh.
7  Q. Did you go to college there?
8  A. Yes, I am currently attending there.
9  Q. You are?
10  A. Yes.
11  Q. So, when did you look at the credit report
12  when you were contacted by San Diego State?
13  A. I don't remember the exact date. It was a few
14  years ago.
15  Q. Maybe two or three years ago?
16  A. Yes, somewhere in that time period.
17  Q. Okay. So, apart from the time that you
18  checked it when you were contacted by San Diego State,
19  and three months ago when you were refinancing, did you
20  look at it any other time in between?
21  A. Yes. It was when my wife was purchasing the
22  condo in Mira Mesa.
23  Q. So, that was five years ago?
24  A. Yes. No, actually 11 years. We were there
25  six years.

3 (Pages 6 to 9)

B-3

Gonzales, Johnny: 04-07-06

**Page 10**

1   Q  Okay. So, let me go over that, I am a little
2 confused. So, you looked at your credit report about
3 three months ago?
4   A  Right.
5   Q  You also looked at it you said a few years
6 ago, maybe three years ago when you were contacted by
7 San Diego State?
8   A  Yes.
9   Q  Okay. But no time in between those two times?
10   A  No.
11   Q  And then going back from that, you said you
12 looked at it when your wife bought her condo?
13   A  Yes.
14   Q  So, that is the one in San Diego?
15   A  Yes.
16   Q  Okay. So, that would have been -- you looked
17 at it about 1995?
18   A  Yes.
19   Q  So, this is three times over a little more
20 than ten years, right?
21   A  Yes.
22   Q  So, it is not your practice to pull a credit
23 report every couple of months and check it out?
24   A  No.
25   Q  Okay. Why did you pull it in 1995 if you

**Page 11**

1 weren't buying the condo then?
2   A  We were checking to see if I could qualify to
3 be on that loan policy.
4   Q  But you didn't qualify?
5   A  No.
6   Q  Do you remember what your credit score was
7 then?
8   A  No, I can't recall.
9   Q  Do you know what it is now?
10   A  I think it is six --
11   MR. BRAGG: Objection. That is privileged
12 information. You do not need to answer that question if
13 you choose not to.
14   MR. REIDY: Are you instructing him not to
15 answer?
16   MR. BRAGG: No, I'm not. I'm presenting him
17 with that option.
18 BY MR. REIDY:
19   Q  Okay.
20   A  I will answer. I think it was 670, I think.
21   Q  Okay. That is in 1995 or that is now?
22   A  That is now.
23   Q  Okay. So, when you looked at your credit
24 report there were lines, trade lines on the report that
25 represent accounts that you have had in the past, right?

**Page 12**

1   A  Yes.
2   Q  And you understand that when you don't pay a
3 bill or when you are late on a payment that is reported
4 on the credit report?
5   A  Yes.
6   Q  And it can negatively affect your credit
7 score?
8   A  Yes.
9   Q  Okay. When did you -- let me go back to --
10 you said you are currently attending San Diego State
11 University?
12   A  That is correct.
13   Q  When did you start there?
14   A  In 2000.
15   Q  Are you going on a part-time basis?
16   A  Yes.
17   Q  Are you studying for a degree?
18   A  Yes.
19   Q  What is the degree?
20   A  Masters.
21   Q  In?
22   A  History.
23   Q  And do you have a bachelors degree as well?
24   A  Yes, I do.
25   Q  And where is that from?

**Page 13**

1   A  National University.
2   Q  Where is that?
3   A  It is a college here in San Diego that has
4 different campuses, different satellite, I guess,
5 campuses.
6   Q  So, when do you get your masters; is it pretty
7 close?
8   A  Yes, it will be this year.
9   Q  Okay. Let me go back to -- get organized
10 here. In this lawsuit you said you received two letters
11 from Arrow Financial Services; is that correct?
12   A  Yes. But there was, I think, a third letter.
13   Q  There was?
14   A  Yes, originally in October of 2003.
15   Q  Okay. So, let me get this straight. The two
16 letters that are attached to your complaint, the first
17 one is April 2004 and the second one is July 2004?
18   A  Yes.
19   Q  Are you saying there was a third letter before
20 then?
21   A  Yes.
22   Q  You don't have a copy of that letter, do you?
23   A  No, I don't.
24   Q  Were there any other letters you received from
25 Arrow?

4 (Pages 10 to 13)

B-4

Gonzales, Johnny: 04-07-06

| | Page 14 | | Page 16 |
|---|---|---|---|
| 1 | A  No. | 1 | A  Thirteen years. |
| 2 | Q  Between October 2003 and July 2004, did you | 2 | Q  So, you joined Bally's when? |
| 3 | get any other collection letters from other collection | 3 | A  It was, I think, around 1990.  Maybe late '89. |
| 4 | agencies? | 4 | Q  And this was in the San Diego area? |
| 5 | A  No, I didn't. | 5 | A  Yes. |
| 6 | Q  Have you ever gotten another collection | 6 | Q  This is Bally's Gym? |
| 7 | letter? | 7 | A  Yes. |
| 8 | A  Yes, I have. | 8 | Q  And when you joined, did you sign some kind of |
| 9 | Q  When? | 9 | contract? |
| 10 | A  I don't recall the exact date, it was when I | 10 | A  Yes. |
| 11 | was attending San Diego State. | 11 | Q  And what did the contract -- do you remember |
| 12 | Q  So, in the last five -- in the last six years? | 12 | what the basic arrangement was? |
| 13 | A  Yes. | 13 | A  The basic arrangement was I would pay $19 a |
| 14 | Q  And who was the other collection letter from? | 14 | month for two years. |
| 15 | A  I don't recall the name. | 15 | Q  And after that you could leave if you wanted |
| 16 | Q  Do you remember the account that it was for? | 16 | to? |
| 17 | A  It was for tuition for San Diego State. | 17 | A  Yes. |
| 18 | Q  And what did you do when you got that letter? | 18 | Q  So, if you leave before two years, was it your |
| 19 | A  I called the Collections Department at San | 19 | understanding that you would have to pay the $19 a month |
| 20 | Diego State and made arrangements to pay. | 20 | for the whole two year period whether you stayed in the |
| 21 | Q  Okay.  So, this was a letter directly from San | 21 | gym or not, was that your understanding? |
| 22 | Diego State? | 22 | A  I don't recall.  The basic pitch was just pay |
| 23 | A  I think they used a collection agency, but you | 23 | $19 a month and you can just use our gym, that was it. |
| 24 | dealt with a collections department on campus. | 24 | Q  But your understanding was that if you left |
| 25 | Q  Okay.  So, this wasn't a debt that had arisen | 25 | before the two-year period, would you be under some |

| | Page 15 | | Page 17 |
|---|---|---|---|
| 1 | years before? | 1 | obligation to keep paying? |
| 2 | A  Oh, no. | 2 | A  No. |
| 3 | Q  This was pretty current? | 3 | Q  So, did you pay the $19 for the whole two |
| 4 | A  Yes. | 4 | years? |
| 5 | Q  So, besides the San Diego State letter and the | 5 | A  No, I didn't. |
| 6 | Arrow letters, are there any other collection letters | 6 | Q  When did you stop paying? |
| 7 | you have ever gotten? | 7 | A  I don't recall the exact date.  I would say it |
| 8 | A  Not that I recall, no. | 8 | might have been less than a year into the contract. |
| 9 | Q  Okay.  So, the only collection letters are the | 9 | Q  So, it was definitely before the two year |
| 10 | San Diego State letter and the Arrow letters? | 10 | period? |
| 11 | A  That is correct. | 11 | A  Yes. |
| 12 | Q  So, what did you do when you got the first | 12 | Q  And did you think that you had breached your |
| 13 | Arrow letter? | 13 | agreement with Bally's? |
| 14 | A  The first one?  I called Arrow.  I actually | 14 | A  Well, I -- what happened is I called them. |
| 15 | called Bally's first, when I found out that it was | 15 | When I stopped paying I called them and I explained to |
| 16 | through Bally's.  And then since they couldn't help me, | 16 | them that I just couldn't pay any more, and that I |
| 17 | they told me that once the collection happens it goes to | 17 | wasn't going to the gym or using any of their gyms in |
| 18 | someone like Arrow.  I called Arrow because I wanted to | 18 | San Diego and that was the end of the conversation. |
| 19 | find out information on the letter. | 19 | Q  What did they tell you when you called them? |
| 20 | Q  So, why did you call Bally's?  What were you | 20 | A  They were trying to get me to pay the -- I |
| 21 | trying to find out? | 21 | missed a month, I think.  I don't recall.  And they were |
| 22 | A  At first I was just thinking, you know, should | 22 | trying to get me to pay, but I was explaining to them |
| 23 | I call them and see why they are trying to collect on a | 23 | that I wasn't going to be able to do it any more. |
| 24 | debt that was that old at the time. | 24 | Q  What did they say? |
| 25 | Q  How old was it at this time? | 25 | A  The last conversation I had with them, the |

5 (Pages 14 to 17)

B-5

Gonzales, Johnny: 04-07-06

**Page 18**

1  service representative she actually hung up on me, and
2  that was the end of the conversation with Bally's.
3  Q  So, it wasn't a happy relationship?
4  A  No, not at all.
5  Q  How many times did you talk to them?
6  A  It was just that one, maybe it was like two
7  months because I didn't pay the next month and then they
8  tried contacting me again, that is when I spoke with the
9  lady. And after that they stopped calling me.
10  Q  Okay. Just so I am clear, you called them
11  initially to tell them that you weren't going to the
12  gym, you weren't working and you couldn't pay, right?
13  A  Well, I was working, it was just for financial
14  reasons.
15  Q  I am sorry. And then subsequently the next
16  month they called you?
17  A  Uh-huh.
18  Q  And that is when the unpleasant exchange and
19  the representative hung up on you?
20  A  Yes.
21  Q  And so at that time, did you think you owed
22  them any money?
23  A  No.
24  Q  Did you get any -- strike that. Did they
25  attempt to collect any money from you after that last

**Page 19**

1  conversation?
2  A  No.
3  Q  You never heard from them again?
4  A  No.
5  Q  So, this is back in what, 1990?
6  A  Yes.
7  Q  So, when you checked your credit report in
8  1995, do you remember seeing anything from Bally's on
9  there?
10  A  No.
11  Q  Did anybody tell you that your credit score
12  had been affected by Bally's?
13  A  No.
14  Q  You said that when your wife was buying her
15  condo you didn't think you qualified for the loan. Were
16  there any other delinquent debts that you knew of at
17  that time that might have affected your credit?
18  A  At that time, no.
19  Q  Okay. So, am I right in assuming that in
20  October of 2005, when you get this letter from Arrow, it
21  is out of the blue?
22  A  Right.
23  Q  As far as you know?
24  A  Yes.
25  Q  So, you said you called Bally's in October

**Page 20**

1  2003?
2  A  Yes.
3  Q  And what did you say to -- did you speak to
4  someone?
5  A  Yes, I spoke to a customer service
6  representative.
7  Q  And what did you ask?
8  A  I just wanted to know why they were trying to
9  collect on a 12 year old debt; 13 at the time.
10  Q  What did they say?
11  A  They said it was out of their hands and they
12  had nothing to do with it.
13  Q  Was that the end of that conversation?
14  A  Yes.
15  Q  And then you called Arrow?
16  A  Yes.
17  Q  Is that because their number, their
18  information was listed on the collection letter?
19  A  Yes.
20  Q  So, did you understand that they were an
21  outside collection agency at that time?
22  A  Yes, I did.
23  Q  Okay. And did you ask Bally's, anyone at
24  Bally's -- going back to that first conversation, did
25  you ask them if this was going to negatively affect your

**Page 21**

1  credit?
2  A  No, I didn't. I just wanted to, like I said,
3  find out if I could deal with them, I guess, and get to
4  the bottom of this letter.
5  Q  Okay. So, was it your intention to pay?
6  A  No.
7  Q  Why not?
8  A  The debt was older than the seven years that
9  is allowed on your credit report.
10  Q  So, you were aware that there was a seven year
11  time limit on debt that can be reported?
12  A  Yes.
13  Q  When did you learn that?
14  A  It was when I worked for -- it was a -- the
15  name of the company was Morgan Home Lending, they were a
16  mortgage brokerage. So, I worked in the funding
17  department and I always dealt with, you know, people --
18  the things they needed to complete their loans.
19  Q  Okay.
20  A  So, that is where I found out about the credit
21  report.
22  Q  Okay. Let's talk about your work history
23  while we are on the subject. When did you work at
24  Morgan Home Lending?
25  A  I would say '93 to '94, I think.

6 (Pages 18 to 21)

B-6

Gonzales, Johnny: 04-07-06

**Page 22**

1  Q  '93 to '94?
2  A  Yes.
3  Q  When did you graduate high school?
4  A  High school?
5  Q  Yes.
6  A  1985.
7  Q  And where did you work from '85 to '93?
8  A  Ralph's Grocery Company.
9  Q  The whole time?
10  A  Yes.
11  Q  And then from '93 to what? I am sorry, what
12  did you say, '93 to '94 Morgan Home Lending?
13  A  Yes, I think that is around the time period.
14  Q  So, about a year?
15  A  Yes, I worked there a year.
16  Q  And what brought you there from Ralph's? It
17  sounds like a different kind of job?
18  A  It was my girlfriend, her sister owned the
19  company and I went to work with them.
20  Q  And what was your job?
21  A  I was working in the funding department.
22  Q  Reviewing documents for people's loans?
23  A  Yes, we would go to a certain mortgage lender,
24  you know, we try and get the best rates for them. They
25  would put their file in, they always have conditions

**Page 23**

1  coming back that they needed, you know, certain things
2  for their file to complete. And it was my job to get
3  those documents.
4  Q  So, you said you learned about credit reports
5  during that year?
6  A  Yes.
7  Q  So, you had a pretty good understanding of
8  what the trade lines were on reporting and that sort of
9  thing?
10  A  Yes.
11  Q  And you said that your understanding was that
12  seven year old debt couldn't be reported?
13  A  Yes, it can be taken off your credit report.
14  Q  So, then why did you call Bally's to try to
15  deal -- you said you wanted to deal with Bally's instead
16  of dealing with Arrow?
17  A  I wanted -- well, what I wanted was for them
18  to stop sending me these letters. There was -- they
19  couldn't collect on the debt.
20  Q  But at that point there was only one letter,
21  right?
22  A  Yes.
23  Q  This is in October of 2003?
24  A  Yes.
25  Q  Okay. When you were working at Morgan Home

**Page 24**

1  Lending, did you ever check your own credit report?
2  A  That is the -- I think that is the time where
3  my wife was -- well, she was my girlfriend at the time,
4  she was getting the condo. Would that be the right time
5  period? I was working there, in fact, we were the ones
6  that did the loan. And so they checked my credit report
7  to see if I could be on the loan with her.
8  Q  And then she bought the condo and you left the
9  job around about that time, is that right?
10  A  It was a few months. Yes, it was a few months
11  I think after we had purchased the condo.
12  Q  Okay. Where did you work after Morgan Home
13  Lending?
14  A  I ended up at Kinko's.
15  Q  From '94?
16  A  Yes. Let's see. Actually it was 1990 -- I am
17  trying to figure out.
18  Q  Let me ask you a different question.
19  A  Okay.
20  Q  And I don't need pinpoint dates. I am just
21  trying to get a general idea of your work history.
22  A  Okay.
23  Q  Am I right in assuming that you went back to
24  college a number of years after high school?
25  A  Yes.

**Page 25**

1  Q  When did you go back to college?
2  A  It was after the Morgan Home Funding, when I
3  worked at Kinko's I attended Kelsey-Jenney.
4  Q  Splitting in, am I right, '94 or '95?
5  A  Probably '95.
6  Q  So, you worked and went to college at the same
7  time?
8  A  Yes, I did.
9  Q  And how long did you work at Kinko's?
10  A  I worked there a year.
11  Q  During the time that you were in college, did
12  you hold any other jobs?
13  A  No, I didn't.
14  Q  So, you worked in Kinko's for a year but then
15  you kept going to school full-time, is that right?
16  A  Yes.
17  Q  And when did you start working again after
18  that, when was your next job?
19  A  It was right after Kinko's. I graduated from
20  Kelsey-Jenney and then I ended up at -- it was Milberg
21  Weis at the time.
22  Q  And what is that?
23  A  A law firm.
24  Q  In San Diego?
25  A  Yes.

BenchmarkDepo-The Deposition Services Company   Condensed Transcript Not a Certified Copy   510.556.0505

B-7

Gonzales, Johnny: 04-07-06

**Page 26**

1  Q  And what year was that?
2  A  It was nine years ago, so.
3  Q  '97?
4  A  Yes.  So, first would -- yes, it would be '97.
5  So, '96 to '97 was Kinko's.  And that is how the other
6  jobs went.
7  Q  Okay.  Can you just briefly walk me through
8  the rest of your work history?  You were at Milberg Weiss
9  for a year?
10  A  No, I have been with Milberg Weiss since then.
11  Q  '97 to the present?
12  A  They are now Lerach Coughlin.
13  Q  Can you spell the first name?
14  A  L-E-R-A-C-H.
15  Q  Second name?
16  A  C-O-U-G-H-L-I-N.
17  Q  And what is your job there?
18  A  I am a document clerk.
19  Q  How did you get the Milberg Weiss job?
20  A  I started there in the copy center, that is
21  where my -- I went from Kinko's and my experience there
22  got me the job in the copy room.
23  Q  And then you just moved into a different job?
24  A  Yes.
25  Q  Now, you said since you -- strike that.  From

**Page 27**

1  the time you joined Bally's in around 1990, you said you
2  haven't received any other collection letters; is that
3  correct?
4  A  That is correct.
5  Q  Okay.  So, after you called Bally's in October
6  of 2003, you said you called Arrow?
7  A  Yes.
8  Q  And why did you call them?
9  A  It was to discuss the letter that I received.
10  Q  To ask them to stop sending you letters?
11  A  Yes.
12  Q  And did you ask them that?
13  A  What I first did was I discussed with them why
14  they were sending this letter, and I asked them, you
15  know, if they could still report it to a credit agency.
16  And the whole purpose was for me to, I guess, like I
17  said, to get them to stop sending me these letters.
18  Q  So, let me just back up here.
19  A  Uh-huh.
20  Q  So, was the first thing you asked them was why
21  are you sending the letters?
22  A  Yes.
23  Q  And what did they say?
24  A  I do not recall.  Actually, they said they had
25  acquired this account and that, you know, that was the

**Page 28**

1  balance due.  That's the basis.
2  Q  That is the gist of what they said?
3  A  Yes.
4  Q  And did you tell them that you weren't going
5  to pay?
6  A  Not at that point.  I kept asking if I was
7  required to.
8  Q  And what did they say?
9  A  They wouldn't give me a yes or no answer.
10  Q  So, they wouldn't give you a yes or no answer
11  when you asked them if you were required to pay the
12  debt?
13  A  Correct.
14  Q  And when you were asking the question what was
15  your intention?  Were you asking them if you were
16  required legally to pay?
17  A  Yes.
18  Q  You said you also asked them if they could
19  report the debt?
20  A  Yes.
21  Q  And what did they say to that?
22  A  They did not give me a yes or no answer.
23  Q  But you knew they couldn't?
24  A  Yes.  It was common sense to me that how -- if
25  I could get the debt taken off after seven years, how

**Page 29**

1  can they report a 13 year old debt if I can just have it
2  taken off again.  That was my basic understanding of it.
3  Q  So, based on your understanding of what you
4  learned at Morgan, you didn't believe they could report
5  the debt?
6  A  That is correct.
7  Q  But they wouldn't give you a straight answer
8  when you asked them this?
9  A  That is correct.
10  Q  Did you ever tell them you were going to pay?
11  A  No.
12  Q  Did you have any intention of paying?
13  A  No.
14  Q  Did they ask you, you know -- strike that.
15  Did they ask you if you were going to pay?
16  A  Yes.
17  Q  What did you say?
18  A  I said no.  And then I kept repeatedly asking
19  them if I was legally bound to pay this debt.
20  Q  You said they wouldn't give you a straight
21  answer to that?
22  A  That is correct.
23  Q  So, how did the phone call end?
24  A  Well, it ended, they finally did admit that
25  they had no recourse against me.  And I asked them how

8 (Pages 26 to 29)

B-8

Gonzales, Johnny: 04-07-06

**Page 30**

1  do I get these letters to stop being sent to me and they
2  told me to do -- to write a letter to the corporate
3  headquarters and that these letters would stop.
4  Q  To Arrow's Corporate Headquarters?
5  A  Yes.
6  Q  So, they did finally give you an answer to the
7  question whether you were required to pay?
8  A  Yes.
9  Q  So, you got them to admit eventually that they
10  said they have no recourse against you?
11  A  Yes.
12  Q  So, do you have that October letter?
13  A  No, I don't.
14  Q  Did you review any documents before coming
15  here today in preparation for the deposition?
16  A  Yes.
17  Q  What did you look at?
18  MR. BRAGG:  Objection.  That invades the
19  attorney-client privilege.  I instruct you not to
20  answer.
21  BY MR. REIDY:
22  Q  Let me ask you this.  Did you look at the
23  April and July letters?
24  MR. BRAGG:  Objection.  In the context of
25  asking for his preparation regarding his deposition, I

**Page 31**

1  instruct him not to answer.  If you revise your question
2  as to whether he has looked at those letters in the
3  past, he may answer.
4  BY MR. REIDY:
5  Q  I think that is my question, but let me ask
6  you that way so we can keep this moving.  You obviously
7  have looked at these letters the April and July letters
8  in the past?
9  A  Yes.
10  Q  And not just when you got them?
11  A  Yes.
12  Q  More recently?
13  A  Yes.
14  Q  Okay.  Did you ever write the letter to
15  headquarters?
16  A  No, I didn't.
17  Q  Why not?
18  A  I think it is when I was -- it was due to
19  school because I was very busy at the time.  And also
20  just figured that they would stop sending the letters.
21  Q  Did you -- when you hung up the phone was your
22  intention to write the letter?
23  A  At that time?
24  Q  Yes.
25  A  Yes.

**Page 32**

1  Q  But then you just changed your mind, got busy?
2  A  Yes.
3  Q  Okay.  So, did you have any other contact with
4  Arrow between October and April when you got the second
5  letter?
6  A  Not that I recall now.
7  Q  Okay.  Let's just do this here.  I am going to
8  introduce these with the exhibit pages from the
9  complaint.  These are the letters attached to the
10  complaint.  So, to the court reporter, these will say
11  Exhibit A on the first page, but if you want to number
12  them A you can or 1 you can.
13  (Exhibit A marked)
14  MR. REIDY:  Okay.  It is Exhibit A.  This is
15  the April 30, 2004 letter from Arrow.  Give you a copy
16  of that.  Actually can you pass that one up to the court
17  reporter.  And I will mark as Exhibit B, the July, 2004,
18  July 8th, 2004 from Arrow to Johnny Gonzales.
19  (Exhibit B marked)
20  MR. REIDY:  I am handwriting Exhibit B so
21  these are the originals.  Pass that to you.  A copy here
22  for you.  And let's see.  And Exhibit C is the amended
23  deposition notice for today.  If you could pass that on.
24  (Exhibit C marked)
25  MS. ARLEO:  Can we take a break?

**Page 33**

1  MR. REIDY:  Absolutely.  Let's take five
2  minutes.
3  THE VIDEOGRAPHER:  Off the record.  The time
4  is 10:44 a.m.
5  (Recess taken)
6  THE VIDEOGRAPHER:  Back on the record.  The
7  time is 10:51 a.m.
8  BY MR. REIDY:
9  Q  Mr. Gonzales, can I have you look at what we
10  marked as Exhibit A.  Do you recognize this as the
11  letter that you received in April 2004?
12  A  Yes.
13  Q  And that's the second letter you said you got
14  from Arrow?
15  A  Yes.
16  Q  What did you do when you got the letter?
17  A  This letter right here?
18  Q  Yes.
19  A  I--
20  Q  Did you read it?
21  A  Yes.  Oh, when I first received it?
22  Q  Yes.
23  A  Oh, yes, I read the letter.
24  Q  So you read the whole thing through?
25  A  Uh-huh.  Yes.

B-9

Gonzales, Johnny: 04-07-06

**Page 34**

1  Q  So, where it says, "We are willing to settle
2  your past due account," on the first line; did you
3  understand that to relate to your Bally's account?
4  A  Okay. No.
5  Q  So, let me go back to the October letter.
6  When you got the October 2003 letter, did that reference
7  your Bally's account somewhere in the letter?
8  A  No, it didn't. Just the Holiday Spa.
9  Q  So, when you got the October letter, how did
10  you know that it was referring to your Bally's account?
11  A  I checked to see who Holiday Spa was and I
12  found out they owned Bally's.
13  Q  Where did you check?
14  A  I just looked at it on the Internet.
15  Q  So, when you got this letter in April 2004,
16  did you notice that it also referenced Holiday Spa of
17  California?
18  A  Yes.
19  Q  So, did you realize that this was the Bally's
20  account again?
21  A  Yes.
22  Q  And when it says at the top of the letter, we
23  are willing to settle your past due account for 50
24  percent; do you remember reading that at the time?
25  A  Yes.

**Page 35**

1  Q  And what did you think that meant?
2  A  At this point, I read the 50 percent and I
3  realized that it really meant 50 percent of nothing to
4  me; after discussing with Bally's and Arrow before this.
5  Q  Okay. But did you understand that the
6  outstanding balance they were talking about was $552.96?
7  A  Yes.
8  Q  And that you could pay them $276.48 to settle
9  the account?
10  A  Yes.
11  Q  But your understanding was that you didn't
12  have to do that?
13  A  Correct.
14  Q  And that was based on your conversations with
15  them in October?
16  A  Yes.
17  Q  Where they said they had no recourse against
18  you?
19  A  That is correct.
20  Q  Was that also based on your understanding
21  about the seven year old debt, your understanding about
22  credit reports?
23  A  Yes.
24  Q  So, when you got this letter, you didn't think
25  you were under any obligation to pay?

**Page 36**

1  A  That is correct.
2  Q  So, did you have any intention to pay?
3  A  No.
4  Q  So, what did you do when you got the letter?
5  A  I went through it and I just put it back in
6  the envelope and just set it aside.
7  Q  Were you concerned that they were going to
8  report this debt to your credit report?
9  A  At this point, no.
10  Q  Did you change your mind on that subsequently?
11  A  After the October conversation, yes.
12  Q  Okay. You said you first got a letter in
13  October of 2003?
14  A  Yes.
15  Q  So, now we are talking about April 2004?
16  A  That is correct.
17  Q  So, I am a little confused. So, in April 2004
18  you didn't think they were going to report?
19  A  That is correct.
20  Q  And I am saying after that, did you change
21  your mind on that; was there any point after that where
22  you felt maybe they would report?
23  A  After the April 30th letter?
24  Q  Yes.
25  A  No.

**Page 37**

1  Q  Okay. So where — so, you said you read the
2  whole letter?
3  A  That is correct.
4  Q  Did you read the sentence where it says, "If
5  we are reporting the accounts, the appropriate credit
6  bureau, will be notified?
7  A  Yes.
8  Q  And what did you think about that?
9  A  On the April 30th letter, I knew that they
10  couldn't report it.
11  Q  So, you understood they wouldn't be reporting
12  this amount?
13  A  That is correct.
14  Q  So, that sentence clearly didn't apply to your
15  situation?
16  A  No.
17  Q  Okay. Why did you keep this letter?
18  A  I was going to — I was going to bring it into
19  work and ask somebody to take a look at it and see if I
20  had any legal recourse myself.
21  Q  Legal recourse against whom?
22  A  Arrow, to get them to stop sending me these
23  letters.
24  Q  Okay. But you weren't intending to pay?
25  A  No.

10 (Pages 34 to 37)

B-10

1  Q   So, did you show the letter to a lawyer at
2  work?
3  A   No, I didn't.
4  Q   But that is why you kept it?
5  A   Yes.
6  Q   So, when did you decide to get a lawyer?
7  A   It was after I had talked to Ms. Arleo that
8  I -- I mean -- how do I put this?
9  Q   Well, let me stop you there.
10 A   Uh-huh.
11 Q   I don't want to get into the content of
12 anything you said with your lawyers, obviously that is
13 beyond the scope of what we are able to talk about. I
14 am just trying to find out what made you make the
15 decision to get a lawyer. Did you go out to contact a
16 lawyer or did somebody contact you?
17 A   I contacted a lawyer.
18 Q   Okay. And who gave you -- was that Ms. Arleo?
19 A   Yes.
20 Q   And who gave you her name?
21 A   I had previously worked with her at Milberg
22 Weis.
23 Q   Okay. So, you just called up and said what is
24 the deal with this letter basically?
25 A   Yes.

Page 38

1  Q   Okay. So, after you got the letter, did you
2  call Bally's?
3  A   This letter? No.
4  Q   Yes, I am talking about the April 30th letter.
5  I am still on Exhibit A.
6  A   No, I did not call Bally's.
7  Q   Did you call Arrow?
8  A   No, I didn't.
9  Q   Did you call Arrow at any time after April?
10 A   After April, I think I did in December.
11 Q   2004?
12 A   No.
13 Q   Let me --
14 A   Well, see I never contacted Arrow again.
15 Q   After?
16 A   Right. After this and then I did contact them
17 again in December of 2005. That is the only other
18 contact I had.
19 Q   Well. Okay. Well, let's just walk through
20 this so that I am clear. When you got the October
21 letter, you said you called them?
22 A   Yes.
23 Q   I don't think I asked you, was that
24 immediately, let's say within a week?
25 A   That was the same night that I received the

Page 39

1  letter.
2  Q   Okay. So, you spoke to them in October 2003.
3  Did you speak to them between October 2003 and when you
4  got the April letter?
5  A   No. Not after that initial conversation.
6  Q   Okay. And after you got the April letter, did
7  you speak to them at any time? Did you contact them at
8  any time between when you got this letter and the end of
9  say 2004?
10 A   No, not that I can recall.
11 Q   Not that you recall?
12 A   No.
13 Q   Can you look at Exhibit B. This is the July
14 letter.
15 A   Okay.
16 Q   I am sorry, just one more question about the
17 April letter. Was the reason you didn't call Arrow
18 because you didn't believe you owed them money?
19 A   That is correct.
20 Q   And you didn't believe that they could report
21 anything negative to your credit report?
22 A   That is correct.
23 Q   So, take a look at Exhibit B. Do you
24 recognize this as the letter you received in July 2004?
25 A   That is correct.

Page 40

1  Q   When you got these letters, were they
2  identifiable from the envelope as letters from Arrow?
3        MR. BRAGG:  Objection. We don't have the
4  envelope with us. You may answer if you can.
5        THE WITNESS:  I don't recall.
6  BY MR. REIDY:
7  Q   So, just based on your recollection, you just
8  opened it not really sure what it was?
9  A   That is correct.
10 Q   Okay. So, did you read the July 8, 2004
11 letter?
12 A   Yes, I did.
13 Q   And did you come to any different conclusions
14 about this letter than you had about the April letter?
15 A   No, I didn't.
16 Q   So, when you read the sentence, "We are
17 willing to settle your past due account for 50 percent,"
18 you understood that was 50 percent of the $560.42
19 balance indicated on that letter?
20 A   That is correct.
21 Q   But you didn't believe that you owed that
22 money?
23 A   That is correct.
24 Q   And you didn't believe that they had any
25 recourse against you to pay that money?

Page 41

11 (Pages 38 to 41)

B-11

Gonzales, Johnny: 04-07-06

**Page 42**

1  A  That is correct.
2  Q  Were you concerned that they would report this
3  debt to your credit?
4  A  No.
5  Q  To your credit report; I am sorry.
6  A  No.
7  Q  So, were you confused at all by this letter?
8  A  No, I wasn't.
9  Q  Okay. And when you read the sentence, "Upon
10  receipt of settlement amount and clearance of funds, and
11  if we are reporting the account, the appropriate credit
12  bureaus will be notified this account has been settled."
13  Did you read that sentence?
14  A  Yes, I did.
15  Q  And did you think they would be reporting your
16  debt?
17  A  No.
18  Q  Okay. Did you contact -- I am sorry. Strike
19  that. You said that between July 2004 and December 2004
20  you didn't contact Arrow during that time period.
21  A  That is correct.
22  Q  So, you don't remember contacting them in May
23  2004?
24  A  That is correct. I don't remember.
25  Q  If I were to tell you that Arrow records

**Page 43**

1  indicate that you contacted them in May, would that jog
2  your memory?
3  A  No.
4  Q  So, you don't think you called them at all?
5  A  No.
6  Q  Did you ask anybody to call Arrow for you?
7  A  No.
8  Q  At any time between October 2004 and the
9  present have you asked anybody to contact Arrow on your
10  behalf?
11  A  No.
12      MR. BRAGG: Objection. Invades the
13  attorney/client privilege. I instruct you not to answer
14  if your answer reveals your conversations or
15  communications with your attorneys.
16  BY MR. REIDY:
17  Q  So, the answer is no?
18  A  I don't recall.
19  Q  You never asked your wife to call them for
20  you, or a friend?
21  A  No.
22  Q  Okay. So, you never called them and told them
23  you would pay the debt?
24  A  No.
25  Q  And you said that, if I told that you that

**Page 44**

1  records indicate that you called in May of 2004, that is
2  not consistent with your memory?
3  A  That is correct.
4  Q  Did you call them in December 2004?
5  A  I think that is the other phone call.
6  Q  That is the next time you called?
7  A  I called them in December.
8  Q  So, why did you call them in December?
9  A  I was checking to see the status of this
10  account to see if it was going to go away. And I just
11  gave them a call.
12  Q  So, when you say go away, do you mean to see
13  if they would stop sending you letters?
14  A  That is correct.
15  Q  So, were you worried about it at all between
16  July 2004 and December of 2004?
17  A  Yes.
18  Q  Just something that was on your mind?
19  A  I can't recall if that was the time that we
20  were going to refinance the house again, and I just
21  wanted to make sure that they weren't, you know, they
22  weren't still having this letter on record of this
23  balance.
24  Q  So, in December 2004, you were thinking about
25  refinancing the house in Poway?

**Page 45**

1  A  Yes, I know we refinanced it once already, so
2  I don't remember the exact date.
3  Q  Was it some time in December 2004?
4  A  I think so.
5  Q  Okay.
6  A  I think it was. I know we refinanced it once
7  and I think we were going to do it again. I was just
8  checking up on this.
9  Q  So, in December of 2004, you and your wife
10  were talking about refinancing, you thought you would
11  give Arrow a call to see if they were going to keep
12  sending you letters?
13  A  Yes.
14  Q  But if you knew that it wasn't a problem for
15  your credit report, why were you worried about that in
16  connection with the refi?
17  A  Since I had notified them, I was shocked that
18  they had continued to send me letters after the October
19  31st conversation.
20  Q  Okay. So, you are referring to the April and
21  July letters?
22  A  Yes. The fact that they still were sending it
23  to me, I didn't really trust Arrow in what they were
24  going to do.
25  Q  But they hadn't sent you any letters from July

12 (Pages 42 to 45)

B-12

Gonzales, Johnny: 04-07-06

**Page 46**

1  in December?
2  A  No.
3  Q  And they hadn't sent you any letters since?
4  A  No.
5  Q  Has anybody from Arrow contacted you since
6  December of 2004?
7  A  No.
8  Q  Did anyone from Arrow contact you by phone
9  ever?
10  A  They tried to in December.
11  Q  Of?
12  A  2004.
13  Q  They tried to call you?
14  A  Yes.
15  Q  Was that before you called them?
16  A  I think it was after I called them.
17  Q  Okay.  So, am I right in assuming that they
18  never called you in an attempt to collect the debt?
19  A  That is correct.
20  Q  So, you only -- the only attempts they made
21  were these three letters that you got?
22  A  The three letters and then the phone calls in
23  December.
24  Q  Let me clarify my question.
25  A  I am sorry.

**Page 47**

1  Q  I am asking about their efforts to collect
2  money from you.  You said that you got three letters
3  from them, right?
4  A  That is correct.
5  Q  And then they never called you before you
6  called them in December 2004?
7  A  That is correct.
8  Q  So, they have never called you to say, hey,
9  why aren't you paying this debt?
10  A  That is correct.
11  Q  So, you called them in -- how many phone calls
12  were there in December?  Do you remember?
13  A  How many times they tried to contact me?
14  Q  I am sorry.  Let me rephrase the question.
15  How many times did you call them in December?
16  A  Just once.
17  Q  Just once.  But they also called you?
18  A  Yes.
19  Q  How many times?
20  A  I don't remember the number.
21  Q  Less than five?
22  A  It was less than five and it was during a week
23  after I had contacted them.
24  Q  So, this was in a short one or two week
25  period?

**Page 48**

1  A  Correct.
2  Q  Had you asked them to call you back?
3  A  No.
4  Q  So, what did they say when they called you?
5  A  They didn't leave any messages.  I just found
6  this weird phone number, so I called them back and it
7  was an Arrow recording.
8  Q  Was this like on a cell phone or some kind of
9  phone with caller ID?
10  A  Yes, my home phone number with caller ID.
11  Q  So, how many -- let me go back.  So, you get
12  home one day and there is a call, there is a missed call
13  but no message?
14  A  That is correct.
15  Q  And you don't recognize the number, so you
16  call back and it is Arrow?
17  A  That is correct.
18  Q  So, you don't know the purpose of the call?
19  A  No.
20  Q  When you spoke to them in December 2004 when
21  you called them --
22  A  Uh-huh.
23  Q  -- what did you say when you called?
24  A  I don't recall that conversation.  I was just
25  looking into the status of this account right here.

**Page 49**

1  Q  And do you remember what they told you?
2  A  No.
3  Q  Do you remember being concerned after the
4  phone call that they were going to report the debt?
5  A  After this phone call, no.
6  Q  And the phone call didn't change your opinion
7  about that account after you spoke to them?
8  A  No.
9  Q  So, were you surprised when you called back
10  and got an Arrow message and learned that maybe they had
11  called tried to call you?
12  A  Yes.
13  Q  And how many times did that happen?
14  A  I don't recall the exact number.
15  Q  Did you ever speak to them when they called
16  you?
17  A  No.
18  Q  How many -- and you said you don't remember
19  how many times that happened, but it was less than five
20  times?
21  A  Yes.
22  Q  Did you ever write any letters to Arrow?
23  A  No.
24  Q  Did you ever keep any notes about your contact
25  with Arrow?

13 (Pages 46 to 49)

B-13

Gonzales, Johnny: 04-07-06

**Page 50**

1  A  No.
2  Q  Any e-mails to anybody, exclude anything to
3  your attorneys obviously; did you ever e-mail anybody
4  about Anow?
5  A  No.
6  Q  Okay. So, there is no other communications
7  apart from these three letters and the phone calls we
8  have discussed?
9  A  That is correct. There is not.
10  Q  Okay. Let's take a five minute break, I think
11  I am almost done. I just want to review my notes and
12  see if I missed anything. Let's take a five minute
13  break.
14  THE VIDEOGRAPHER: We are off the record. The
15  time is 11:11 a.m.
16  (Recess taken)
17  THE VIDEOGRAPHER: We are back on the record.
18  The time is 11:20 a.m.
19  BY MR. REIDY:
20  Q  Mr. Gonzales, I just want to ask a couple of
21  quick follow-up questions here. Do you currently have
22  any copies of your credit report?
23  A  No, I don't.
24  Q  And between April, when you got the second
25  letter and the present, did you contact Bally's at all?

**Page 51**

1  A  No, not to my recollection.
2  Q  Or Holiday Spa?
3  A  After April, no.
4  Q  So, you don't have any letters or e-mails or
5  anything like that?
6  A  No.
7  Q  And you said you don't have any -- you don't
8  currently have any copies of your credit report?
9  A  No, I don't.
10  Q  You understand that you are a class
11  representative in this case; is that correct?
12  A  Yes, I do.
13  Q  Is it your understanding that you are entitled
14  to some kind of compensation for being a class
15  representative?
16  MR. BRAGG: Objection. Calls for a legal
17  conclusion. You may answer if you can.
18  THE WITNESS: Yes.
19  BY MR. REIDY:
20  Q  That is your understanding?
21  A  Yes.
22  Q  Have you ever been a plaintiff in a lawsuit
23  before?
24  A  No.
25  Q  Have you ever been a defendant in a lawsuit

**Page 52**

1  before?
2  A  No.
3  Q  Have you ever disputed anything on your credit
4  report?
5  A  Yes, I have.
6  Q  When?
7  A  It was, I think it was the very first time
8  that I ran my credit.
9  Q  In? 1992, is that when?
10  A  No, when I was working at Morgan.
11  Q  So, '93, '94?
12  A  Yes, around that. 1994.
13  Q  You said you pulled your credit report then
14  when your wife was about to buy her place?
15  A  Yes.
16  Q  And what did you dispute on your credit
17  report?
18  A  There was a -- it was a -- it had to deal with
19  an apartment that I was renting at the time and the debt
20  was old on it. So, I just had them take it off.
21  Q  When you say the debt was old, this was a rent
22  check that wasn't paid or something?
23  A  Yes.
24  Q  And how old was the debt in 1994?
25  A  It was -- I think it was, it had to reach the

**Page 53**

1  seven year limit. So, I did it. I disputed it.
2  Q  Was it your understanding that the information
3  on the credit report was wrong?
4  A  Yes.
5  Q  So, you think that you had paid the rent but
6  there was some mistake in reporting?
7  A  Yes.
8  Q  And did they take the line off the credit
9  report?
10  A  Yes, they did.
11  Q  Okay. But no other credit disputes?
12  A  No.
13  MR. REIDY: Okay, I think I am done. So, I
14  want to thank you for coming in.
15  THE WITNESS: Okay.
16  MR. REIDY: And I propose the following
17  stipulation.
18
19  EXAMINATION
20
21  MR. BRAGG: I have a couple of questions.
22  MR. REIDY: Okay.
23  BY MR. BRAGG:
24  Q  What was the purpose of the obligation to
25  Bally's?

14 (Pages 50 to 53)

B-14

Gonzales, Johnny: 04-07-06

**Page 54**

1    A   I had moved to San Diego and I wanted to join
2  a gym.
3    Q   And was this part of your business, or was
4  this personal use or?
5    A   Oh, it was for personal use.
6    Q   Okay. I have no further questions.
7       MR. REIDY: Okay. So, I will propose that we
8  relieve the court reporter of his duties under the Code.
9  The original of the transcript may be sent to you Ms.
10  Arleo?
11       MS. ARLEO: Yes.
12       MR. REIDY: You will see to it that the
13  witness reads the transcript and signs under penalty of
14  perjury within 30 days. Is that okay with you
15  Mr. Gonzales?
16       THE WITNESS: Yes, it is.
17       MS. ARLEO: That is agreeable.
18       MR. REIDY: We will be advised of any changes
19  to the transcript that you make, as I explained to you
20  earlier today, within that 30 day time period.
21       MR. BRAGG: No, not within the 30 day period,
22  at the conclusion of the 30 days.
23       MR. REIDY: Okay. At the conclusion of the 30
24  days we will be notified if there has been any changes
25  to the transcript.

**Page 56**

1       were concluded at 11:25 A.M.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 55**

1       MR. BRAGG: Yes, we will send you an errata
2  sheet.
3       MR. REIDY: If we don't get a signed copy, a
4  certified copy may be used in lieu of the original for
5  all purposes including at trial.
6       MR. BRAGG: Are you familiar with the Federal
7  Rules of Civil Procedure, the rule itself speaks to
8  that.
9       MR. REIDY: Okay. Do you want to change that.
10  I am used to deposition in state court, I am sorry. We
11  will follow the rule.
12       MR. BRAGG: We will follow the Federal Rules
13  of Civil Procedure.
14       MR. REIDY: Okay... So, Ms. Arleo, you will
15  maintain custody of the original and produce it at trial
16  as we may reasonably request?.
17       MS. ARLEO: Yes.
18       MR. REIDY: I am finished. Thank you.
19       MR. BRAGG: Thank you.
20       THE VIDEOGRAPHER: This concludes the
21  videotaped deposition of Johnny Gonzales consisting of
22  one tape. The time is 11:25 a.m. We are off the
23  record.
24
25       (The deposition proceedings

**Page 57**

1       PENALTY OF PERJURY CERTIFICATE
2
3
4
5       I hereby declare I am the Deponent in the
6  within matter, that I have read the foregoing transcript
7  and know the contents thereof, and I declare that the
8  same is true of my knowledge except as to the matters
9  which are therein stated upon my information or belief,
10  and as to those matters, I believe them to be true.
11       I declare, being aware of the penalties of
12  perjury, that the foregoing answers are true and
13  correct.
14
15
16
17       Executed on the _____ day of _____
18  20___, at _____, California.
19
20
21       _____
22       Johnny Gonzales
23
24
25

15 (Pages 54 to 57)

B-15

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

JOHNNY GONZALES, on Behalf of )
Himself and All Others )
Similarly Situated, )
)
        Plaintiff, )
)
   -vs- ) No. 05-CV-0171 JAH(RBB)
)
ARROW FINANCIAL SERVICES, LLC, ) VOLUME I
)
)
      Defendant. )
)

Deposition of ISMAEL ROBLES,
taken at 550 West C Street, Suite 600,
San Diego, California, at 4:01 p.m.,
Wednesday, July 19, 2006, before
Antonia Sueoka, RPR, CSR No. 9007

1



**2**

1  APPEARANCES OF COUNSEL:
2
3  FOR THE PLAINTIFF:
4    ARLEO LAW FIRM, PLC
     BY: ELIZABETH J. ARLEO, ATTORNEY AT LAW
5    850 Main Street
     Suite 201
6    Ramona, California 92065
     (760) 789-8000
7
8
9  FOR THE DEFENDANT:
10   HINSHAW & CULBERTSON, LLP
     BY: LINDA STREETER, ATTORNEY AT LAW
11   11601 Wilshire Boulevard
     Suite 800
12   Los Angeles, California 90025-1744
     (310) 909-8000
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1  SAN DIEGO, CALIFORNIA, WEDNESDAY, JULY 19, 2006, 4:01 P.M.
2          - - -
3          ISMAEL ROBLES,
4  having been administered an oath, testified as follows:
5
6          EXAMINATION
7  BY MS. ARLEO:
8    Q.  Good afternoon, Mr. Robles. My name is
9  Elizabeth Arleo. I represent the plaintiff in this
10 action. It's entitled Gonzales vs. Arrow Financial
11 Services.
12     Please state your full name for the record.
13   A.  My name is Ismael, I-s-m-a-e-l, Robles,
14 R-o-b-l-e-s.
15   Q.  Do you have a middle name?
16   A.  No.
17   Q.  Have you ever had your deposition taken before,
18 Mr. Robles?
19   A.  No.
20   Q.  Before we get started, I would like to go over a
21 few ground rules.
22     As you can see, the questions that I ask and the
23 answers that you give are being taken down by transcript
24 by the court reporter. Obviously, the court reporter can
25 only take one person down at a time, so please wait for me

**3**

1          INDEX
2  Wednesday, July 19, 2006
3  WITNESS: ISMAEL ROBLES
4  EXAMINATION                    PAGE
5    BY MS. ARLEO                   4
6
7          EXHIBITS
8  NUMBER   DESCRIPTION            MARKED
9
10 1  Amended Deposition Notice of Ismael Robles
     (6 pages)                    8
11
12 2  First Amended Complaint for Violation of the
     Federal and California Fair Debt Collection
13   Practices Acts (17 Pages)     36
14
15 3  Arrow Financial Services LLC's Supplemental
     Responses to Plaintiff's First Set of Discovery
16   Requests (22 pages)           45
17
18 4  Letter to Magistrate Judge Ruben B. Brooks
     from David S. Reidy, May 1, 2006, with
19   attachments (7 pages)         63
20          - - -
21     QUESTIONS NOT ANSWERED
              PAGE LINE
22            68  18
23     INFORMATION REQUESTED
              PAGE LINE
24            (NONE)
25

**5**

1  to finish my question before you respond.
2    A.  Okay.
3    Q.  Is that okay?
4    A.  Yes.
5    Q.  And just like you answered, "yes," it's
6  better -- "yes" and "no" is better than "uh-huh" or a
7  gesture because it reads better in the transcript.
8      Although this is a somewhat informal setting,
9  this is a very formal proceeding. Do you understand that?
10   A.  Yes.
11   Q.  Okay. You've been sworn to tell the truth and
12 you're under penalty of perjury. Do you understand what
13 that means?
14   A.  Yes.
15   Q.  Okay. When this deposition is over, the
16 transcript will be made available for you to read and
17 reviewed and sign. Do you understand that?
18   A.  Yes.
19   Q.  Is there anything in your testimony that you
20 think -- if there is anything in your testimony that you
21 think is inaccurate, you can make changes to the
22 transcript when you get the transcript. Do you understand
23 that?
24   A.  That's correct, yes.
25   Q.  I just want you to know that I can comment on

**6**

1  any changes that you make, particularly substantial
2  changes that you make from a "yes" to a "no," and I can
3  comment on those changes to undermine your credibility at
4  trial. Do you understand that?
5      A. Yes.
6      Q. There are a few questions that I have to ask
7  just from a procedural standpoint. Are you under the
8  influence of any medications or alcohol today?
9      A. No.
10     Q. Is there any reason you can think of why we
11  can't have your best testimony here today?
12     A. I didn't have lunch. I haven't had lunch. I
13  didn't eat anything.
14         MS. ARLEO: Well, if you get to a point where
15  you'd like to stop, we can certainly break.
16         THE WITNESS: Okay.
17         MS. ARLEO: We can give you sufficient time.
18  There are ample restaurants in the area and then we can
19  resume the deposition at a later time.
20         I think we can agree on that, Counsel?
21         MS. STREETER: That's agreed.
22  BY MS. ARLEO:
23     Q. Okay. Mr. Robles, when did you first learn
24  about this deposition?
25     A. I don't remember.

**7**

1      Q. Was it sometime this year?
2      A. I don't remember actually.
3      Q. Okay. Without going into any detail about what
4  was said, can you tell me who told you about the
5  deposition?
6      A. David -- actually, I have an attorney. David
7  Reidy who was the former attorney for Arrow contacted my
8  attorney.
9      Q. And who is your attorney?
10     A. Daniel Marshall.
11     Q. And where does Mr. Marshall --
12     A. Here in San Diego. I guess someone tried to
13  track me down. They contacted my attorney and sent him a
14  letter. I want to say it was the beginning of this year,
15  but I'm not certain.
16     Q. Have you talked to anyone else about appearing
17  here today?
18     A. No. Just my boss. I sent him an e-mail.
19     Q. What is his name?
20     A. Mitch Bonilla.
21     Q. Can you spell that last name?
22     A. B-o-n-i-l-l-a.
23     Q. Was there anybody else that you spoke to?
24     A. No.
25     Q. No one in your family?

**8**

1      A. My wife.
2      Q. So you told your wife you were coming to the
3  deposition --
4      A. Yes.
5      Q. -- today?
6         Did you review any documents in preparation for
7  today's deposition?
8      A. No.
9      Q. Mr. Robles, you have in front of you a document
10  entitled "Amended Deposition Notice of Ismael Robles." If
11  you would like a few seconds to review it?
12     A. Okay.
13         MS. ARLEO: For the court reporter, I'd like to
14  make this Exhibit 1.
15         (Exhibit No. 1 was marked for
16         identification and is annexed hereto.)
17         THE WITNESS: You want me to go through the
18  whole document or --
19  BY MS. ARLEO:
20     Q. It's not honestly necessary. I'll just ask you
21  one or two questions about it.
22     A. Okay.
23     Q. This is the first time you've seen this
24  document; is that correct?
25     A. That is correct.

**9**

1      Q. Have you received any other notices that are
2  similar to this document?
3      A. No.
4      Q. Did you agree to appear today, the 19th of July?
5      A. Today at 4:00.
6      Q. Okay. Were you available any other time to
7  appear?
8      A. No.
9      Q. Okay. Did you work today?
10     A. Yes.
11     Q. And you worked yesterday?
12     A. Yes.
13     Q. And you typically work 9:00 to 5:00, Monday
14  through Friday?
15     A. All 7:30 to 6:30, maybe sometimes 7 o'clock.
16     Q. Okay. We'll get to that a little further down
17  the line. And that's the only points, questions that I'll
18  ask you from this.
19         I'd like to spend some time discussing your work
20  history. Are you presently employed?
21     A. That is correct.
22     Q. Where are you employed?
23     A. I think that's irrelevant, though, where -- I
24  would say, where I'm working at currently.
25     Q. Well --

**10**

1    MS. STREETER: Would you like to talk to me
2  about it?
3        She is entitled to that information.
4        THE WITNESS: Entitled to that information?
5        I just don't want my, you know, former -- or my
6  current employer to get involved with anything, anything
7  that has the do with this. That's the reason why I'm
8  saying.
9        MS. ARLEO: If you would like a few moments to
10 spend with your counsel, I would like to know that
11 information.
12       MS. STREETER: Let's go off the record.
13       (Recess taken.)
14 BY MS. ARLEO:
15    Q.  Mr. Robles, do you currently work for Arrow?
16    A.  No.
17    Q.  Do you currently work for any subsidiaries of
18 Arrow?
19    A.  No.
20    Q.  And by, "Arrow," I'm referring to Arrow
21 Financial Services?
22    A.  Arrow Financials, no.
23    Q.  Its parents -- it's parent Sallie Mae?   .
24    A.  No. I haven't worked for them for 14 months.
25    Q.  When did you begin working for Arrow?

**11**

1    A.  July of '98.
2    Q.  And what was your position at that time?
3    A.  I was a manager --
4    Q.  You --
5    A.  -- collections manager.
6        MS. STREETER: Let her finish her question.
7        THE WITNESS: Okay.
8  BY MS. ARLEO:
9    Q.  How many people did you oversee?
10    A.  At the time there was I want to say 15.
11    Q.  And what were your duties?
12    A.  My duties were as to oversee production,
13 training, FDCPA training, approving vacations, hiring, and
14 all the other admin. stuff that goes along with that
15 position.
16    Q.  At the time you were manager of collections, how
17 many people worked in the same facility?
18    A.  I want to say -- I want to say 33 individuals.
19    Q.  And was this in San Diego?
20    A.  That is correct.
21    Q.  And to whom did you report?
22    A.  I reported to Frank Ganan, G-a-n-a-n.
23    Q.  Do you recall his title?
24    A.  He was the operations manager.
25    Q.  Do you recall who his boss was?

**12**

1    A.  I want to say Ron Lavin, L-a-v, as in Victor,
2  i-n.
3    Q.  And Mr. Lavin's title?
4    A.  COO at the time. I'm not sure what his title
5  was, but he's a COO.
6    Q.  Did Mr. Lavin work in the same facility that you
7  did?
8    A.  No.
9    Q.  And just to clarify, did you work in the
10 San Diego facility?
11    A.  Yes.
12    Q.  Did Mr. Ganan work in the San Diego facility?
13    A.  Yes.
14    Q.  Did Mr. Ganan oversee all the employees in the
15 San Diego office?
16    A.  Yes.
17    Q.  Were there any other managers in the San Diego
18 office?
19    A.  Mike Pablo. Michael Pablo.
20    Q.  Would that be P-a-b-l-o?
21    A.  Yes.
22    Q.  And what was his title?
23    A.  He was a manager as well.
24    Q.  Manager of collections?
25    A.  Yes.

**13**

1    Q.  And did he oversee --
2    A.  The other 15 individuals. Sorry.
3        MS. STREETER: It's very hard to have one person
4  speak at a time.
5        THE WITNESS: Okay.
6        MS. STREETER: But it's important.
7        THE WITNESS: Sorry.
8  BY MS. ARLEO:
9    Q.  Mr. Robles, you said that one of your duties was
10 to oversee production. Could you describe what you mean
11 by production?
12    A.  I would review liquidation rates on certain
13 portfolios.
14    Q.  And by "liquidation rates," what are you
15 referring to?
16    A.  I'm referring to what we would collect based on
17 what we were getting. Example, let's -- I'll give you an
18 example. Let's say we were working a G.E. Capital 90
19 million dollar face value. We would focus on producing
20 about 50 basis points, which is half of a percent on a
21 monthly basis. So that will be about 50 basis points
22 would be about $45,000 a month on that particular
23 portfolio, and we had separate portfolios.
24    Q.  Is it accurate to say that a portfolio refers to
25 a bulk purchase of debt?

**14**

1    A.  Yes.
2    Q.  Are you familiar with a portfolio referred to as
3  Bally's Holiday Spa?
4    A.  Yes.
5    Q.  What do you recall about that particular
6  portfolio?
7    A.  From what I remember, I know that that was a
8  portfolio that we were working on.  I believe it was a
9  Holiday Spas, yes, Bally's, individuals that defaulted on
10  their memberships and average balance I will say between
11  300 to 800.
12    Q.  Do you recall the aggregate size of that
13  portfolio?
14    A.  No.
15    Q.  Were you responsible for the accounts only in
16  California?
17    A.  No.
18    Q.  So the portfolio was a nationwide?
19    A.  That is correct, yes.
20    Q.  Could you give me an estimate of the size of the
21  portfolio?
22    A.  Which one?
23    Q.  The Bally's Holiday Spa.
24    A.  I don't recall.
25    Q.  Would it have been a 100 million dollar

**15**

1  portfolio?
2    A.  I don't recall.
3    Q.  Approximately, how many portfolios did you
4  manage in a year?
5    A.  About -- about 200.
6    Q.  So is it accurate to say that Bally's portfolio
7  was one of 200 that you managed?
8    A.  Yes.
9    Q.  And this is -- do you recall the time period for
10  this?
11    A.  No.
12    Q.  Do you recall the liquidation rate for the
13  Bally's Holiday Spa portfolio?
14    A.  No.
15    Q.  Do you recall the average liquidation rate for
16  the portfolios?
17    A.  Every portfolio was different.
18    Q.  And what made the portfolios different?
19    A.  On the aging of the account.
20    Q.  And by that you're referring to?
21    A.  If it was a precharge-off or if the account was
22  five years old.
23    Q.  And when you say, "precharge-off," what do you
24  mean?
25    A.  That means after a 180 days, which is 6 months,

**16**

1  if they -- if Arrow would purchase these portfolios,
2  they're newer, so the liquidation rate would vary.
3    Q.  Is there a correlation between the age of the
4  debt and the liquidation rate?
5    A.  That is correct.
6    Q.  Is it fair to say that the newer the debt, the
7  higher the liquidation rate?
8    A.  Yes.
9    Q.  Meaning that if a portfolio with 90 million
10  dollars, you would get maybe 1 point instead of 50 basis
11  points?
12    A.  That is correct.
13    Q.  Do you recall the age of the Bally's Holiday Spa
14  portfolio?
15    A.  No.
16    Q.  If you wanted to know that information, assuming
17  you were still working at Arrow, where would you go to
18  look?
19    A.  I would -- I don't remember the menu, the screen
20  that we would go and look at the size of the portfolio,
21  but I would have access to that.
22    Q.  Would other debt collectors have access to the
23  same information?
24    A.  No.
25        MS. STREETER:  Objection.  Vague and ambiguous.

**17**

1  Other debt collectors within Arrow?
2        MS. ARLEO:  Correct, yes.
3        THE WITNESS:  No.  Just managers.
4  BY MS. ARLEO:
5    Q.  How did you find out about overseeing a new
6  portfolio?
7    A.  I'm going to go back and touch a little bit on
8  the Bally's.  I want to say that that was probably in the
9  early 2000s, and by that time we had expanded already, and
10  I want to say we had probably over a hundred employees
11  now.  So there were certain portfolios that I would
12  probably be responsible at a time I was promoted.  There
13  was another individual that was promoted, and that
14  individual would be in charge of the other portfolios.  So
15  I vaguely remember how, you know, when -- when we received
16  that portfolio, that Bally's portfolio.
17        MS. STREETER:  Stop there.
18        Could you read back what the question was?
19        (Record read as follows:
20        "Question:  How did you find out about
21  overseeing a new portfolio?")
22        MS. STREETER:  Okay.  Belated objection as to
23  time, and in light of his answer.
24  BY MS. ARLEO:
25    Q.  I think we'll start clarifying those right now.

C-5

**18**

1       After you were the manager of collections in
2   July 1998 what was your next job?
3       A.  I want to say the portfolio manager.
4       Q.  And when did you begin that position?
5       A.  Sometime in 2000. I'm guessing now, but I'm not
6   certain.
7       Q.  And how long did that position last?
8       A.  A little bit over a year.
9       Q.  And after that job, what was your next job?
10      A.  I was a group manager.
11      Q.  And the time period?
12      A.  About I want to say three years.
13      Q.  So between 2001 through 2003?
14      A.  I -- I held three positions there from a
15  manager, collections manager, to operations portfolio
16  manager, to a group manager within that eight-year period.
17      Q.  By eight years, you're referring from 1998
18  through 2005?
19      A.  That is correct.
20      Q.  Would that be May 2005?
21      A.  Yes, May 15th to be exact.
22      Q.  Is it accurate to say that your last position
23  was group manager of operations?
24      A.  Just group manager.
25      Q.  And can you briefly describe your duties as a

**19**

1   group manager?
2       A.  I was responsible for 4 department managers, 8
3   supervisors, and about 60 employees.
4       Q.  And can you tell me the department managers'
5   titles, how were they divided?
6       A.  Department managers were managers that would
7   manage the individuals, manage production, manage the
8   disciplinary action, you know, stuff like that.
9       Q.  So they were divided by the number of employees?
10      A.  Give you a -- let me see. The department
11  manager had 2 supervisors below them and about 20
12  collectors below the supervisors, and 10 for each
13  supervisor, 10 and 10.
14      Q.  Was there any other reasoning behind the
15  division of departments, for example, was one department a
16  commercial division and the other a consumer division?
17      A.  We all did purchased. When I say, "purchased,"
18  they were purchased portfolios. There was another group
19  manager who handled all the contingency. Contingency is
20  paper that is being serviced through agencies or clients.
21      Q.  As opposed to paper that was being -- that had
22  been purchased?
23      A.  Purchased, that is correct.
24      Q.  To your understanding the Bally's Holiday Spa
25  portfolio was a purchased account; is that correct?

**20**

1       A.  Yes.
2       Q.  Were the departments divided by the type of
3   debt?
4       A.  No.
5       Q.  Do you recall when you first received the
6   Bally's Holiday Spa portfolio?
7       A.  No.
8       Q.  Could you give me any kind of estimate?
9       A.  I can give you an estimate, and I will say 2002.
10      Q.  Did you always work in the San Diego facility?
11      A.  Yes.
12      Q.  And you testified previously that your
13  supervisor when you were manager, was Frank Ganan?
14      A.  That is correct.
15      Q.  Was Mr. Ganan always your supervisor throughout
16  your tenure?
17      A.  No.
18      Q.  Can you tell me your other names of your other
19  supervisors?
20      A.  After Frank Ganan, I want to say there was the
21  guy's last name was Duffy. I don't remember his first
22  name. He was only there for a few months, then there was
23  Tony Galluzzi, G-a-l-l-u-z-z-i, followed by Mark Cavin.
24      Q.  Can you spell Cavin?
25      A.  C-a-v, as in Victor, i-n.

**21**

1       Q.  And Mr. Cavin's title?
2       A.  Vice president of operations at the time.
3       Q.  Were any of these supervisors also responsible
4   for the Bally's portfolio?
5       A.  The supervisors that were below me or which --
6   what are you referring to?
7       Q.  Let's clarify.
8           The names that you just gave me, are those
9   supervisors who reported to you?
10      A.  Oh, the supervisors, not the individuals that
11  I -- not the names that I just provided to you?
12          MS. STREETER:  Listen to the question.
13          THE WITNESS:  Okay.
14          MS. STREETER:  And answer the question.
15          THE WITNESS:  Okay.
16  BY MS. ARLEO:
17      Q.  The four names that you just gave me, are those
18  individuals who reported to you?
19      A.  They didn't report to me.
20      Q.  Is it -- did you report to them?
21      A.  Yes.
22      Q.  Okay.
23      A.  I was confused.
24      Q.  Were any of these individuals also responsible
25  in any way for the Bally's portfolio?

**22**

1    A.  I would say probably Mark Cavin.
2    Q.  Why would you say probably Mr. Cavin?
3    A.  I don't think we had the Bally's portfolio when
4  Frank, Tony, and Duffy were there.
5    Q.  And when did Mr. Cavin work there?
6    A.  I believe 2002 he started the organization. I'm
7  guessing now, but it's roughly around there.
8    Q.  And do you recall how long you oversaw the
9  Bally's portfolio?
10    A.  I -- till I left. I mean, I don't -- 2005. So
11  if I'm saying -- I'm estimating it was 2002, so three
12  years.
13    Q.  And by the time you left, you had one supervisor
14  reporting to you; is that correct?
15    A.  No.
16    Q.  How many supervisors were reporting to you
17  there?
18    A.  It was four managers, eight supervisors.
19    Q.  I apologize.
20      You said that before, correct?
21    A.  Yes.
22    Q.  Just want to back up and get a general
23  understanding of what you know about the debt collection
24  business. So can you tell me what you know about credit
25  reporting?

**23**

1    A.  Well, credit reporting, we don't report -- well,
2  in general, accounts do not report on the credit bureaus
3  for over seven years.
4    Q.  And when you say, "we," are you referring to
5  Arrow?
6    A.  I'm referring to in general credit reporting.
7  That's standard procedure across the industry.
8    Q.  And when you say, "seven years," what, can
9  you --
10    A.  Seven years from the last payment.
11    Q.  And the last payment would occur before the
12  charge-off date?
13    A.  Yes. In most instance, yes.
14    Q.  And why is it that a debt which is older than
15  seven years cannot be reported?
16    A.  Due to the Fair Credit Reporting Act.
17    Q.  In general, the portfolios that you managed,
18  were most of them, meaning anything beyond 50 percent,
19  beyond 7 years old?
20    A.  No. From what I recall, no.
21    Q.  Was it unusual to have debt that was older than
22  seven years?
23    A.  Yes.
24    Q.  Did the Bally's portfolio stand out for that
25  reason?

**24**

1    A.  I would think so, yeah. I mean, I'm -- there
2  was I would say 50/50, probably.
3    Q.  Meaning 50 percent of your portfolios that you
4  managed?
5    A.  Let me clarify that. When I say, "50/50,"
6  there's a difference between over 7 years or the account
7  being out of stat., statute of limitations. Statute of
8  limitations every state is different.
9    Q.  Can you be more specific with your description
10  of 50/50? Do you mean --
11    A.  Okay. California -- a lot of these accounts
12  were in California; therefore, in the statute of
13  limitations in California it's four years. If the account
14  hadn't received a payment in five years, it's out of state
15  statute, but not federal.
16    Q.  And by federal, you're referring to the credit
17  reporting?
18    A.  That is correct. So that's what I mean by
19  50/50. It was -- it was out of stat., but it was still
20  within that federal reporting account.
21    Q.  Do you recall whether the Bally's portfolio was
22  out of stat., statute of limitations, as well?
23    A.  That's why I say it was like 50/50. Most of
24  them are -- majority of them, from what I remember, was
25  California accounts.

**25**

1    Q.  You're saying that the majority of the Bally's
2  portfolio were California accounts?
3    A.  That's correct.
4    Q.  And the majority of those accounts were outside
5  the statute of limitations in California?
6    A.  Like 50/50.
7    Q.  Is it accurate to say that some of the Bally's
8  debt was less than four years old?
9    A.  Is it accurate to say that?
10    Q.  Let me rephrase that.
11    A.  Just the opposite.
12    Q.  Right.
13      Was some of the debt new, meaning was it newer
14  than four years old?
15    A.  50/50 I'm going to say.
16    Q.  And how did you obtain your understanding of the
17  Fair Credit Reporting Act?
18    A.  How did I obtain my understanding?
19      I've been in the business for a few years.
20    Q.  Did anyone train you?
21    A.  Yes. I've gotten a lot of training.
22    Q.  Formal training? Was formal training provided
23  by Arrow?
24    A.  That's correct, yes.
25    Q.  Did you attend seminars?

**26**

1    A.  I attended seminars.  I've attended internal
2  training which was required.
3    Q.  Do you recall receiving any manuals or books or
4  memos?
5    A.  Yes.
6    Q.  Do you recall the names of those documents?
7    A.  I didn't take nothing with me when I left, so I
8  just want to say it's a training manual, Arrow's training
9  manual.
10    Q.  And that manual discussed the Fair Credit
11  Reporting Act?
12    A.  Yes.
13    Q.  Did the manual discuss the Fair Debt Collection
14  Practices Act?
15    A.  Yes, very much so.
16    Q.  And do you recall in general what the manual
17  discussed?
18    A.  No, but they had general stuff.  But every
19  company has different guidelines in terms of how they work
20  accounts.  But from what I remember, it's just, you know,
21  do not call the consumer more than twice a day; do not ask
22  for a place of employment, phone number, stuff like that.
23  It's a violation.
24    Q.  Do you recall what the limitations were with
25  respect to the Fair Credit Reporting Act?

**27**

1    A.  Limitations in terms of?
2    Q.  When you talked to debtors?
3    MS. STREETER:  Well, objection, overbroad.
4  BY MS. ARLEO:
5    Q.  How often did you attend training sessions?
6    A.  I would say twice every quarter.  It was
7  mandated.  Actually, I would mandate it, too, with my
8  employees.
9    Q.  And who would facilitate those training
10  sessions?
11    A.  Christine Muller, M-u-l-l-e-r, I believe.
12    Q.  And do you recall her title?
13    A.  She was a group manager when I left.
14    Q.  In the San Diego office?
15    A.  In the San Diego office for training.
16    Q.  Did she hand out manuals to the employees?
17    A.  Yes.  Every employee that walked into that
18  office.
19    Q.  And the employees were able to keep the manuals?
20    A.  Yes.  As long as they're still employed with
21  Arrow.
22    Q.  And the manuals discussed the Fair Credit
23  Reporting Act and the Fair Debt Collection Practices
24  Act --
25    A.  (Witness nods head.)

**28**

1    Q.  -- and any other items that you can recall?
2    A.  Systems, how to utilize the system, training and
3  objections, standard stuff.
4    Q.  Were there any other books given to employees
5  other than the manual?
6    A.  We -- the office was required from the V.P. down
7  was required to take the FDCPA test once a year.
8    Q.  And who was the vice president?
9    A.  Mark Cavin at the time.  Well, when I left.
10    C-a-n -- C-a-v, as in Victor, i-n.
11    Q.  Who was the vice president in 2004?
12    A.  I think he was.
13    Excuse me, may I get some more water?
14    Q.  Sure.
15    During these training sessions --
16    A.  Yes.
17    Q.  -- what were you told about credit reporting?
18    MS. STREETER:  Objection.  Overbroad.
19    Go ahead.
20    THE WITNESS:  We do not report accounts over six
21  years, nine months.  We do not discuss credit bureaus, and
22  the difference between the state and federal statute,
23  which I mentioned earlier.
24  BY MS. ARLEO:
25    Q.  Were all of the accounts in the Bally's

**29**

1  portfolio over six years, nine months?
2    A.  No.
3    Q.  Okay.  Can you tell me what you know about
4  collection letters that were sent by Arrow?
5    A.  By law, the customer is required to receive the
6  first initial letter five days from receiving the
7  portfolio, within five days, standard letter, just
8  basically introducing ourselves, our name, address, the
9  original creditor, the amount; Mini Miranda.
10    Q.  Was this letter referred to by a name or a
11  number?
12    A.  Yes, but I don't recall the letter.
13    Q.  Can you describe any subsequent letters?
14    A.  There was a procedure where you get the first
15  initial letter, I want to say -- I really never got
16  involved with the letter sequence.  I mean, I know that
17  they, I will say, 45 to 6 -- maybe 60 days that there was
18  a settlement proposal letter, if we didn't get no mail
19  returned, of course.
20    Q.  Can you repeat that, please?
21    A.  If there was no mail returned to the first
22  letter.
23    Q.  Do you mean if there was no response to the
24  first letter?
25    A.  If there was no response or no mail returned, of

**30**

1 course, we weren't able -- we wouldn't send a second
2 letter.
3    Q. Do you mean that the first letter didn't arrive
4 and was returned to Arrow?
5    A. That is correct. We wouldn't send a second
6 letter.
7    Q. Was the San Diego facility responsible for
8 mailing letters?
9    A. No.
10    Q. Where were the letters mailed from?
11    A. Through a vendor somewhere in the east coast. I
12 wasn't sure who they were using at the time.
13    Q. Were you responsible for sending letters?
14    A. No.
15    Q. And the name of the vendor in the east coast,
16 you don't recall?
17    A. I'm not sure.
18    Q. Who was responsible for sending letters; a
19 department, a name?
20    A. Well, the Technology Department, they would sort
21 out the accounts and send letters.
22    Q. Can you go through the process of from the time
23 that you received a portfolio to the time that the letters
24 were sent?
25    A. Okay. We get a portfolio today, it gets

**31**

1 scrubbed, meaning goes through bank code, and it scrubs
2 out any bankruptcies, deceased, disputes. All the other
3 outstanding accounts, letters will go out. It was
4 automated, so I didn't really get involved with that.
5    Q. When you say, "automated," are you referring to
6 computer automated?
7    A. Yes.
8    Q. Was that over -- was that controlled by a
9 different office?
10    A. By the corporate office.
11    Q. And the corporate office is located where?
12    A. In Chicago, Illinois.
13    Q. Do you know when the first letters were sent
14 regarding the Bally's portfolio?
15    A. Soon as we got the portfolio, but I don't recall
16 the date.
17    Q. Do you recall the year that you received the
18 portfolio?
19    A. I don't.
20    MS. STREETER: Objection. Asked and answered.
21    THE WITNESS: Tell me again?
22    MS. STREETER: I've just stated an objection for
23 the record, but you can answer.
24    THE WITNESS: I mean, if I recall, I mean, I
25 don't remember, but I'm saying 2002, so --

**32**

1    (Telephone interruption.)
2    MS. STREETER: I apologize.
3 BY MS. ARLEO:
4    Q. Do you recall any supervisor in the Chicago
5 Technology Department responsible for sending the letters?
6    A. Tim Copple.
7    Q. Can you spell his last name?
8    A. C-o-p-p-l-e.
9    Q. And did he work at Arrow between 2002 and 2004?
10    A. Yes. Yes, he did.
11    Q. Would you say that he was responsible for
12 sending every letter Arrow sent?
13    A. I would think so, yes. I want to say, yes.
14    Q. When you say -- when I say, "responsible," I'm
15 referring to the ordering of the letters to ensuring that
16 they were mailed?
17    A. The batches of account, yes. He would get the
18 portfolio, send out the letters after he scrubs the
19 accounts.
20    Q. Okay. I want to back up a little bit. Are you
21 familiar with a form letter, what that is?
22    A. A form letter?
23    Q. Yes.
24    A. No.
25    Q. Are you familiar with the concept of mass

**33**

1 mailing?
2    A. Yes.
3    Q. Okay. Can you describe what you know about mass
4 mailing?
5    A. What I just described earlier where you get the
6 portfolio and send out a first initial letter, which is
7 required by law to send out those first initial letters.
8    Q. Is it fair to say that the letters say the same
9 thing, but to different individuals -- but are sent to
10 different individuals?
11    A. Yes.
12    Q. And who decides which letters are sent? Is it
13 Mr. Copple?
14    MS. STREETER: Best of your knowledge.
15 BY MS. ARLEO:
16    Q. And, again, this is for the time period 2002
17 through 2004?
18    MS. STREETER: To the best of your knowledge.
19    THE WITNESS: Well, he reported to -- he
20 reported to Ron Lavin. So I'm assuming it's Ron Lavin
21 gave him some direction.
22    MS. STREETER: I want to caution you to answer
23 what you know and not make assumptions. If it's something
24 that you know, testify to it, otherwise it's a fair answer
25 to say that you don't know.

**34**

1    THE WITNESS: Okay.
2    BY MS. ARLEO:
3    Q.   Are you familiar with an individual named Brian
4    Cutler?
5    A.   Yes.
6    Q.   And what is or was Mr. Cutler's position at
7    Arrow?
8    A.   CTO.
9    Q.   And you're referring to chief technology
10   officer?
11   A.   Yes.
12   Q.   And is it accurate to say that he was CTO at
13   Arrow from 2001 through 2005?
14   A.   Yes.
15   Q.   Do you recall Mr. Cutler's involvement with the
16   letters or the sending of the letters?
17   A.   I don't remember.
18   Q.   Do you know who wrote the letters that were
19   mailed regarding the Bally's Holiday Spa account?
20   A.   No.
21   Q.   Let me back up.
22       Do you know whether letters were sent to debtors
23   regarding the Bally's Holiday Spa portfolio?
24   A.   Sorry, can you repeat the question?
25   Q.   Do you know whether letters were sent to debtors

**35**

1    regarding the Bally's Holiday Spa portfolio?
2    A.   First initial letter, yes.
3    Q.   Are you familiar with the fact that whether any
4    letters were sent after the first?
5    A.   Am I familiar -- well, letters, I mean
6    settlement letters, but I'm not sure what the percentage
7    is.
8        MS. STREETER: The question was, Do you know?
9        THE WITNESS: No.
10   BY MS. ARLEO:
11   Q.   Do you know the purpose of sending the letters
12   to the debtors in general, the purpose?
13   A.   It's by law. It's required by law.
14   Q.   Do you mean that the Mini Miranda is required by
15   law?
16   A.   Mini Miranda.
17   Q.   Does Arrow do anything to identify debts as
18   consumer debts?
19   A.   Can you clarify that?
20   Q.   As opposed to business debts?
21       MS. STREETER: Objection. Vague as to time.
22       THE WITNESS: I don't understand the question.
23       MS. STREETER: Beyond the scope.
24   BY MS. ARLEO:
25   Q.   Let me get off of this line of questioning, and

**36**

1    then just move to ask you whether you're familiar with the
2    Complaint in this action that was filed by plaintiff
3    Johnny Gonzales against Arrow?
4    A.   From when I received that first call, yes.
5    Q.   And when did you first learn about the Complaint
6    in this action?
7    A.   Sometime the beginning of this year.
8    Q.   And was that the same time that you talked to
9    Mr. Reidy about taking the deposition today?
10   A.   I called him when I received the letter from
11   him.
12       MS. ARLEO: Mr. Robles, I'm going to hand you a
13   document entitled "First Amended Complaint for Violation
14   of The Federal and California Fair Debt Collection
15   Practices Act."
16       I'm going to ask the court reporter to mark it
17   as Exhibit 2. And if you would like to take a few moments
18   to look at it. I will not ask you detailed information or
19   have any legal questions, but I refer you specifically to
20   the exhibits marked "A" and "B" attached to the Complaint.
21       THE WITNESS: Right here?
22       MS. STREETER: (indicating)
23       THE WITNESS: Okay.
24       (Exhibit No. 2 was marked for
25       identification and is annexed hereto.)

**37**

1        THE WITNESS: Okay.
2    BY MS. ARLEO:
3    Q.   Okay. And while you worked at Arrow, were you
4    known by any other name other than --
5    A.   Yes.
6    Q.   -- Ismael Robles?
7        Can you tell me those names?
8    A.   Mike Robles and Mike Ortega.
9    Q.   Any other names?
10   A.   Not that I remember. Mike Ortega, Michael
11   Robles.
12   Q.   Did you select these names?
13   A.   Yes.
14   Q.   Were you asked to select fictitious names?
15   A.   No.
16   Q.   How did it come about that you assumed these
17   aliases?
18   A.   I -- I'm -- everyone calls me Mike. Everyone
19   from my mother to my wife know me by Mike, so Mike Robles,
20   Ortega is actually part of my name. It's my mother's
21   maiden name.
22   Q.   Mr. Robles, I refer you to Exhibit "A" attached
23   to the Complaint, which is a letter dated April 30th,
24   2004, and I'm going to ask you, have you seen this letter
25   before?

**38**

1    A.  Not in this format, but these were system
2  generated letters.
3    Q.  And by, "system generated," you're referring to
4  the Technology Department in Chicago?
5    A.  Yes.
6    Q.  Do you recall requesting that these letters or
7  this specific letter be sent to Mr. Gonzales?
8    A.  If I requested for this letter to be sent?
9    No.  I mean, they were sent randomly, but to
10  point out a specific account, no, if that's what you're
11  asking.
12    Q.  How did it come about that this letter was sent
13  with Mike Ortega's signature?
14    A.  That --
15    MS. STREETER:  Objection.  It doesn't actually
16  have a signature, but --
17    THE WITNESS:  This is a system generated
18  signature.  That's not my signature.  Every letter the
19  San Diego office sent went out with Mike Ortega.
20  BY MS. ARLEO:
21    Q.  Can you clarify that?  Do you mean every letter
22  that was sent from the San Diego office had Mike Ortega's
23  name on it?
24    A.  On purchased portfolios.
25    Q.  So every portfolio that you were responsible for

**40**

1  BY MS. ARLEO:
2    Q.  Was in California or are you saying 25 percent
3  of the portfolio received letters like this?
4    A.  I mean, you're asking me to give you an
5  estimate, so I'm giving you an estimate.  And the reason
6  why I'm saying I'm not sure is I don't know how many
7  letters came back as mail returned.  So I can't say
8  50 percent for everyone.
9    Q.  Do you know who authorized the sending of this
10  letter or letters like it?
11    A.  No.
12    Q.  Do you know who wrote this letter?
13    A.  No.
14    Q.  Did you review this letter before it was mailed?
15    A.  No.  My V.P. did.
16    Q.  And your V.P. was?
17    A.  Mark Cavin.
18    Q.  Okay.  I would like to refer you to Exhibit B, a
19  few pages away, and I'd like to ask you if you have seen
20  this letter before or a letter similar to it?
21    A.  Exhibit "A" I just seen similar to it, but --
22    Q.  Would you say that this is a form letter?
23    A.  A form letter?
24    Q.  Meaning that --
25    A.  Standard.

**39**

1  had Mike Ortega's name on it?
2    A.  Yes.
3    Q.  Do you recall requesting in any way that this
4  letter be sent to Mr. Gonzales?
5    MS. STREETER:  This letter in particular?
6  BY MS. ARLEO:
7    Q.  This letter in particular.
8    A.  No.
9    Q.  Do you recall in any way authorizing similar
10  letters to other debtors on the Bally's account?
11    MS. STREETER:  Objection.  Vague and ambiguous.
12    THE WITNESS:  Okay.
13  BY MS. ARLEO:
14    Q.  Let me -- I can rephrase that.
15    Do you know how many letters were sent by Arrow
16  similar to this letter?
17    A.  No.
18    Q.  Do you have an estimate, any idea in California?
19    MS. STREETER:  Are you talking about on the
20  Bally's account?
21    MS. ARLEO:  Yes.
22    THE WITNESS:  On the Bally's?
23    Estimate, I want to say 25 percent of the
24  portfolio.
25  /////

**41**

1    Q.  -- the words are the same -- a standard letter.
2    A.  Yes.
3    Q.  Do you know if this letter has a name?
4    A.  I know it has a name, but I don't know the name
5  of the letter.
6    Q.  Do you recall if this was assigned a letter
7  number 2107?
8    A.  I don't recall the letter number, but I know it
9  has a number, but I don't recall the number.
10    Q.  Did you cause this letter to be mailed?
11    A.  No.
12    Q.  Did you cause letters similar to this letter to
13  be mailed?
14    A.  No.
15    Q.  Did you ever talk to debtors who called the
16  San Diego facility?
17    A.  Sometimes.
18    Q.  And when did that occur?
19    A.  When they would ask for a manager.
20    Q.  Do you recall speaking to debtors specifically
21  about the Bally's accounts?
22    A.  I don't recall.  I -- I'm sure I talked to a lot
23  of clients, a lot of customers from different types of
24  portfolios, but I don't recall.
25    Q.  Were there any guidelines or procedures used by

**42**

1  Arrow for the conversations with debtors?
2      A.  Was there any guidelines such as?
3      Q.  What you could say to a debtor under the Fair
4  Debt Collection Practices Act?
5      A.  We had training on that.
6      Q.  And you had already testified that you received
7  a training manual?
8      A.  Yes.
9      Q.  And would you say that this training manual was
10  written to ensure compliance with the Fair Debt Collection
11  Practices Act?
12      A.  Yes.
13      Q.  Would you say that there were any manuals that
14  referred you specifically to the Bally's portfolio?
15      A.  It was general.
16      Q.  So was there just one manual?
17      A.  One manual for every -- for every account in the
18  purchased.  Contingency was a different guidelines,
19  depending on the client.
20      Q.  But the Bally's was a purchased account, so
21  there was one specific manual regarding purchased
22  accounts; is that accurate?
23      A.  Yes.
24      Q.  And would you say that that manual was available
25  in January of 2003?

**43**

1      A.  Yes.
2      Q.  Was the manual updated annually?
3      A.  Yes.
4      Q.  So in January 2004, would you have a different
5  manual?
6      A.  Either that or just they would -- they would
7  give us any updates and we would put them in our manual.
8      Q.  And assuming you were still at the San Diego
9  facility, where would you go to find that manual?
10      A.  Training department.
11      Q.  And was the San Diego facility closed?  Is there
12  a San Diego Facility for Arrow?
13      MS. STREETER:  If you know.
14      THE WITNESS:  No.
15      Oh, sorry.  Not a collections floor, but there
16  is an office here in San Diego.
17  BY MS. ARLEO:
18      Q.  By the time that you left Arrow in 2005, could
19  you find the training manual at the San Diego facility?
20      A.  At my desk, too.  Matter of fact, in every
21  collector's desk.
22      Q.  So not too hard to find the training manual?
23      A.  Huh-uh.  I would make them read the manual.
24      Q.  And would the manual discuss Credit Reporting
25  Act requirements?

**44**

1      A.  Yes.
2      Q.  So if a debtor called and spoke to an Arrow
3  collector and asked questions about reporting
4  requirements, would it be possible that the collector
5  would discuss those?
6      MS. STREETER:  Objection.  Calls for
7  speculation.
8      Go ahead.
9      THE WITNESS:  If the collector wasn't able to
10  handle the call, it would be escalated to the manager,
11  yes.
12  BY MS. ARLEO:
13      Q.  Okay.  Can you tell me what you know about the
14  process for calls made by Arrow employees who generated
15  calls?
16      MS. STREETER:  Objection.  Overbroad, vague and
17  ambiguous.
18      THE WITNESS:  It was a dialer that we have.
19  BY MS. ARLEO:
20      Q.  A computerized dialer?
21      A.  Yes.
22      Q.  So for the Bally's accounts, a computer would
23  dial the telephone number for each debtor?
24      A.  If -- for every portfolio, every account they
25  were mixed in with -- everything was mixed in with one --

**45**

1  in one pool.
2      Q.  How would the computer decide to contact a
3  debtor regarding the Bally's account?
4      A.  It wouldn't.  It would just come up on the
5  dialer.  You would probably get a Portfolio "A," Portfolio
6  B, after that another, Portfolio C, and so forth.  So it
7  doesn't segregate the accounts.  We work them all in one
8  pool.
9      Q.  Did the Arrow collectors have information
10  concerning the calls?
11      MS. STREETER:  Objection.  Vague and ambiguous.
12      THE WITNESS:  You say collections call on -- on
13  the particular -- I mean, the call would record on the
14  accounts, so they'll see how many calls that particular
15  account received, but other than that, no.
16      MS. ARLEO:  Okay.  I'd like to at this time
17  introduce another document entitled "Arrow Financial
18  Services LLC's Supplemental Responses to Plaintiff's First
19  Set of Discovery Requests," and I ask the court reporter
20  to mark it as Exhibit 3.
21      (Exhibit No. 3 was marked for
22      identification and is annexed hereto.)
23  BY MS. ARLEO:
24      Q.  And specifically, Mr. Robles, I will ask you
25  questions concerning the computerized notes that are

**46**

1  attached to this document.
2      MS. STREETER: Would this be an okay time to
3  take a break?
4      MS. ARLEO: Sure.
5      (Recess taken.)
6  BY MS. ARLEO:
7      Q. Mr. Robles, we're looking at computerized notes
8  which are attached to Exhibit 3. The first page of these
9  notes have a title on them, "Arrow Financial Services
10 LLC," and the next line underneath says, "Selected."
11     With respect to this document, have you seen
12 notes like this before?
13     A. Yes.
14     Q. And where have you seen them?
15     A. On accounts in general.
16     Q. Have you seen them on a computer screen?
17     A. Yes.
18     Q. At Arrow?
19     A. Yes.
20     Q. Is it accurate to say that each debt collector
21 at Arrow has a computer screen and is able to view notes
22 similar to this?
23     A. Yes.
24     Q. Would you say those are computer generated
25 notes?

**47**

1      A. Some are, yes.
2      Q. But in total, the report itself is a compilation
3  generated by the computer; is that accurate?
4      A. Yes.
5      Q. Mr. Robles, I'm having a hard time interpreting
6  some of the data that is contained in this report, and I'm
7  hoping that you can spend some time with me informing me
8  about each of the fields and the characters and the codes.
9      So what I'd like to do is have you start on the
10 first page from the line, it's probably a third of the way
11 down, and it starts, "List colon 6/11/02."
12     Do you see that?
13     MS. STREETER: Excuse me, just a minute. Before
14 we get to the questions on this, let me just ask, is this
15 document the way it was produced, because I see in this it
16 says "redacted"?
17     MS. ARLEO: I believe that's a typo.
18 Originally, it was produced in redacted form. The
19 supplemental responses unredacted a good portion of what
20 was previously redacted. So the last page on this
21 document is redacted.
22     MS. STREETER: Oh, I see. And the rest of this
23 is produced the way it was produced?
24     MS. ARLEO: This document is the document that I
25 received from Arrow's prior counsel.

**48**

1      MS. STREETER: All right. Thank you.
2      THE WITNESS: What I see, the first thing I see
3  is I see Daiwa. It's not a Bally's Holiday Spa. This is
4  a different account.
5  BY MS. ARLEO:
6      Q. Do you know that the Bally's portfolio was
7  purchased from Daiwa Bank?
8      A. I don't remember.
9      Q. Just so that you know, Mr. Robles, Arrow has
10 said previously in its discovery responses that it
11 purchased the debt from Daiwa Bank, and received an
12 electronic file containing all the information regarding
13 the Bally's debt.
14     A. Okay.
15     Q. So looking again at the line starting, List
16 6/11/02?
17     A. 6/11/02.
18     Q. Could you just go across that line and explain,
19 if you recall, what those dates are referring to and the
20 numbers are referring to?
21     A. I have never seen this in this format, so I'm
22 trying to understand this.
23     MS. STREETER: Well, if you know, if you're
24 familiar with this document --
25     THE WITNESS: Yes.

**49**

1      MS. STREETER: -- and this format.
2      THE WITNESS: Okay. The 6/11 is the date that
3  we received the portfolio.
4  BY MS. ARLEO:
5      Q. "We" being Arrow?
6      A. Arrow Financial at the time.
7      Q. And would that be also the San Diego office of
8  Arrow or it's broader, it's just Arrow --
9      A. It's Arrow Financial. Yeah, it's Arrow
10 Financial.
11     Q. And moving to the right, it says, "Srv colon,"
12 do you know what that stands for?
13     A. To the right?
14     "Srv."
15     MS. STREETER: Do you know what that stands for
16 (indicating)?
17     THE WITNESS: Service date.
18 BY MS. ARLEO:
19     Q. And that service date would refer to any
20 specific date do you know of?
21     A. No.
22     Q. And "Ltrs" refers to?
23     MS. STREETER: If you know.
24     THE WITNESS: Letters.
25 /////

**50**

BY MS. ARLEO:

1   BY MS. ARLEO:
2     Q.  And moving to the right, "Time: 100," do you
3   know what that means?
4     A.  No.
5     Q.  Okay.  Moving down one line, where it start
6   "KJB," in the left column, do you know what the name of
7   this field is?
8     A.  Name of this field?
9     Q.  The column.
10    A.  No.
11    Q.  Do you know what KJB refers to or could refer
12  to?
13    A.  No.
14    Q.  Are those initials of debt collectors?
15    A.  No.
16       For the record, from just taking a glance at it,
17  the first three and a half pages are all system generated.
18    Q.  What do you mean by that?
19    A.  They're not -- they're not collectors.  They're
20  all -- they're our system moving or making notes on
21  accounts -- on the account.
22    Q.  Are you aware of any document that would explain
23  the codes on these?
24    A.  Yes.
25    Q.  And what would that document be called?

**51**

1     A.  It's the -- I don't remember what it's called,
2   but I know there's a document explaining not the codes but
3   each, for example, that new -- "2NEW," what that means;
4   2000.
5     Q.  Is that a document contained in a manual?
6     A.  Yes.
7        They're called dispositions.  Dispositions.
8     Q.  So if I wanted to find a document explaining the
9   codes contained in these computerized notes, would I ask
10  Arrow for the dispositions?
11    A.  Disposition codes.
12    Q.  Is that, the disposition codes, does that refer
13  to all the codes contained in Arrow's notes, computerized
14  notes?
15       If you can be more specific, it would just
16  help --
17    A.  Yes.  Yes.  You know, what is 2NEW means?  Gives
18  you a description of what that -- what that means.  2000,
19  what the 2000 represents.  Gives a description and so
20  forth.
21    Q.  And are those disposition codes made available
22  to each Arrow debt collector?
23    A.  Yes.
24    Q.  In hard copy?
25    A.  On manual -- in a manual.

**52**

1     Q.  Is it part of the employee training manual?
2     A.  Yes.
3     Q.  And were those disposition codes available in
4   2002?
5     A.  Yes.
6     Q.  In 2003?
7     A.  Yes.
8     Q.  In 2004?
9     A.  Yes.
10    Q.  In 2005?
11    A.  I left after that, so I'm --
12    Q.  But during the time you were there in 2000 --
13    A.  Yes.
14    Q.  Moving down the page, looking at the second to
15  last line from the bottom, do you know -- dated 9/11/02,
16  do you know what it means by "transferred from KJC to
17  EK3"?
18    A.  Yes.
19    Q.  Can you tell me what that means?
20    A.  It's -- no, it's actually "EW3."  "Transferred
21  from EW3 to KJC," then we transferred from KJC to EW3, I
22  think it is.
23       Basically, when someone is no longer employed
24  with the organization, we get their account.  We can get
25  their account -- at the time when I was employed with

**53**

1   them, the accounts will be moved to a general population,
2   then transferred to individuals that needed, that were
3   short of accounts.  That's why you show -- that's why you
4   see EW transfer to the general population, and then
5   transferred out again to another individual.
6     Q.  And the general population refers to --
7     A.  A holding tank.
8     Q.  That makes things less apparent to me.
9     A.  Sorry.
10    Q.  So if we can, the general population refers to a
11  pool of debt collectors; is that correct?
12    A.  General population of pool -- or not debt
13  collectors, but a pool of accounts.
14    Q.  So would it be accurate to say that this account
15  was transferred from one pool to another?
16    A.  From one collector to a general pool, such as a
17  holding, and then retransferred out to an individual that
18  was either coming out of training and needed accounts or
19  just dispersed evenly to the floor.
20    Q.  So KJC is probably referring to the holding tank
21  of accounts?
22    A.  That's the system.  That is the -- the system,
23  yes.
24    Q.  Do you know what those initials stand for?
25    A.  No.

C-14

**54**

1    Q.  Turning the page to the first line which is
2    dated October 4th, 2002, and reading across, we see a code
3    "enDI," do you know what that refers to?
4    A.  No.
5    Q.  Do you have any idea?
6    A.  No, I don't.
7    Q.  Again, moving to the right, "3AEX," do you know
8    what that code refers to?
9    A.  Yes.
10   Q.  Could you explain?
11   A.  All efforts exhausted.
12   Q.  Moving along on that sentence, "changed DU66002
13   from to Kenny Jackson." Could you interpret that for me?
14   A.  Let me go back to these notes here.  Okay.
15       MS. STREETER:  If you know.  I don't want you to
16   speculate, to go back through the documents and look at
17   them to try to come up with an explanation that you don't
18   already have knowledge about, okay?
19       THE WITNESS:  Uh-huh.
20       MS. STREETER:  So if you know what that stands
21   for, testify to it.
22       THE WITNESS:  Can you repeat the question?
23   Sorry.
24   BY MS. ARLEO:
25   Q.  Could you interpret this line for me?

**55**

1    A.  Which one was it?
2    Q.  The top line of the second page, I understand,
3    the starting from "Changed."
4        MS. STREETER:  (Indicating)
5        THE WITNESS:  Okay.
6        The account was in an AEX disposition.  When the
7    account got transferred, it got transferred to Kenny
8    Jackson, which is EK3.
9    BY MS. ARLEO:
10   Q.  And who is Kenny Jackson?
11   A.  An employee.
12   Q.  Was he a debt collector?
13   A.  Yes.
14   Q.  Did he report to you?
15   A.  No.
16   Q.  Did he report to a supervisor?
17   A.  He reported to a supervisor then a manager, but
18   I forgot who.
19   Q.  And that manager reported to you; is that
20   correct?
21   A.  Yes, correct.
22   Q.  Going down this page, counting four lines from
23   the bottom, dated January 29th, 2003, can you interpret
24   that entry for me?
25   A.  Which one, sorry?

**56**

1    Q.  January 29th, 2003.
2    A.  EK3 Kenny Jackson no longer with the
3    organization, is transferred to a holding tank, which is
4    Mike Robles.
5    Q.  Was it transferred to you personally?
6    A.  No.  Transferred to a holding tank.
7    Q.  If you –
8    A.  Holding tank.
9    Q.  If you could look up one line where it says,
10   "From Kenny Jackson to Mike Robles"?
11   A.  Uh-huh.
12   Q.  Are you testifying that Mike Robles is referring
13   to a holding tank and not to an alias?
14   A.  What I will say is I didn't work accounts, so it
15   would be under an item – or a holding tank which is used
16   for transferring accounts as well.
17   Q.  So it was a disbursement or a change from Kenny
18   Jackson to accounts under your purview?
19   A.  The accounts would get transferred.  NLE's will
20   get transferred to my user code.  From my user code, I
21   would distribute the accounts evenly.
22   Q.  Okay.  So you mean, on the next line, "EK3 to
23   IR3," IR3 would be a debt collector under your management?
24   A.  IR3 would be me.
25   Q.  And the last line there, the end of it says,

**57**

1    "from 4560 to 4500," do you know what that means?
2    A.  No.
3        Sorry.  That is extension number, 4400.  Kenny
4    Jackson was at 4560, and the IR3 item or user was a
5    general user which is 4400, extension number.  That's what
6    it means.
7    Q.  Would that be the telephone extension number?
8    A.  Extension, yes.
9    Q.  Would that be the telephone number and extension
10   that would be listed on the letters sent with Mike Ortega?
11   A.  Yes.
12   Q.  So I refer you back to the First Amended
13   Complaint, Exhibit "A," which is the letter dated
14   April 30th, 2004, and looking at the right upper right
15   quarter?
16       MS. STREETER:  Exhibit "A."
17   BY MS. ARLEO:
18   Q.  You're doing good.
19   A.  I'm almost looking –
20   Q.  Yes.
21       I'm pointing now to the 4400 number.
22   A.  Yes.
23   Q.  Is it accurate to say that the computer assigned
24   this debt to telephone extension 4400 and as a result the
25   telephone extension was reflected on a subsequent letter?

**58**

1    A. Yes.
2    Q. So that's an accurate chain of events?
3    A. Okay. Let me -- you're saying that is it safe
4 to say that when the account got transferred to Mike
5 Robles, the extension also gets changed, transferred which
6 is 4400 which is a general number?
7        Yes, that's what happened.
8    Q. So if --
9        MS. STREETER: Excuse me, but wasn't your
10 question also asking about how that appears on this
11 document Exhibit "A" as part of that same process?
12       MS. ARLEO: Well, let me proceed with the
13 questioning.
14 BY MS. ARLEO:
15    Q. If a debtor called the telephone number listed
16 on this letter and asked for extension 4400, would that
17 mean it would be assigned to you or your holding tank?
18    A. Yes. It would be assigned to the holding tank
19 when it comes through the reception. So the reception
20 would notice that it's a 4400, so it would go to any
21 available agent.
22    Q. Not necessarily you?
23    A. No. I didn't take calls.
24    Q. But the agent who would receive this call would
25 be working in your group; is that correct?

**59**

1    A. Yes. Or in the Training Department as well.
2    Q. As a fallback position?
3    A. Training department also worked purchased
4 accounts.
5    Q. When -- in what event would cause the telephone
6 number to be transferred to the Training Department as
7 opposed to your department?
8    A. It would be random.
9    Q. Do you recall giving any instructions regarding
10 the contents of this letter (indicating)?
11    A. No.
12    Q. Do you know if debt collectors who worked in
13 your group received instructions regarding the content of
14 this letter?
15       MS. STREETER: This letter particularly?
16       MS. ARLEO: This format, this form letter.
17       THE WITNESS: Well, we would say, you know
18 50 percent settlement letters will go out on the accounts,
19 but we -- we didn't see the letter.
20 BY MS. ARLEO:
21    Q. Looking again at Exhibit "A" attached to the
22 Complaint, there's a -- under the heading "Settlement
23 Amount," there's a sentence that begins, "Upon receipt of
24 the settlement amount ...," do you see it?
25    A. "Upon receipt ...," yes.

**60**

1    Q. "... and the clearance of funds, and if we are
2 reporting the account ...."
3        Do you know what that means, "if we're reporting
4 the account"?
5    A. If we're reporting the account to the credit
6 bureau.
7    Q. Would the debt collectors in your group know if
8 the account was being reported to the credit bureau?
9    A. Yes.
10    Q. How would they know that?
11    A. Based on the account when you look at the last
12 payment.
13    Q. And that would be on the computer screen?
14    A. It would be, yes, on the computer screen.
15    Q. Can you show me where in this report it says
16 where the last payment was?
17       MS. STREETER: As a foundational question --
18       THE WITNESS: I don't see it.
19       MS. STREETER: -- I think that the testimony has
20 been that he hasn't seen this in this format before, that
21 there's something similar that would be on the computer
22 screen in his experience. Is that correct?
23       THE WITNESS: Yeah. That's why when I look at
24 this, I don't -- I never seen it in this format, but I
25 don't see it.

**61**

1 BY MS. ARLEO:
2    Q. Is it accurate to say that the last payment date
3 was available to the debt collectors?
4    A. Sometimes, not all the times. Whatever the
5 client gives us, which is when they purchased.
6    Q. Okay. Mr. Robles, I'm going to ask you to go
7 two pages. We're looking again at the computerized notes.
8    A. This one?
9    Q. Correct.
10       Actually, it reads, Page 15 on the faxed
11 notation?
12    A. Okay.
13    Q. And I ask you to count six lines down, dated
14 April 30th, '04. Can you tell me what the notation "1s
15 No. 2107" means?
16    A. "Ls" -- it is actually "Ls," letter sent. I
17 don't know the -- that letter number.
18    Q. Could that refer to a letter that was mass
19 mailed, such as Exhibit "A"?
20       MS. STREETER: Objection. Calls for
21 speculation.
22       You can answer.
23       THE WITNESS: Letter sent. I'm not sure if it's
24 the same letter, though.
25 /////

**62**

1  BY MS. ARLEO:
2      Q.  If you can look at Exhibit "A", and I think more
3  than halfway down on the right-hand side is a group of
4  letters and numbers in very small font and at the end of
5  that group it says, "2107-E"?
6      A.  I see that right here.
7      Q.  Does that refresh your recollection with respect
8  to the naming of this letter?
9      A.  Just by looking at it, it matches 2107, so it
10  looks like it.
11      MS. STREETER:  I'll object as lacking
12  foundation, however, because the witness has testified
13  he's not familiar with this particular letter.
14      I'm sorry for interrupting.  Go ahead and
15  finish.
16  BY MS. ARLEO:
17      Q.  Is that accurate, you're not familiar with that
18  particular letter?
19      A.  No, because they're a system generated letter,
20  like I mentioned.
21      Q.  So do you ever recall someone talking to you
22  about a letter entitled 2107?
23      A.  I don't remember.
24      MS. ARLEO:  And then at this time, I'd like to
25  introduce Exhibit 4, which is a letter dated May 1st from

**63**

1  Reed Smith to Magistrate Judge Ruben Brooks.
2      (Exhibit No. 4 was marked for
3      identification and is annexed hereto.)
4  BY MS. ARLEO:
5      Q.  And, again, Mr. Robles, I refer you to
6  Exhibit "A" attached to this letter, which states that
7  it's a memo to Jack Lavin, Ron Lavin, Brian Cutler, and
8  it's dated January 26th, 1999.  I'm going to ask you, have
9  you seen this memo before?
10      A.  No.
11      Q.  Do you recall any discussions which may have
12  pertained to this letter?
13      A.  No.
14      Q.  Do you recall a lawsuit against Arrow that was
15  pending in 1999?
16      A.  No.
17      Q.  Were you made aware of lawsuits brought against
18  Arrow?
19      A.  No.
20      Q.  So your testimony is that you've never seen this
21  memo --
22      A.  Never seen this.
23      Q.  -- or even if the black lines --
24      A.  No.
25      Q.  -- nothing similar to it?

**64**

1      A.  This was when we were first starting, and I
2  was -- I would think they would go to my manager, but,
3  yeah.
4      Q.  Have you ever met Brian Cutler?
5      A.  Yes.
6      Q.  And on what occasion?
7      A.  On business occasions, and when I'd gone to
8  Chicago or he's come to San Diego.
9      Q.  Have you ever had any discussions regarding
10  letters with Mr. Cutler?
11      A.  No, I don't remember.
12      Q.  Have you ever talked to Mr. Cutler about the
13  Bally's portfolio?
14      A.  No.
15      Q.  Have you ever talked to Mr. Cutler about credit
16  reporting?
17      A.  No, I don't remember.
18      Q.  Do you recall any conversation that you had with
19  Mr. Cutler?
20      A.  Regarding production, employees, but not about
21  letters or specific portfolio.
22      Q.  Okay.  Going back to the computerized notes,
23  turning the page, and going down about 10 lines where the
24  left column begins "GR3"?
25      A.  Uh-huh.

**65**

1      Q.  And looking at May 6th, '04, can you read the
2  notations made and try to interpret that for me?
3      A.  Yes.
4      MS. STREETER:  Well, again, I'm going to ask you
5  to do that if you know what they stand for, but, you know,
6  if there's a general format for making these notes, but I
7  don't want you to speculate if it's just --
8      THE WITNESS:  Okay.
9      MS. STREETER:  -- you trying to interpret it as
10  we sit here.
11      THE WITNESS:  I'll just read how I -- what I
12  know.
13      MS. STREETER:  Okay.
14      THE WITNESS:  "DID A 2ND" and then "T/O," talk
15  off.  Talked to debtor, "TT."  "He not going to pay.  He
16  will mail a cease and desist letter.  Told him to address
17  to CCD.  He kept asking what he can legally do.  I had to
18  repeatedly tell him that I'm not an attorney and this is a
19  call center not a law firm."
20  BY MS. ARLEO:
21      Q.  And when you said the words, "talk off," can you
22  tell me what that means?
23      A.  Talk off, "TO," just hand over the call to
24  someone else.
25      Q.  Do you mean the debt collector handed the call

66

1  off to their supervisor?
2    A.  Yes.
3    Q.  And what does CCD refer to?
4    A.  Customer Care Department.
5    Q.  And then moving to the top of that page on the
6  second line, which is dated May 6, '04, the first and
7  second line, can you please interpret those for me?
8    A.  First or the second?
9    Q.  Both. I believe they're together.
10   A.  I think it continues from the page, the previous
11 page.
12      "Debtor called in," which is C/I, "referred to
13 pay wanted to know if there was anything that AFS," which
14 is Arrow Financial Services, "could do to him legally.
15 Also wanted to know if account could be placed on his
16 credit report -- or credit bureau. Refused to pay.
17 Terminated call. Wouldn't answer whether or not he would
18 pay," referring to the customer.
19   Q.  Mr. Robles, if you can look at this page and see
20 if there was any response to the debtor's question whether
21 the account could be placed on his credit report?
22      MS. STREETER:  Well --
23      THE WITNESS:  I don't see it.
24      MS. STREETER:  -- I'm going to object to that.
25      MS. ARLEO:  I'm just asking if you see an

67

1  indication on these notes whether or not the question was
2  answered.
3      MS. STREETER:  I don't --
4      THE WITNESS:  I don't know.
5  BY MS. ARLEO:
6    Q.  Could you take a few minutes and look at these
7  notes to see if there's any indication whether the
8  question was answered?
9    A.  He like -- I don't know. I mean, I don't know
10 if it was answered or not.
11   Q.  In your experience, how would the debt collector
12 have responded?
13      MS. STREETER:  Objection. Calls for
14 speculation.
15      THE WITNESS:  That's why he transferred it to a
16 supervisor, and the supervisor took the phone call.
17 BY MS. ARLEO:
18   Q.  And then the notations are made down on line
19 beginning with "GR3"?
20   A.  Yes.
21   Q.  And according to these notes, the supervisor's
22 response was -- was what?
23   A.  Just as it states right here; he's not an
24 attorney.
25   Q.  But didn't you testify --

68

1    A.  "I'm not an attorney."
2    Q.  Didn't you testify before that each of the
3  employees had received training in credit reporting?
4    A.  Uh-huh.
5    Q.  That they understood about the seven-year credit
6  reporting limitation?
7    A.  He's not asking that, though, I don't think.
8  The customer is not asking.
9    Q.  Don't you agree the customer is asking whether
10 his account could be placed on his credit report?
11   A.  He's talking about -- he's not. He's talking
12 about can they take him -- can they do anything legally to
13 him, that's what he's asking. He's not asking, you know,
14 if it's on his -- if it's reported on his credit report.
15 He's asking if Arrow can take legal action against him
16 legally. That's what he's saying, according to this.
17   Q.  Wouldn't you agree that the words, "also wanted
18 to know if account could be placed on his credit -- on his
19 credit report"?
20      MS. STREETER:  Well, I'm going to assert an
21 objection. You're asking him to interpret a document that
22 he didn't create. He's done his best to interpret it.
23 Now you seem to be wanting him --
24      MS. ARLEO:  I'm sorry, Counsel --
25      MS. STREETER:  -- to draw a legal conclusion.

69

1      MS. ARLEO:  -- is that your objection?
2      I'd appreciate it if you just limit -- I
3  understand we've had discussions right now, but if you
4  could just limit it to an objection and let Mr. Robles
5  answer the question as best he can, I'd appreciate it.
6      MS. STREETER:  All right.
7      Objection. Calls for speculation, calls for a
8  legal conclusion, calls for expert testimony. I'll
9  instruct him not to answer.
10      MS. ARLEO:  On what grounds are you instructing
11 him not to answer? You've stated your objections.
12      MS. STREETER:  On the basis that you are asking
13 for expert testimony and a legal conclusion. That's not
14 within the personal knowledge of this witness.
15      MS. ARLEO:  Can we go off the record a minute.
16      (Discussion held off the record.)
17      (Record read as follows:
18      "Question: Didn't you testify before that
19      each of the employees had received training in
20      credit reporting?
21      "Answer: Uh-huh.
22      "Question: That they understood about the
23      seven-year credit reporting limitation?
24      "Answer: He's not asking that, though, I
25      don't think. The customer is not asking.

**70**

1   *Question: Don't you agree the customer is
2   asking whether his account could be placed on
3   his credit report?
4       *Answer: He's talking about -- he's not.
5   He's talking about can they take him -- can they
6   do anything legally to him, that's what he's
7   asking. He's not asking, you know, if it's on
8   his -- if it's reported on his credit report.
9   He's asking if Arrow can take legal action
10  against him legally. That's what he's saying,
11  according to this.")
12  BY MS. ARLEO:
13      Q. Mr. Robles, were Arrow employees trained to
14  provide information to debtors concerning credit
15  reporting?
16      A. They would refer accounts to the CCC department.
17      Q. Were employees of the CCD department trained to
18  respond to questions concerning credit reporting?
19      A. I don't know.
20      Q. Who would I go to to find out that information?
21      A. Corporate office.
22      Q. Is the CCD located in the corporate office?
23      A. Yes.
24      Q. You testified before that you conducted training
25  with your employees; is that correct?

**71**

1       A. Yes.
2       Q. Did you instruct your employees concerning
3   credit reporting?
4       A. Did I instruct my employees?
5       Q. Yes.
6       A. We would speak in general about objections,
7   disputes, stuff like that.
8       Q. Would you instruct your employees to respond to
9   questions concerning credit reporting?
10      A. I would instruct them to place the call or have
11  them call the CCC department, Customer Credit Department.
12  That's what their -- that's -- that's the reason why that
13  department was created.
14      Q. According to the letter, Arrow says, If we're
15  reporting the account, we will provide information to the
16  credit bureaus, correct?
17      A. If they're --
18      MS. STREETER: The letter speaks for itself.
19      THE WITNESS: That's what the letter states.
20  BY MS. ARLEO:
21      Q. If the debtor called the San Diego office, got
22  into your group through the 4400 code or the training
23  group and asked the question, "Is my debt being reported?"
24  was your group or employees in your group trained to
25  answer the question?

**72**

1       A. Depending on the collector.
2       Q. What would be the difference between one
3   collector and another collector?
4       A. A seasoned and a fairly new collector.
5       Q. If it were a seasoned collector, what would be the
6   response be?
7       MS. STREETER: Objection. Calls for
8   speculation, but you can answer.
9       THE WITNESS: I don't know what they would
10  say.
11  BY MS. ARLEO:
12      Q. If it were a new collector, do you know what
13  they would say?
14      A. No.
15      Q. I'm trying to get at what Arrow's training was,
16  what were the employees trained to do in this situation?
17      A. That's the Training Department, though.
18      Q. But you testified before that you provided
19  training to your employees?
20      A. Yes. I provided training based on objections,
21  based on, you know, FDCPA, production, stuff like that.
22      Q. Is it accurate to say you provided no training
23  regarding credit reporting issues?
24      A. Yes.
25      Q. Did you ever provide any instruction to any

**73**

1   employee regarding credit reporting?
2       A. Instructions such as what reporting, I mean,
3   accounts being reported to credit bureaus?
4       Q. Correct.
5       A. I mean --
6       MS. STREETER: The question isn't clear to me.
7       THE WITNESS: Yeah.
8   BY MS. ARLEO:
9       Q. You testified previously that Arrow did not
10  report debts that were six years, nine months old; is that
11  correct?
12      A. Uh-huh.
13      Q. Were Arrow employees trained as to that policy?
14      A. It's -- it's standard procedure.
15      Q. How would an employee know this procedure?
16      A. It's -- and I'll use this analogy, you don't
17  cross the red -- you don't cross the street when there's a
18  red light. It's standard.
19      Q. Are you saying that employee standard
20  information was that accounts older than six years, nine
21  months were not reported?
22      A. It wouldn't be reported.
23      Q. And is it your testimony that if a debtor asked
24  the question whether his accounts could be reported, the
25  stand response would be to transfer the debtor to the CCC

**74**

1  department?
2     A.  Yes.
3     Q.  And is it your testimony that you have no
4  knowledge with respect to the information provided by the
5  CCC department -- CC department?
6     A.  No.
7     Q.  You do not what they --
8     A.  I do not know what they -- what they would say.
9     Q.  Mr. Robles, I request -- I refer you to Page 20,
10  the faxed Page 20 on these computerized notes, and looking
11  at the second line from the bottom, reading, "The ANI
12  Agent field," that line, do you see that?
13     A.  Uh-huh.
14     Q.  Could you interpret that sentence for me?
15     A.  I don't know.
16     Q.  Do you know what ANI refers to?
17     A.  ANI? I don't remember.
18     Q.  If you wanted to find out what that meant, was
19  there a source for you to look at?
20     A.  I would -- I would ask the training manager.
21     Q.  Would you go to the codes that you talked about,
22  the disposition codes?
23     A.  I don't think that that's a code.  Codes --
24  dispositions start with numbers, either two, three,
25  et cetera.

**75**

1     Q.  And at the end of that line it says, "Was
2  changed to 'RY3.'"  Do you recall what RY3 means?
3     A.  A collector.
4     Q.  A specific debt collector?
5     A.  Uh-huh.
6     Q.  Do you know the name of that specific debt
7  collector?
8     A.  No.
9     Q.  Do you recall if that debt collector was in one
10  of your groups or your group?
11     A.  I don't know who RY3 is, so --
12     Q.  Okay.  I just want to state for the record, that
13  on the last page of these computerized notes is what is
14  called a redaction.  It means that there was information
15  here and that it was withheld by Arrow, and it was held
16  because it was notes placed by legal counsel.  And I'll
17  make that representation to you.
18         And my question is:  Do you recall seeing any
19  notes placed on computerized on the system from Arrow's
20  legal counsel whether it's these specific notes or just in
21  general where they made available to you?
22     A.  I don't remember.
23     Q.  Were you aware of any lawsuits that were filed
24  against Arrow?
25     A.  I don't remember.

**76**

1     Q.  Do you recall seeing on the computer information
2  concerning lawsuits?
3     A.  I don't remember.
4         MS. ARLEO:  Okay.  Can we just take like a
5  three, four-minute break or three-minute break?  I just
6  want to review my notes to make sure I haven't missed
7  anything, and we can wrap this up.
8         MS. STREETER:  Okay.
9         (Recess taken.)
10  BY MS. ARLEO:
11     Q.  Mr. Robles, in general would the debtors have
12  made payment, if at all, to the Arrow office in San Diego?
13         MS. STREETER:  Payment pursuant to these
14  letters?
15         MS. ARLEO:  Correct.
16         THE WITNESS:  No.
17  BY MS. ARLEO:
18     Q.  Where would those payments have been sent?
19     A.  To corporate.
20     Q.  Corporate meaning Chicago?
21     A.  Corporate office, Chicago.
22     Q.  And do you know what happened to those payments?
23     A.  No.
24     Q.  Would it be listed on the debtor's account?
25     A.  Oh, yes.

**77**

1     Q.  Would you be able to see that from the
2  computerized notes?
3     A.  I'm trying to remember.  I don't remember.
4     Q.  Would the computerized notes state the balance
5  of it?
6     A.  The account?
7     Q.  Correct.
8     A.  Showed -- yes, show -- it does shows the
9  balance.
10     Q.  Did the San Diego office have any responsibility
11  for credit reporting?
12     A.  Not that I recall.
13     Q.  So in your experience, you've never generated
14  any report to any other reporting agencies, any
15  information?
16     A.  Did I ever report?
17         No.
18     Q.  And that was done mainly in the Chicago office;
19  is that correct?
20     A.  Yes.
21     Q.  So if the San Diego office didn't receive
22  payment, didn't know if an account was being reported, why
23  would this letter contain your name on it?  Why wouldn't
24  the calls all be sent to the Chicago office?
25         MS. STREETER:  Objection.  Calls for

**78**

1  speculation, lacks foundation.
2  BY MS. ARLEO:
3  Q. I can back up.
4  In general, why did Arrow direct the debtors to
5  contact you in San Diego when most of the information was
6  in Chicago about the account?
7  A. The account itself, account portfolios were
8  listed in the San Diego office, but payments would be
9  submitted through our corporate office. If you notice on
10  the letter, you'll have a corporate address there to send
11  payments, so we never see any payments.
12  Q. Is it correct to say you never saw payments for
13  individual accounts, is that your testimony, as opposed to
14  aggregate payments on the Bally's portfolio?
15  A. I would look at payments in general.
16  MS. STREETER: Excuse me, just a second. Let me
17  object as being vague and ambiguous. I think there's some
18  confusion about the meaning of the word payments.
19  Are you talking about a check being sent in or
20  are you talking about information about payments having
21  been made? I think that's unclear.
22  BY MS. ARLEO:
23  Q. Well, I think we've established that the checks
24  were mailed to Chicago and that the payments were
25  reflected on each debtor's account.

**79**

1  A. Okay.
2  Q. Do you agree with that? Do you know if that's
3  true?
4  A. If a payment -- if a debtor sent a payment, it
5  is going to reflect on the debtor's account, yes.
6  Q. What information did the San Diego office have
7  that wasn't in the Chicago office?
8  A. Like such as what do you mean?
9  Q. When the debts were charged off.
10  A. I don't understand.
11  Q. I'm just -- I'm trying to understand why your
12  name was put on this letter.
13  A. It was because this -- with my name, this
14  represents San Diego, so this is the San Diego office.
15  Q. And it was only San Diego who had the Bally's
16  portfolio; is that correct?
17  A. I do not know.
18  MS. ARLEO: Well, I don't have any other
19  questions, and I appreciate you coming in today. And
20  thank you for your time, and I apologize in advance for
21  the bad traffic you're going to hit on the way home.
22  Is there any stipulations or anything you would
23  like to add?
24  MS. STREETER: Can we go off the record for a
25  moment, talk about the stipulation?

**80**

1  MS. ARLEO: Sure.
2  (Discussion held off the record.)
3  MS. STREETER: I will propose this limited
4  stipulation at this time that we are agreeing that the
5  deposition transcript will be provided to the witness by
6  mail as is stipulated by other counsel in the case after
7  the deposition tomorrow.
8  MS. ARLEO: So agreed.
9  (Discussion held off the record.)
10  MS. ARLEO: The parties have agreed that to
11  allow Plaintiff's counsel to use the rough draft of this
12  deposition in reply to Plaintiff's Motion to Compel
13  scheduled for a hearing on July 31st, 2006.
14  MS. STREETER: And I agree with that. But would
15  like whatever is provided to you to be provided to the
16  counsel for the defense as well.
17  MS. ARLEO: That's agreed.
18  - - -
19  (TIME NOTED: 6:55 P.M.)
20  - - -
21
22
23
24
25

**81**

1  DECLARATION UNDER PENALTY OF PERJURY
2
3  I, ISMAEL ROBLES, the witness herein, declare
4  under penalty of perjury that I have read the foregoing in
5  its entirety; and that the testimony contained herein is a
6  true and accurate transcription of my testimony elicited
7  at said time and place.
8
9  Executed this _____ day of _____, _____.
                              (Month)   (Year)
10
11  at _____, _____.
        (City)         (State)
12
13
14
15
16  ISMAEL ROBLES
17
18
19
20
21
22
23
24
25

1   STATE OF CALIFORNIA        ) ss:

2   COUNTY OF SAN DIEGO        )

3

4        I do hereby certify:

5        That the foregoing deposition was taken before me at

6   the time and place therein set forth, at which time the

7   witness was put under oath by me;

8        That the testimony of the witness and all objections

9   made at the time of the examination were recorded

10  stenographically by me, were thereafter transcribed

11  under my direction and supervision and that the

12   foregoing is a true record of same.

13       I further certify that I am neither counsel for nor

14  related to any party to said action, nor in any way

15  interested in the outcome thereof.

16

17       IN WITNESS WHEREOF, I have subscribed my name

18  this 31 st day of _____July_____, 2006.

19

20

21

22

23            Antonia Sueoka, C.S.R. NO. 9007

24

25

C-22

# EXHIBIT D

GONZALES vs. ARROW FINANCIAL SERVICES   Case No. 05-CV-0171 JAH (RBB)   Deposition of Brian Cutler

**Page 1**

```
  1                                        1
  2              UNITED STATES DISTRICT COURT
  3            SOUTHERN DISTRICT OF CALIFORNIA
  4
  5    JOHNNY GONZALES, on behalf    )
       of Himself and All Others    )
  6    Similarly Situated,          )
  7                   Plaintiff,    ) Case No.
                                    ) 05-CV-0171 JAH (RBB)
  8              vs.                )
                                    ) The Honorable
  9    ARROW FINANCIAL SERVICES LLC,) John A. Houston
 10                   Defendant.    )
 11        The deposition of BRIAN CUTLER, taken before
 12    Traci Elice Bourbeau, C.S.R., Notary Public,
 13    pursuant to the Illinois Code of Civil Procedure
 14    and the Rules of the Supreme Court thereof
 15    pertaining to the taking of depositions for the
 16    purpose of discovery at Suite 900, 25 East
 17    Washington Street, in the City of Chicago, Cook
 18    County, Illinois, commencing at 1:45 p.m. on the
 19    20th day of July, 2006.
 20
 21
 22
 23
 24
         RONALD A. MICHELETTO & ASSOCIATES, LTD.   (312) 419-1408
```

**Page 2**

```
  1   APPEARANCES:
  2
      HORWITZ, HORWITZ & ASSOCIATES
  3   BY: Mr. O. Randolph Bragg
          25 East Washington Street
  4       Suite 900
          Chicago, Illinois  60602
  5
          On behalf of the Plaintiff;
  6
  7   HINSHAW & CULBERTSON, LLP
      BY: Mr. David M. Schultz
  8       222 North LaSalle Street
          Suite 300
  9       Chicago, Illinois  60601
 10       On behalf of the Defendant.
 11
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
```

**Page 3**

```
  1                       INDEX
  2
  3   WITNESS                       PAGE
  4
  5   BRIAN CUTLER
  6   Examination by Mr. Bragg       4
  7   Examination by Mr. Schultz    65
  8
  9
 10                     EXHIBITS
 11
 12   CUTLER EXHIBIT               PAGE
 13   No. 1               16
 14   No. 2               45
 15   No. 3               52
 16   No. 4               61
 17
 18
 19
 20
 21
 22
 23
 24
```

**Page 4**

```
  1            (Witness duly sworn.)
  2            (WHEREUPON, Cutler Deposition
  3       Exhibit Nos. 1 through 4 were
  4       marked for identification.)
  5   WHEREUPON:
  6            BRIAN CUTLER,
  7   called as a witness herein, having been first duly
  8   sworn, was examined upon oral interrogatories and
  9   testified as follows:
 10            EXAMINATION
 11   BY MR. BRAGG:
 12       Q.  Would you state your name, please.
 13       A.  Brian Cutler.
 14       Q.  Have you ever been to a deposition
 15   before?
 16       A.  Yes, I have.
 17       Q.  And you're aware of how these things
 18   work, but just to get it on the record.  The
 19   general ground rules are that I'll be asking you a
 20   series of questions.  If you don't understand my
 21   question, please let me know and I will attempt to
 22   clarify it.
 23            It's important that you answer aloud.
 24   The court reporter will find it difficult to get
```

Case 3:05-cv-00171-JAH-RBB   Document 94   Filed 08/11/06   Page 65 of 95

GONZALES vs. ARROW FINANCIAL SERVICES   Case No. 05-CV-0171 JAH (RBB)   Deposition of Brian Cutler

**5**

1  down nods or gestures or uh-huhs or uh-uhs sort of
2  thing. We can take a break at any time, just let
3  us know. However, I'll ask you to answer any
4  question that's before you before taking a break,
5  otherwise it looks like, you know, you've
6  consulted with your attorney and formulated the
7  answer during the break.
8      Do you understand those general ground
9  rules?
10     A. Yes, I do.
11     Q. Are you the designated witness at this
12  deposition for Arrow Financial Services LLC?
13     A. Yes, I am.
14     Q. What is your address?
15     A. Home address or business address?
16     Q. Business address.
17     A. 5996 West Touhy Avenue, Niles, Illinois
18  60714.
19     Q. What is the highest level of education
20  you've attained?
21     A. Some college.
22     Q. And where did you attend college?
23     A. University of Illinois Chicago Circle.
24     Q. And what was your field of study?

**6**

1      A. Criminal justice.
2      Q. Did you receive a degree or a
3  certification of any sort?
4      A. No.
5      Q. And when did you last attend college?
6      A. 1975.
7      Q. What is your work experience? We can
8  either start from when you left school till -- and
9  bring it forward until today or work backwards
10  from today to back when you left school.
11     A. Well, when I left school, I went to work
12  for a collection firm called Keo and
13  Associates (phonetic), worked there for
14  approximately a year.
15     Q. And where was that located?
16     A. That was on Peterson Avenue in Chicago.
17     Q. And what were your -- what was your title
18  and duties?
19     A. I was a collector, just collected bad
20  debt.
21     Q. Uh-huh.
22     A. And then I went to a retailer on the west
23  side called Howard Styleshop (phonetic), and I
24  worked there until 1978.

**7**

1      Q. What did you do there?
2      A. I was a collection manager, collected
3  again bad debts for the company.
4      Q. Uh-huh.
5      A. And in 1978 I joined Arrow Financial.
6      Q. And what was the position you took when
7  you joined Arrow?
8      A. I was a collector.
9      Q. And did you change positions at any time
10  thereafter?
11     A. Yes.
12     Q. What was your first change?
13     A. First change I became the office manager.
14     Q. And what was the difference between being
15  an office manager and a collector?
16     A. I was managing the collectors and working
17  with clients on a day-to-day basis.
18     Q. And did the job change again?
19     A. Yes.
20     Q. And when was that?
21     A. 1982, I got into computer.
22     Q. And what was your title then?
23     A. At that time I was still the office
24  manager. I just was in charge of computer

**8**

1  systems.
2      Q. What were your duties being in charge of
3  the computer systems?
4      A. I was in charge -- at that time we were
5  developing our own software. So I was working
6  with the software vendor and telling them what we
7  needed and how systems should work and what we
8  needed out of the computer system to do.
9      Q. Did you prior to that time have any
10  training or education with regards to computer
11  work?
12     A. No.
13     Q. Since that time did you attend courses or
14  seminars on computer work?
15     A. Yes.
16     Q. What was your next job change?
17     A. Job really didn't change, just the
18  systems got bigger, and I got more into the
19  computer systems and that. And as the company
20  grew and that, I had to segregate duties. So
21  therefore I went into the technology side of the
22  systems.
23     Q. And what was your title at that time?
24     A. Eventually I became chief technology

GONZALES vs. ARROW FINANCIAL SERVICES  Case No. 05-CV-0171 JAH (RBB)  Deposition of Brian Cutler

**9**

1  officer.
2  Q. And did the job change when you became
3  the chief?
4  A. I've -- yeah, I've probably spent more
5  time focusing on the technology side of the
6  business than the operational side of the
7  business.
8  Q. And since that time has the job changed?
9  A. No.
10  Q. And is that the position you currently
11  hold?
12  A. Yes.
13  Q. And what is your present title?
14  A. Executive vice president and chief
15  technology officer.
16  Q. And when did you become vice president?
17  A. 1998.
18  Q. Who's your supervisor?
19  A. Jack Lavin.
20  Q. What is his title?
21  A. He's the CEO.
22  Q. And what is your method of reporting to
23  Mr. Lavin?
24  A. I'll talk to him about different items so

**10**

1  he's -- doesn't have anything really to do with
2  the day-to-day operations in the technology side.
3  Q. How frequently do you communicate with
4  Mr. Lavin? You say it's not day-to-day; is it
5  every week, is it every month, as needed?
6  A. As needed.
7  Q. How many persons do you supervise?
8  A. I have four direct reports.
9  Q. What are their titles?
10  A. There's a director of technology, network
11  director, data warehouse manager and systems
12  manager.
13  Q. On an organizational chart, would there
14  be persons that those four individuals supervise?
15  A. Yes.
16  Q. And what is the category of persons they
17  supervise or title of persons they supervise; if
18  you can?
19  A. From the operations side of the business
20  it would be -- we call them admin. ones and admin.
21  twos, they build our pools and do our software
22  development. Then we have a network group which
23  would be help desk people, security people and
24  just server management. Data warehouse, we have

**11**

1  people that are doing actually coding and
2  programming in sequel; and the director level, he
3  has people that are doing programming and coding
4  also.
5  Q. Do you have any ownership interest in
6  Arrow Financial?
7  A. Yes, I do.
8  Q. And what is that or how is that?
9  A. I'm not sure of the question.
10  Q. Well, do you own stock or are you the
11  owner of the business or part owner, that sort of
12  thing?
13  A. I'm a part owner of the business.
14  Q. And how much of the business do you own?
15  A. I truly don't know offhand. I really
16  don't.
17  Q. Do you own most of the business?
18  A. No. We were purchased by Sallie Mae, so
19  they own 76 percent; myself, Ron, Jack and Michael
20  Valentino own the other 24 percent basically, a
21  few other minority ownerships.
22  Q. And how do you own it, is it through
23  stock?
24  A. I own a percentage, yeah, through stock.

**12**

1  Q. So you own a number of shares?
2  A. Of shares, yes.
3  Q. What is the business of Arrow Financial?
4  A. We're a collection agency.
5  Q. What is the relationship between Arrow
6  and Johnny Gonzales?
7  A. Johnny Gonzales who's the plaintiff in
8  this case?
9  Q. In this lawsuit, yes.
10  A. Johnny Gonzales has a debt with Arrow
11  Financial that Arrow purchased.
12  Q. And how did Arrow obtain that debt?
13  A. We purchased that debt through a company
14  called Daiwa.
15  Q. Who was the original owner of the debt?
16  A. I would not know.
17  Q. Would it have been Bally's Health Club?
18  A. Probably, yes.
19  Q. If you know, did Daiwa purchase the debt
20  from Bally's?
21  A. I would not know that.
22  Q. But Arrow obtained the debt by purchasing
23  it from Daiwa?
24  A. Correct.

GONZALES vs. ARROW FINANCIAL SERVICES  Case No. 05-CV-0171 JAH (RBB)  Deposition of Brian Cutler

**13**

1  Q. Is there a document that memorializes the
2  purchase of the debt, a contract or purchase
3  agreement, something like that?
4  A. Yes.
5  Q. And am I correct to assume that Johnny
6  Gonzales' obligation is not the sole, it was a
7  package of debts?
8  A. That is correct.
9  Q. And how many debts were in that package?
10  A. I don't know what the total number was
11  offhand.
12  Q. Now, in discovery responses, Arrow has
13  indicated that there were 39,727 accounts, but I
14  think that's limited to the number of accounts
15  that had been charged off at the time they were
16  acquired. Do you know if that's correct?
17  A. I don't know. I believe -- no, I believe
18  that was the number of accounts in California,
19  wasn't it?
20  Q. Oh, could be, could be.
21  A. Yeah, I'm not sure. I'd have to check.
22  Q. And I -- what I'm driving at is, the
23  purchase from Daiwa was a larger package than the
24  ballpark 39,000 that we're talking about?

**14**

1  A. Correct. That would be correct.
2  MR. SCHULTZ: I think the 39 -- just to
3  be a little clear, I think the 39 was in response
4  to class definition I believe, but the discovery
5  answer would show that most accurately.
6  MR. BRAGG: (Nodding head.)
7  BY MR. BRAGG:
8  Q. And another response to written discovery
9  was that 44,761 letters were sent on those
10  accounts in the form of the letters that were sent
11  to Johnny Gonzales.
12  Now, I'm assuming that the reason why the
13  number of letters is greater than the number of
14  accounts is that sometimes more than one letter
15  would be sent on an account as it was with Johnny
16  Gonzales; is that correct?
17  A. That would be correct.
18  Q. What was the purpose of the debts that
19  were originated by Bally's Health Club?
20  A. I'm not -- what's the question? I'm --
21  the purpose?
22  Q. Were the debts originated by Bally's
23  Health Club for personal, household or family
24  purposes?

**15**

1  A. I would believe so, yes.
2  Q. And in another written response, Arrow
3  was -- it was indicated that Arrow does not
4  generally purchase commercial debt; is that
5  correct?
6  A. That is correct.
7  Q. Were the 39,000 debts that have been
8  identified in -- with regard to this lawsuit, when
9  they were acquired from Daiwa, were they seven
10  years of age or older?
11  A. I believe that was the case, yes.
12  Q. Was or is Arrow reporting any of the
13  debts that were originated by Bally's Health Club
14  to credit reporting agencies?
15  A. Within that 39,000?
16  Q. Yes.
17  A. No.
18  Q. Does Arrow Financial have a system or a
19  procedure to identify whether the debt was for
20  personal, family or household purposes or business
21  purposes?
22  A. No.
23  Q. And just another way of going at that
24  question. Some collection companies will have a

**16**

1  category in its computer system to check whether
2  it's business or nonbusiness. Does Arrow have
3  such a category?
4  A. No.
5  Q. Arrow has not provided the purchased
6  agreement or contract with Daiwa through which it
7  obtained or purchased the debts in question. Will
8  Arrow provide a copy of that document to us?
9  MR. SCHULTZ: I'm not sure it's a
10  question of fact to be elicited from a witness
11  like this. That's a discovery you would serve on
12  counsel and be addressed through counsel I
13  believe.
14  So I don't think he's in a position to
15  answer that. I don't think it's a proper
16  question. If you have a discovery dispute in
17  regards to that response, apparently we can
18  certainly address that and raise it amongst
19  ourselves with the court as appropriate.
20  MR. BRAGG: Okay.
21  BY MR. BRAGG:
22  Q. Show you what's been marked as Exhibit 1.
23  This is a -- I'll call it a log of the Johnny
24  Gonzales account which was provided to us in

D-4

GONZALES vs. ARROW FINANCIAL SERVICES   Case No. 05-CV-0171 JAH (RBB)   Deposition of Brian Cutler

**17**

1   discovery. Are you familiar with this document?
2      A.   Yes.
3      Q.   How is it that you are familiar with it?
4      A.   This is a printout from our computer
5   system.
6      Q.   I would like to go through this document
7   and have you explain the entries. We'll start on
8   the first page of the document.
9      A.   Okay.
10     Q.   In the upper left-hand corner is a date,
11  page one, a time and then it's LCA. What does LCA
12  mean?
13     A.   That would have been the person who
14  printed this document.
15     Q.   Do you know who that person is?
16     A.   No, not offhand.
17     Q.   And then in the center at the top of the
18  first page is Arrow Financial Services LLC and
19  beneath that is the word selected. What does
20  selected mean?
21     A.   That this was the account selected to
22  print.
23     Q.   And then the next line down on the left
24  is the word in all caps status, there's an account

**18**

1   number. Does that account number refer to the
2   Johnny Gonzales account?
3      A.   Yes, it does.
4      Q.   The next word over is disposition 9999.
5   What does that mean?
6      A.   It means the account's inactive.
7      Q.   And then there's the word inactive
8   meaning the same thing?
9      A.   (Nodding head.)
10     Q.   Then the next word over is wait and the
11  date of February 8, 2006. What does that mean?
12     A.   That would be the date if we were going
13  to work the account, if it was an active account
14  that we would work it next.
15     Q.   Then the next line down begins date,
16  121304. What does that mean?
17     A.   That's the date December 13th of '04.
18     Q.   And what does that date indicate?
19     A.   Oh, that was a due date on the payment,
20  on a payment that they set up.
21     Q.   And then the next line down there's
22  the -- in all caps debtor, the name Johnny
23  Gonzales, there's a phone number and address,
24  place of employment.

**19**

1      If you're following with me, if you can,
2   I'm three lines down in the debtor category. In
3   the right-hand column, there's CANC colon LGL, and
4   then a born 08 slash 01 slash 1967. What does
5   that mean?
6      A.   The CANC is cancelled, and the LGL means
7   it's cancelled because it's legal. It's a legal
8   account, we've been sued, and then that's his date
9   of birth in the 08-01, 1967.
10     Q.   What does cancel mean in that category?
11     A.   It means we're not working the account,
12  we closed it.
13     Q.   Then two lines beneath that is CLNT.
14  Does that mean client?
15     A.   Correct.
16     Q.   Then the number 5362S. What does that
17  mean?
18     A.   That's the client number, 5362, and the S
19  stands for that it was in our San Diego call
20  center at the time.
21     Q.   Then AFS, assignee of Daiwa, Niles,
22  Illinois. What does that mean?
23     A.   That means we purchased the account from
24  Daiwa.

**20**

1      Q.   The next -- well, I guess it's the next
2   line. In the far left column is 166.25. What
3   does that mean?
4      A.   That was the original balance that was
5   assigned to us.
6      Q.   The line beneath that begins, list colon
7   06 slash 11 slash 02. What does that mean?
8      A.   That's the date we purchased the account.
9      Q.   And to the right of that is SRV 11 slash
10  04 slash 90. What does that mean?
11     A.   That's the charge off date.
12     Q.   To the right of that is LTRS colon six.
13  What does that mean?
14     A.   That's how many letters we sent in the
15  account.
16     Q.   To the right of that, time colon 100.
17  What does that mean?
18     A.   That's how much time we spent with the
19  account up on the screen.
20     Q.   What does 100 mean?
21     A.   That would be 100 minutes.
22     Q.   Minutes. To the right of that, calls
23  colon seven. What does that mean?
24     A.   There were seven calls placed on the

Case 3:05-cv-00171-JAH-RBB  Document 94  Filed 08/11/06  Page 69 of 95

GONZALES vs. ARROW FINANCIAL SERVICES  Case No. 05-CV-0171 JAH (RBB)  Deposition of Brian Cutler

**21**

1   account.

2     Q. To the right of that, CON colon two.

3   What does that mean?

4     A. Two contacts made with the consumer.

5     Q. And to the right of that, BAL colon zero

6   point zero zero?

7     A. The balance is zero.

8     Q. I'm not understanding what that means.

9   Does that mean that the account has been paid off?

10     A. No, it's because we closed the account

11   off and made it inactive, we zero it out.

12     Q. Now, with the SRV category, I believe you

13   indicated that was the charge off?

14     A. Correct.

15     Q. And how is the charge off date measured,

16   how do you determine that date?

17     A. We don't determine that date. The

18   original creditor will determine that date.

19     Q. In this scenario, would that be Bally's

20   or would it be Daiwa?

21     A. I would not know which one of them

22   calculated that.

23     Q. But some prior owner calculated it and

24   then it was input into the Exhibit 1?

**22**

1     A. Correct.

2     Q. And then the next general category at the

3   far left is entitled to notes. What do the notes

4   from it looks like June 12, 2002, indicate?

5     A. Basically this is the process we use to

6   what we call board an account, put an account in

7   the system. So those are all the steps that it

8   goes through to board the account.

9     MR. SCHULTZ: Randy, this is your dep

10   obviously, and I'm not going to interfere.

11   Hopefully I'm not interfering, but there's 12

12   pages of single spaced notes, an account where

13   this is two contacts and the lawsuit based on the

14   letter.

15     And I'm just curious for my own sanity,

16   are we going to be going through every line?

17     MR. BRAGG: Yeah.

18     MR. SCHULTZ: Of 12 pages?

19     MR. BRAGG: Yeah.

20     MR. SCHULTZ: Can you possibly

21   explain why you need to -- I mean, you've done

22   hundreds of fair debt cases, you've seen hundreds

23   of account notes. What possibly do you need to go

24   through every line of these 12 pages of single

**23**

1   spaced notes for?

2     MR. BRAGG: To understand what they mean.

3   We did not receive a plain English translation in

4   response to our written discovery.

5   BY MR. BRAGG:

6     Q. And let me be more specific. On the line

7   we're referring where it begins --

8     MR. SCHULTZ: You asked for a plain

9   English --

10     MR. BRAGG: Yeah.

11     MR. SCHULTZ: -- translation. You asked

12   for that when? I --

13     MR. BRAGG: In our first --

14     MR. SCHULTZ: -- was aware of --

15     MR. BRAGG: -- set of --

16     MR. SCHULTZ: I was aware of a request

17   for a code, you know, of some sort.

18   BY MR. BRAGG:

19     Q. Well, yeah, and let's start with that.

20   The first entry is KJB. What does that mean?

21     MR. SCHULTZ: I just want to get back to

22   that. I'm just wondering, you know, the rate

23   we're going, it could take what, five hours of

24   question on this.

**24**

1     MR. BRAGG: Uh-huh.

2     MR. SCHULTZ: I can't imagine how this

3   could possibly lead to anything in connection with

4   the letter case under the FDCPA. I know you've

5   done a lot of these before, maybe you can

6   elucidate in some way how it is that's necessary.

7     MR. BRAGG: It's discovery. I need to

8   know what this means.

9     MR. SCHULTZ: Discovery is a lot of

10   things. I just wondered, is there any possible

11   explanation why you need to go through these? A

12   letter case --

13     MR. BRAGG: Yeah.

14     MR. SCHULTZ: A letter case, class has

15   been certified, what is it? What is the

16   explanation?

17     MR. BRAGG: Already articulated it, I

18   need to know what these log entries mean.

19     MR. SCHULTZ: You're saying what you

20   want, I'm just wondering why.

21     MR. BRAGG: So I will know what they

22   mean.

23     MR. SCHULTZ: Same thing, it's circular

24   what you're saying.

Case 3:05-cv-00171-JAH-RBB   Document 94   Filed 08/11/06   Page 70 of 95

GONZALES vs. ARROW FINANCIAL SERVICES   Case No. 05-CV-0171 (RBB)   Deposition of Brian Cutler

**25**

1  BY MR. BRAGG:
2    Q.  What does KJB mean?
3        MR. SCHULTZ:  Do you have a suggestion
4  for how to speed this along, perhaps get to the
5  contact?
6        MR. BRAGG:  We'll get there.
7        MR. SCHULTZ:  Why don't we take a break.
8        (Short break.)
9        MR. SCHULTZ:  On the record.
10       I would just say we did have a short
11  discussion here.  I cannot fathom the need to go
12  line by line through this in connection with the
13  issues in this case.  It's a fee shifting statute,
14  and I believe the hours spent doing that would be
15  unnecessary.  I'll raise that at the appropriate
16  time as well as my objection now.
17       Mr. Bragg and I spoke for a moment, and I
18  believe that there is a way to speed this up.  I
19  believe that Mr. Cutler is an expert on these
20  notes, could probably just look at a page and sort
21  of walk through the page fairly quickly, and
22  Mr. Bragg can certainly stop him with comments
23  when we get to anything of any particular
24  importance.

**26**

1        It seems to me that those two contacts
2  would be considered of particular importance.  I
3  suppose the reference to the six letters could be
4  of particular importance.  The seven calls could
5  be of particular importance.  I imagine the most
6  of the rest of the 12 pages would be of no
7  relevance.  With that comment, perhaps we could
8  find a way to assist you in pursuing a question
9  that you need.
10  BY MR. BRAGG:
11       Q.  All right.  With that stated, Mr. Cutler,
12  can you explain page one?
13       A.  Okay.  You had previously asked what KJB
14  was.  So those initials, that is you're always
15  going to find by each day is either the person who
16  started a process.  In this case, KJB would have
17  been the person who entered all the accounts and
18  updated the accounts for new business.
19       And then the rest of the initials as
20  you'll see will change from item to item, either
21  people that start a particular process will be on
22  there, people that make disposition changes or
23  people that may have talked to Mr. Gonzales.
24       Q.  And who is KJB?

**27**

1        A.  KJB is Kim Burn (phonetic) up in my
2  Whitewater, Wisconsin office.
3        Q.  Do you have a further summary of page
4  one?
5        A.  Page one is pretty much the boarding of
6  the account.  So we basically loaded the account
7  in to new, meaning it was new business.  It got
8  transferred from a department 699 to department 0
9  which gets the letters generated, which you'll see
10  on June 25th we sent letter 2175.
11       The credit bureau flag on June 26th was
12  set -- or changed from yes to no meaning we
13  weren't going to report it, marked the account
14  credit bureau removal with a tactic so it would
15  remove it from a file.
16       We then -- 7-16, the first letter 2175
17  that we sent was returned to us as mail return.
18  We then put the account September of '02 into a
19  nonworking disposition AEX, 3AEX means all efforts
20  exhausted.  And that's pretty much on page one.
21       Q.  Okay.  I see a couple or three entries of
22  interest added.  How was the interest determined?
23       A.  Interest would have been calculated --
24  the first interest rate which you see on June 13th

**28**

1  would have been calculated from the charge off
2  date to the June 13th date and whatever interest
3  rate was on the contract.
4        Q.  And so the addition of interest was
5  pursuant to the contract?
6        A.  Correct.
7        Q.  Looking at June 14, there's a 7:21 I
8  assume p.m. entry, A hyphen and a series of
9  numbers.  What does that mean?
10       A.  On June 14th, that's an index number the
11  computer generates randomly.
12       Q.  Does the number mean anything?
13       A.  It only means something if we would have
14  to go back and look at an audit file to see what
15  happened on the account.
16       Q.  Then moving down to the credit report
17  flag changed.  How does that occur, is that an
18  automatic process -- a computer determined
19  process, does a human being make the decision; how
20  is the decision made?
21       A.  That is a computer system generated
22  option.
23       Q.  And what caused the Arrow computer to
24  change the flag from yes to no?

Case 3:05-cv-00171-JAH-RBB   Document 94   Filed 08/11/06   Page 71 of 95

GONZALES vs. ARROW FINANCIAL SERVICES   Case No. 05-CV-0171___ (RBB)   Deposition of Brian Cutler

## 29

1   A.   That would have been -- it looked at the
2   charge off date seeing that it exceeded the seven
3   year statute.
4   Q.   I'm confused.  If I followed your earlier
5   explanation, the charge off date was
6   November 14, -- oh, I'm sorry, 1990.  So that was
7   the date it looked at it, and indeed it is over
8   seven years, got you.
9   A.   That is correct.
10   Q.   Moving to the second page, and I'm
11   referring to the page numbers in sequence because
12   they're not numbered.
13   A.   Right.
14   Q.   What do the notes indicate?
15   A.   The indication on page two is that we ran
16   an -- a program called Enable which is -- gets
17   data from another program and basically makes
18   changes.  So you'll see that the disposition
19   stayed the same, but it changed window 660, field
20   two to Kenny Jackson; 660, field one to 100402.
21        It transferred the account, it showed the
22   account going in window 660 to field level three
23   to collector EK3 and pretty much it just shows
24   field changes it made in that particular window.

## 30

1   It's an audit file.  Further, we added interest as
2   you can see.
3   Q.   And again, that was pursuant to the
4   contract rate?
5   A.   Correct.  And then the information we got
6   in the -- showing that the customer is 660 no
7   longer employed, so they changed the collector
8   from EK3 to IR3.  And if we go to the next page.
9   Q.   Well, before leaving that page.  What
10   does EK3 mean; what does IR3 mean?
11   A.   Those would be collector initials.
12   Q.   But there's a number at the end, what
13   does the number refer --
14   A.   San Diego.  All the collectors --
15   Q.   Oh, so three means San Diego?
16   A.   Correct, for the collector.
17   Q.   And, for example, IR, would that mean
18   Ishmael Robles?
19   A.   Robles, correct.
20   Q.   Okay, I understand.  Going back to the
21   first page, the first column.  Except for LET, do
22   those initials stand for individuals' employed at
23   Arrow at the time?
24   A.   Yes.

## 31

1   Q.   Same thing on page two, except for LET,
2   the initials would refer to the person that
3   performed the entry?
4   A.   That would be correct.
5   Q.   And if you would explain the third page.
6   A.   The third page we are seeing again
7   interest being assessed on a monthly basis, then
8   you'll see that we updated window 904, field one
9   which -- and then we sent out letter 2992 with GLB
10   notification.
11   Q.   Which was a what?
12   A.   GLB, Gramm-Leach-Bliley Act, privacy
13   notice.
14   Q.   Okay.
15   A.   Then as you can see again, we assess
16   interest on a monthly basis.  We pulled data on
17   3-14-04, entered new address from the credit
18   bureau that we pulled, continued to assess
19   interest and a letter got requested on 4-17-04,
20   2107.
21        Then the rest of the notes are just
22   basically updating a user defined window 310 with
23   different data and adding index numbers for
24   auditing.

## 32

1   Q.   And the initials in the left-hand column,
2   except for LET again stand for the person who
3   performed the function?
4   A.   That would be correct.
5   Q.   And would you summarize the occurrences
6   on page four or the fourth page in?
7   A.   Page four, we're continuing to update
8   user defined windows with the letter information
9   that was sent.  We assessed interest again in
10   April and then we request another letter 2992
11   which is a GLB letter, and then we update the user
12   define window 131, field one and 131, field 12
13   with a new phone number.  So we changed those from
14   blank to the 858-813-____.
15        Then on May 6th you'll see debtor called
16   in, refused to pay, wanted to know if there was
17   anything that AFS could do to him legally, also
18   wanted to know if the account could be placed on
19   his credit bureau, refused to pay.
20        Terminated call, wouldn't answer whether
21   or not he would pay.  And then they marked it as a
22   debtor contact, and they put it back or left it in
23   the 3AEX, all efforts exhausted disposition.  So
24   then we update user defined windows again through

**33**

1   all those actions.
2       Q.   If I could stop you there.  The last line
3   on the fourth page begins MU3.  What does MU3
4   mean?
5       A.   That would have been a California
6   collector.
7       Q.   The San Diego?
8       A.   Yeah.
9       Q.   The three meaning --
10      A.   Yes.
11      Q.   And continuing on then to the fifth page.
12  Again the MU3 is the San Diego collector?
13      A.   Correct.  So then right afterwards GR3
14  did a second talk off, talked to debtor.  He's not
15  going to pay.  He will mail a cease and desist
16  letter, told him to address it to CCD which is our
17  Customer Care Department in Niles.
18          He kept asking what he can legally do.  I
19  had to repeatedly tell him that I am not an
20  attorney, and this is a call center, not a law
21  firm.  And then that collector put it in AEX, all
22  efforts exhausted.  And we go further down --
23      Q.   Well, let me interrupt you there.
24      A.   Oh.

**34**

1       Q.   Looks like the -- well, if I'm reading
2   this correctly, the first call ended around 7:43.
3   Is this Chicago time, California time?
4       A.   This would be California time.
5       Q.   And then there's a second call at 7:51;
6   is that --
7       A.   Correct.
8       Q.   -- correct?
9           Now, the first call if I understood your
10  explanation, is the debtor Johnny Gonzales called
11  Arrow.  The second call, did Arrow call
12  Mr. Gonzales or did Mr. Gonzales call Arrow back?
13      A.   No, Arrow called Mr. Gonzales on the
14  second call.
15      Q.   And GR3 is a different San Diego
16  collector?
17      A.   Correct.
18      Q.   If you know, why did Arrow call
19  Mr. Gonzales back, what was that, seven or eight
20  minutes later?
21          MR. SCHULTZ:  Object to the form of the
22  question, lack of foundation.
23          You can answer if you can.
24

**35**

1   BY THE WITNESS:
2       A.   The assumption is the way the other
3   conversation ended, sometimes a manager will make
4   a second call, talk off and try to resolve the
5   issue.
6   BY MR. BRAGG:
7       Q.   Do you know if GR3 is a manager?
8       A.   I'd have to check.  I do not know.
9       Q.   About halfway down is the GR3; May 6,
10  '04; 7:52, debtor contact, open paren.  CONTS,
11  close paren.  What does that mean?
12      A.   That means he registered it as that he
13  spoke with the debtor, marked it as a contact.
14      Q.   And we have the same entry above at 7:43
15  except it's a different collector.  I thought that
16  was the -- indicated who had made the call; am I
17  mistaken?
18      A.   Debtor contact?
19      Q.   Yeah.
20      A.   Yes.  No, that's exactly what it is.  So
21  MU3 talked to him, marked it up as a debtor
22  contact, so then you've got that contact.  Then
23  GR3 talked to him, and he or she marked it up as a
24  debtor contact again.

**36**

1       Q.   But what I'm confused about is debtor
2   contact.  Does that mean the debtor contacted
3   Arrow --
4       A.   No, no.  It means we spoke to the debtor.
5       Q.   Okay.  And if you could summarize the
6   rest of that page.
7       A.   Okay.  Then you'll see we -- again, just
8   updating user defined windows 830, field two with
9   the contact information.  So the system updates
10  the user defined windows.  Again, we sent out a --
11  the 2992 letter, and let's see, we assessed
12  interest again, assessed interest again.
13          Then we requested a letter 2107 which
14  then started updating different fields within the
15  system, field three -- window 790, field 15, 16,
16  and 17.  Also updated window 410, fields one, two
17  and three and four, and on 7-7-04 we sent letter
18  2107, then added some more interest.
19          Debtor phone flag changed from blank to
20  blank meaning we made no change on phone flag.  We
21  did change the phone number from 513-███ to
22  858-513-███ and then we assessed interest again
23  on 8-31-04.
24          The following page which is marked page

**37**

1 four on the left first --
2   Q.  Stop there, you've lost me. Where does
3 it say page four?
4   A.  On the left-hand side. I want to make
5 sure we're on the same thing.
6   Q.  Oh, I'm sorry. You -- I'm sorry, I
7 wasn't following you close enough and you moved a
8 page ahead of me.
9   A.  Okay.
10   Q.  Let me number my pages so I can have at
11 least a sequence.
12   MR. SCHULTZ: It's the seventh page of
13 the exhibit, right?
14   THE WITNESS: Yes.
15 BY MR. BRAGG:
16   Q.  I think we're on the seventh page into
17 Exhibit 1.
18   A.  Okay.
19   Q.  If you would continue.
20   A.  Okay. So as you can see, on the top
21 we've assessed interest again. We have a user
22 define window update. We changed the phone number
23 858-513-■■ to 619-338-■■ We moved the
24 account into disposition 3,000, updated user

**38**

1 define window.
2   Q.  Well, where you have 3,000, it says begin
3 REG collect. What does that mean?
4   A.  It's just a -- beginning phase so it
5 means begin regular collections.
6   Q.  Okay.
7   A.  So anyways, what happened here is we --
8 debtor called in off the letter, wanted to take
9 care of account, verified info, offered him a 50
10 percent settlement for $286.48, need due date in
11 window eight. There's an auditing note. They put
12 that in there.
13   So then that put the account in -- again,
14 we started updating user defined window, this time
15 845, fields one, two, three and four to set up
16 calls. We made a phone call. We got dead air so
17 they left the account in 3,100. Updating windows
18 831 and 841, field one and all those. Let's see.
19   Then because RY3 you'll see was working
20 the account, so we updated what we call the ANI
21 agent meaning if somebody called -- if
22 Mr. Gonzales would have called back, RY3 would
23 have gotten that phone call back because it was
24 that person's account. RY3 tried to place a call

**39**

1 again and he got dead air again. Left it in
2 3,100.
3   Q.  What does dead air mean, no answer?
4   A.  No, not really. It means you got
5 nothing. It just dialed either -- either dial
6 tone, and he dialed a number, there was nothing
7 there, no ringing sound, no anything so.
8   Then again we're updating windows 845,
9 fields one and two with call information. 845s,
10 field three and four, call information is being
11 updated. December 20th of '04 we --
12   Q.  Excuse me, I think you've -- well, maybe
13 not. I think we're at more or less the same
14 place, but I'm looking at one, two, three, four --
15 the fifth line from the bottom of the seventh page
16 in, it's RY3; December 17, 2004; 11:15; 3,100,
17 payment promised. What does that mean?
18   A.  That's still from the original payment
19 promised. This is just the disposition so we got
20 the payment promise back on December 13th.
21   Q.  Okay, I see. And now on to December 20;
22 if you would.
23   A.  Okay. So we start updating user define
24 windows on the call stats 845, field one, field

**40**

1 two, field three and field four. On 12-20 when
2 the payment didn't come in, he called the
3 residence, no answer and it says left a message.
4 So it must be on an answering machine. Left the
5 account into 3,100 disposition showing that they
6 telephoned, made a contact, they attempted to
7 contact the party for that day.
8   Updating again windows 831 and 841, field
9 two, ANI agent kept the account to RY3 because he
10 was still working the account.
11   Q.  What is ANI agent?
12   A.  That's the terms we use to track who made
13 the last call on the account. So when a call
14 comes inbound on the system, the ANI which is --
15 it can identify the inbound phone number would
16 transfer the call to the collector who's working
17 the account.
18   Q.  General question.
19   A.  Sure.
20   Q.  A couple pages ago you mentioned dead air
21 meaning the phone call had reached dead air. I'm
22 confused about how that happened because on the
23 eighth page in which we just covered a phone call
24 was made where a message was left. So it would

**41**

1  seem that there was a valid telephone number. Do
2  you have any idea why a dead air would call on
3  this account?
4     A.  It could be several reasons. You know,
5  it could have been problems at the local, you
6  know, telephone company at that time on his line;
7  it could have been our system; our dialer may have
8  not been able to dial through for some reason.
9  Those would be the answers for dead air.
10    Q.  And so now we're moving to the ninth page
11 in which begins on December 20, are we in the same
12 place?
13    A.  Yes.
14    Q.  If you would summarize that page.
15    A.  Okay. We're starting out, again we're
16 updating user defined window, this time 355, field
17 two; user define window 845, fields one, two,
18 three and four. RY3 on December 23rd of '04
19 called residence again and received a no answer,
20 left message. So they made another contact.
21    Start updating user define window 831,
22 field three; 841, field three. The ANI agent
23 again gets updated to the RY3. We update windows
24 355, field two and then update user defined window

**42**

1  845, fields one, two, three and four.
2     So a call on December 27th of '04, again,
3  we called the residence, no answer, left a
4  message.
5     Q.  And the line beneath that is RY3,
6  December 27, '04; 1:51 p.m.; 3,100, payment
7  promised?
8     A.  Correct.
9     Q.  What does that mean?
10    A.  He left -- he or she left that into
11 disposition 3,100, payment promised. 12-28-04 is
12 the next day that that person would try reaching
13 them, and 12-13-04 is the original due date of the
14 payment, the $286.48.
15    Q.  If you would continue.
16    A.  We then -- again, we start updating user
17 defined windows for the call. 831, field four;
18 841 window, field four. ANI agent again gets
19 updated to RY3, and that's all on that page.
20    Q.  Moving to the tenth page in.
21    A.  Continue start updating window 355, field
22 two. 12-27 they again then left it at and
23 promised to pay with no action taken at that
24 point. We updated window 845, field one, two,

**43**

1  three and four. The RY3 placed a call again
2  December 28th of '04, and called residence with
3  again no answer, left message.
4     Q.  Turning to the eleventh page in, would
5  you summarize that page.
6     A.  December 28th of '04, collector set it up
7  again, left it at 3,100, intention to call it back
8  December 29th of '04. Original due date stayed
9  the same of 12-13-04, settlement amount 286.48.
10    We then update window 831, field five;
11 window 841, field five. ANI agent gets updated
12 again to RY3. Then we update window 355, field
13 two; windows 845, field one, two, three and four.
14    Q.  What is GC call?
15    A.  That's our dialer, meaning they call off
16 the dialer.
17    Q.  Okay. If you would continue.
18    A.  Okay. January 3rd of '05, again they
19 left it in promise to pay. They want it called
20 back on January 4th of '05 leaving the original
21 due date of 12-13-04, settlement amount still is
22 286.48.
23    Updating window 831, field six; 841,
24 field six. ANI agent is changed again, really

**44**

1  remains the same, the RY3. Updating window 355,
2  field two. On January 3rd he placed that call,
3  resident again no answer, left message. Updating
4  user define window 845, field one, two -- two,
5  three and four. Call res. again, no answer, left
6  message.
7     Q.  Turning to the twelfth page in, would you
8  summarize that page.
9     A.  Is that your page 12?
10    Q.  Yes.
11    A.  Okay. On January 5th RY3 updated the
12 account to disposition 3201 which is a general
13 call back meaning anybody could handle the
14 account. User define window 831 and 841 got
15 updated within field seven. ANI agent remained
16 the same at RY3, and they updated user define
17 window 355, field two, and we assessed interest on
18 January 31st of '05.
19    Q.  The top line of that twelfth page in, the
20 entry is 3201, GC call back. What is GC?
21    A.  The dialer, guaranteed contact dialer
22 meaning that it's going to go back to the dialer.
23 The dialer will call automatically.
24    Q.  Turning to the thirteenth page, is

---

**45**

1  blacked out. What is that page; if you know?
2    A.  Normally if something is blacked out or
3  redacted in notes, it would have been
4  attorney/client privilege after the lawsuit.
5    Q.  And is it correct to have blacked out the
6  whole square as opposed to -- what I'm trying to
7  understand is somehow was this page photocopied
8  with the lid up or something that caused the whole
9  thing to be black and there's supposed to be print
10  or was it intentionally blacked out?
11    A.  No, it was intentionally blacked out.
12    Q.  And that was because there was
13  attorney/client information on that page?
14    A.  Correct.
15    Q.  And then turning to the fourteenth page
16  in, there's just a little type, end of report. Is
17  there anything else to explain with regard to the
18  fourteenth page?
19    A.  That is it.
20    MR. BRAGG:  Off the record.
21    (Discussion had off the record.)
22  BY MR. BRAGG:
23    Q.  Next I show you what's been marked as
24  Exhibit 2, it is a copy of the letter that was

---

**46**

1  attached as Exhibit A to the first amended
2  complaint. Are you familiar with this document?
3    A.  Yes.
4    Q.  Is this the 2197 letter?
5    A.  No.
6    Q.  What -- or I'm sorry, 2107 letter?
7    A.  That would be correct.
8    MR. SCHULTZ:  Actually, can we take a
9  break?
10    (Short break.)
11  BY MR. BRAGG:
12    Q.  I'm showing you what is marked as
13  Exhibit 2. Are you familiar with this document?
14    A.  Yes.
15    Q.  And is this a letter on the letterhead of
16  Arrow Financial Services to Johnny Gonzales dated
17  April 30, 2004?
18    A.  Yes.
19    Q.  I think you've already testified that
20  this is the 2107 letter; is that correct?
21    A.  That would be correct.
22    Q.  Who drafted or created the format of
23  Exhibit 2?
24    A.  Don't really know. Probably would have

---

**47**

1  been our general counsel, but this letter was --
2  could have been drafted many years previous.
3    Q.  That was going to be my next question.
4  Do you know when it was put --
5    A.  No.
6    Q.  -- into service?
7    Did you draft this letter?
8    A.  No, I didn't personally draft the letter,
9  no.
10    Q.  Did you participate in creating it?
11    A.  No.
12    Q.  Who's Tim Copple?
13    A.  He's my director of IT.
14    Q.  Do you know if he created Exhibit 2?
15    A.  No, he would not have.
16    Q.  Directing your attention to the second
17  full paragraph which is immediately beneath
18  asterisk, asterisk, asterisk, settlement amount.
19    A.  Okay.
20    Q.  It reads, quote, upon receipt of the
21  settlement amount and clearance of funds, comma,
22  and if we are reporting the account, comma, the
23  appropriate credit bureaus will be notified that
24  this account has been settled, close quote. What

---

**48**

1  does that mean?
2    MR. SCHULTZ:  Object to the form of the
3  question.
4  BY MR. BRAGG:
5    Q.  You may answer.
6    A.  That means if they pay the settlement
7  amount and if the account has been reported to a
8  bureau, that we will notify the bureaus that the
9  account has been settled.
10    Q.  Now you answered that if the account has
11  been reported to a bureau. Is that reported by
12  Arrow or reported by anyone?
13    A.  Reported by Arrow.
14    Q.  And was Arrow reporting the Johnny
15  Gonzales account?
16    A.  No, we were not.
17    Q.  How would Mr. Gonzales know whether or
18  not Arrow was reporting his account?
19    MR. SCHULTZ:  Object to the form, calls
20  for speculation.
21    Answer if you can.
22  BY THE WITNESS:
23    A.  He could pull his credit report.

---

**49**

1  BY MR. BRAGG:
2  Q.  Other than that, how would he know?
3  MR. SCHULTZ: Object to the form, lack of
4  foundation, calls for speculation.
5  BY MR. BRAGG:
6  Q.  You can answer.
7  A.  The only other way he would know, he
8  could call us and ask.
9  Q.  Directing your attention back to Exhibit
10  1, I think it was May 6. The -- I believe it's on
11  the fifth page in dated May 6. Mr. Gonzales had
12  contacted Arrow, and if I'm interpreting or
13  reading this correctly, the notes indicate, also
14  wanted to know if account could be placed on CBR.
15  Is that credit bureau report?
16  A.  Correct.
17  Q.  Is that what you mean by he could ask
18  whether it was being reported?
19  A.  Correct.
20  Q.  Reading that note, it appears that he did
21  ask and there was not a response; is that correct?
22  A.  No, that's not correct.
23  Q.  What was the response?
24  A.  There's no response notated, just says

**50**

1  that's the question he asked. It doesn't say
2  whether or not MU3 responded that, yes, he
3  could -- yes, it was or it was not on the credit
4  report.
5  Q.  How would Arrow respond to such
6  inquiries; was there any training on the subject?
7  A.  Yes.
8  Q.  And how were -- how was the person at
9  Arrow to respond?
10  A.  It would be yes or no. It's either
11  reported or it wasn't reported.
12  Q.  But here we have no indication whichever
13  response, if any, was made?
14  A.  Correct.
15  Q.  Now back to the text of Exhibit 2. The
16  appropriate credit bureaus, what does appropriate
17  mean?
18  A.  Any credit bureau that we would have been
19  reporting to.
20  Q.  Then moving down to I guess it's the next
21  paragraph that begins with the number one, I think
22  it's the third sentence in reads, open quote, when
23  my funds clear, comma, and if you are reporting
24  the account, comma, you will notify the

**51**

1  appropriate credit bureaus of this settlement,
2  period, close quote.
3  Does that mean the same as the preceding
4  paragraph?
5  A.  Correct.
6  Q.  Beneath the paragraph that begins with
7  the number two is the line, open quote, should you
8  have any questions please feel free to contact me
9  at 800-989-4093 extension 4400, close quote.
10  Where is that phone answered?
11  A.  San Diego call center at that time.
12  Q.  What does extension 4400 indicate, if
13  anything?
14  A.  It would have just gone to the general
15  operator.
16  Q.  Does 4400 have any reference to the
17  account or anything like that?
18  A.  No.
19  Q.  Then at the signature line is Mike
20  Ortega. How did Mr. Ortega's name come to be
21  listed here?
22  A.  These accounts were all assigned to -- we
23  called him Mike Robles or Ishmael Robles, and his
24  name was on these letters.

**52**

1  Q.  What was Mr. Robles' title?
2  A.  I believe he was a manager.
3  Q.  Was he also an account representative?
4  A.  Yes.
5  Q.  What does an account representative do?
6  A.  Collects past due debts.
7  Q.  Next I show you what has been marked as
8  Exhibit 3 which is Exhibit B to the first amended
9  complaint. Are you familiar with this document?
10  A.  Yes.
11  Q.  Who designed or created Exhibit 3?
12  A.  Again, I don't have direct knowledge who
13  would have done that at that time.
14  Q.  Did you create it or did you participate
15  in its creation?
16  A.  No.
17  Q.  Do you know if Mr. Copple did?
18  A.  No, he did not.
19  Q.  Is Exhibit 3 on the letterhead of Arrow
20  Financial Services to Johnny Gonzales dated July
21  8, 2004?
22  A.  Yes.
23  Q.  The second full paragraph reads, open
24  quote, upon receipt of this settlement amount and

## 53

1 clearance of funds, comma, and if we are reporting
2 the account, comma, the appropriate credit bureaus
3 will be notified that this account has been
4 settled, close quote.
5   Would your explanation of that sentence
6 be the same as it was with regard to Exhibit 2?
7  A. Yes.
8  Q. And the next I guess paragraph down I
9 guess begins with a box, the third sentence in
10 reads, open quote, after my funds clear, comma,
11 you will notify the appropriate credit bureaus of
12 this settlement if you are reporting the account,
13 period, close quote.
14   Would your explanation of that sentence
15 be the same as it was with regard to Exhibit 2?
16  A. Yes, it would be.
17  Q. Further down the first page of Exhibit 3
18 is a sentence that reads, open quote, after the
19 account has been paid in full and my funds have
20 cleared, comma, you will notify the appropriate
21 credit bureaus of this payment in full if you are
22 reporting the account, period, close quote.
23   Would your explanation of that sentence
24 be the same as it was with regard to Exhibit 2?

## 54

1  A. Yes, it would be.
2  Q. The letter bears the signature of Mike
3 Ortega.  Would your explanation regarding Mike
4 Ortega be the same as it was with Exhibit 2?
5  A. Yes, it would be.
6  Q. With regard to the series of letters sent
7 on the Bally's accounts, were -- where did
8 Exhibits 2 and 3 fall; were they the first,
9 second, third, et cetera letter?
10  A. They would have been the second and third
11 letters I believe.
12  Q. And what causes letters in the form of
13 Exhibit 2 to be sent; is it a passage of time, is
14 it a particular event?
15  A. Both.  It's a passage of time and a
16 particular event.  Within a certain time limit, we
17 will run a tactic that will request to send out
18 these letters.
19  Q. What is the time limit if you know for
20 the -- sending the letters in the form of Exhibit
21 2?
22  A. It can vary and will depend on time of
23 year and just how the portfolio is performing.
24  Q. And what is the event if you know that

## 55

1 triggered the sending of Exhibit 2?
2  A. Exhibit 2 went out around tax time so
3 that's probably the event that would have
4 triggered that.
5  Q. Okay.  I note that the date on Exhibit 2
6 is April 30 which is about two weeks after the tax
7 deadline.  Was that what you mean by around tax
8 time?
9  A. Correct.
10  Q. What triggered the sending of letters in
11 the form of Exhibit 3?
12  A. Do not know.  It was towards the end of
13 the summer, it might have been a slow collection
14 month or the portfolio might have been performing
15 slowly.
16  Q. Now, I believe in response to written
17 discovery, Arrow responded that 387 of the Bally's
18 accounts were paid; is that correct, Holiday Spa
19 accounts?
20  A. I believe so.
21  Q. And were those 387 accounts reported to
22 credit bureaus?
23  A. I didn't check that.  I don't know.
24   MR. SCHULTZ:  I think -- I just object to

## 56

1 the form of the question because I'm -- you're
2 referencing a document which is a discovery answer
3 which is fine, I'm just not --
4   MR. BRAGG:  Let's see if I can find it.
5   MR. SCHULTZ:  Not sure if it's an
6 accurate statement, that's all.  I am not sure the
7 witness would either.  I object to the foundation
8 without the use of that.  It is certainly
9 something if you want us to check later, we could
10 verify one way or another.
11   When you find it, just call me, I'll try
12 to find out one way or another and tell you.
13   (Brief pause.)
14 BY MR. BRAGG:
15  Q. For the sake of this deposition, if
16 payment was made on one of the Bally's or Holiday
17 Spa accounts and the payment was reported to a
18 credit bureau, did that mean that Arrow had been
19 previously reporting that account to the credit
20 bureau?
21  A. Yes.
22  Q. And turning that question around.  If
23 Arrow had not been previously reporting the
24 account to a credit reporting bureau, the payment

Case 3:05-cv-00171-JAH-RBB  Document 94  Filed 08/11/06  Page 78 of 95

GONZALES vs. ARROW FINANCIAL SERVICES  Case No. 05-CV-0171 JAH (RBB)  Deposition of Brian Cutler

## 57

1  of the account would not have triggered a report
2  to the credit bureau; is that correct?
3      A.  That would be correct.
4      Q.  Is the net worth of Arrow Financial $50
5  million or greater?
6      A.  Yes, it is.
7      Q.  Is Arrow Financial able to and willing to
8  provide me with the names and addresses of the
9  class members?
10      MR. SCHULTZ: I think I -- I'm going to
11  object for the same reason I objected before.
12  Obviously he's here to answer questions in regards
13  to facts.  It seems to me that you're getting into
14  a question as to response of discovery, something
15  in the nature of asking for invasion of
16  attorney/client privilege.
17      There has been a class certified.  I've
18  asked the client to obtain the class list, and
19  I've represented that to you at least three times
20  in e-mails this week.  I understand from the
21  e-mail I received today that they're getting that
22  list to me.  I've asked first class and what
23  formats they would like that list.  First class
24  has advised me this morning what formats would be

## 58

1  acceptable to them.
2      I think Arrow as I understand it can meet
3  those requests to put into that format, and we'll
4  do so.
5      MR. BRAGG: And will they provide me with
6  a copy of that list?
7      MR. SCHULTZ: If asked, I suppose they
8  will.
9      MR. BRAGG: And when will they do so?
10      MR. SCHULTZ: But I -- we're here for a
11  deposition.  If you want to have an off the record
12  discovery conference, I will.  You want to have an
13  on the record discovery conference, I will.  But I
14  don't want to have this conversation, discovery
15  conversation between counsel on the record in
16  regards to his dep and transcribed in connection
17  with his dep.
18      So we can stop, complete his dep and then
19  have that conversation if you would like.
20      MR. BRAGG: On the record.  I would like
21  to have on the record as to Arrow's intentions of
22  providing me with the names and addresses of the
23  class members.
24      MR. SCHULTZ: You've got an answer.  He's

## 59

1  here as a witness to answer questions --
2      MR. BRAGG: Right.
3      MR. SCHULTZ: -- in regards to discovery.
4  You're -- in regards to this case.  You're asking
5  questions in regards to discovery which should be
6  directed to counsel, not to my client.
7      When you're done with the deposition, the
8  court reporter is here, we can proceed on the
9  record if you would like -- on a record if you
10  like but not in connection with this deposition.
11  I don't want this deposition record having all
12  these kind of conversations on it.
13      MR. BRAGG: Okay.
14  BY MR. BRAGG:
15      Q.  Did or does Arrow maintain procedures to
16  ensure the compliance with the Fair Debt
17  Collection Practices Act when sending letters in
18  the form of Exhibits 2 and 3 marked for this
19  deposition?
20      MR. SCHULTZ: Object to the form of the
21  question.  It's overly vague -- it's broad and
22  vague.
23      But answer if you can.
24

## 60

1  BY THE WITNESS:
2      A.  Yes, we do.
3  BY MR. BRAGG:
4      Q.  And what are those procedures?
5      MR. SCHULTZ: Same objection.  There's no
6  context.  The FDCPA has dozens of sections, dozens
7  of subsections.  Without that context, the
8  question is difficult to answer.
9      But if you're able to answer it, go
10  ahead, try your best.
11  BY THE WITNESS:
12      A.  We have our general counsel review
13  letters and verifies they're within the FDCPA.
14  BY MR. BRAGG:
15      Q.  Are there any other procedures with
16  regards to Exhibits 2 and 3?
17      A.  Again, either use general counsel,
18  outside counsel to review letters.
19      Q.  But other than using either --
20      A.  No.
21      Q.  -- general counsel or other counsel, are
22  there any other procedures?
23      MR. SCHULTZ: Object to the form of the
24  question, it's still vague.

**61**

1   BY THE WITNESS:
2      A.  It's -- seems to be about all we do.
3   BY MR. BRAGG:
4      Q.  I show you what's been marked as
5   Exhibit 4 which is entitled Arrow Financial
6   Services LLCs responses to plaintiff's statement
7   of material facts. Are you familiar with this
8   document?
9      A.  Yes.
10     Q.  Have you had an opportunity to review it?
11     A.  Yes.
12     Q.  And is it accurate?
13     A.  Yes, it is.
14       MR. BRAGG: Okay. Let's take a short
15  break, and I'll see what, if anything, else I
16  have.
17       (Short break.)
18       (Discussion had off the record.)
19  BY MR. BRAGG:
20     Q.  I had earlier asked you about how a
21  debtor might know whether or not Arrow was
22  reporting the account to a credit bureau, you had
23  indicated that the debtor might ask Arrow. We had
24  a discussion about what had happened in Johnny

**62**

1   Gonzales.
2        Was there training provided to Arrow
3   employees regarding how to respond to inquiries
4   about whether an account was being reported or
5   not?
6      A.  Yes.
7      Q.  And tell me about the training.
8      A.  They can look into a specific window, and
9   it'll show whether or not an account's being
10  reported to the bureau or not.
11     Q.  And may Arrow's employee pass that
12  information along to the debtor who calls in?
13     A.  They can tell them if it is or if it is
14  not being reported to the bureau, yes.
15     Q.  Is there a procedures manual or a
16  procedure -- or something in writing with regard
17  to that instruction?
18     A.  I am not for sure if there is a
19  procedures manual or not on that.
20     Q.  Who would have that knowledge?
21     A.  We'd have to pull it from the training
22  manual to see if it's in the training manual.
23     Q.  And who's in charge of the training
24  manual or who would have that information?

**63**

1      A.  In charge of training at this point,
2   Nancy. I'm not sure of Nancy's last name, I'm
3   sorry, but she's in the Niles office.
4      Q.  Is there a category or a subsection of
5   the training manual where that information would
6   be located?
7      A.  I don't know. I'd have to look at it.
8      Q.  Now, with regard to payment of one of the
9   accounts in this case, should Arrow have reported
10  the payment of the account or settlement of the
11  account to the credit reporting bureau, how would
12  that affect the consumer's credit score or report;
13  if you know?
14     A.  I don't know exactly how it would affect
15  it. It would assume to be a positive increase
16  versus negative being an unpaid collection versus
17  a paid collection.
18     Q.  And that would assume that it is being
19  reported on the credit report prior?
20     A.  Correct.
21     Q.  If it had not been report -- was not on
22  the credit report and then was reported, do you
23  have an opinion about how that would affect the
24  consumer's credit report?

**64**

1      A.  It would be no affect.
2      Q.  And on what do you base that knowledge?
3      A.  You said it wasn't being reported?
4      Q.  Right, prior.
5      A.  Oh, and then you're saying a report of
6   payment?
7      Q.  What I'm saying is, the credit report
8   does not contain the account.
9      A.  Okay.
10     Q.  The consumer settles or pays off to Arrow
11  the account, Arrows reports that information to
12  the credit reporting agency. How would the fact
13  that it -- you know, it was reported at that later
14  date affect the consumer's report?
15     A.  We can't do that. We can't report it.
16  There's nothing to report because we didn't report
17  it originally.
18       MR. BRAGG: I have no further questions.
19       MR. SCHULTZ: Can I take one minute.
20       MR. BRAGG: (Nodding head.)
21       (Short break.)
22       MR. SCHULTZ: I've just got a quick
23  question.
24

65

1             EXAMINATION
2 BY MR. SCHULTZ:
3     Q.   Mr. Bragg asked you a couple questions
4 about how someone would obtain knowledge about
5 their credit report, and I think you said well,
6 they could -- you recall you said something like
7 they could call in or they could look at the
8 report, right?
9     A.   Right.
10     Q.   And I think I objected to the question on
11 speculation. Is it accurate that there's probably
12 many ways that a person may or may not know
13 whether something is or is not on their credit
14 report?
15     A.   Yeah, there's many other ways to find
16 out.
17     Q.   I mean, you don't know all the
18 circumstances in which somebody could find out
19 whether something's on their credit report, do
20 you?
21     A.   No, I'm sure I don't.
22     Q.   Is one way that a person could simply
23 know that after seven years a discharged debt
24 should or should not be on their report; is that

66

1 one way?
2     A.   People have knowledge that after seven
3 years -- I mean, anybody in the business will know
4 of CRA.
5     Q.   I suppose another way is if they applied
6 for a -- is it accurate that perhaps another way
7 is if they applied for a mortgage and a person
8 told them there's debts or no debts on their
9 credit report?
10     A.   They would -- basically if you apply for
11 a mortgage and got rejected, you would be
12 referring to the credit bureau which then you
13 would have to pull your credit report.
14     Q.   These -- you were also asked about these
15 collector notes I think, and it's accurate to say
16 today you have a court reporter and she's doing a
17 great job taking every word being said in here
18 down. These collector notes aren't meant to be
19 like a court reporter taking every word down,
20 right?
21     A.   No, they're supposed to give a general
22 appearance of, you know, what -- the conversation
23 that took place.
24     MR. SCHULTZ: That's all I have.

67

1     MR. BRAGG: I have no further questions.
2     MR. SCHULTZ: We'll reserve signature.
3     AND FURTHER DEPONENT SAITH NOT

68

1
2       UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF CALIFORNIA
3 JOHNNY GONZALES, on Behalf )
  of Himself and All Others )
4 Similarly Situated,     )
                   )
5     Plaintiff, ) Case No.
              )05-CV-0171 JAH (RBB)
6   vs.       )
            ) The Honorable
7 ARROW FINANCIAL SERVICES LLC,) John A. Houston
               )
8     Defendant. )
9
10     I, BRIAN CUTLER, hereby certify that I
11 have read the foregoing transcript of my
12 deposition taken on Thursday, July 20th, 2006,
13 consisting of pages 1 through 67, and that to the
14 best of my knowledge it is a true and correct
15 transcript of said deposition, except as I have
16 changed it on the attached sheets in accordance
17 with the rules provided by the said Court.
18
19
20        BRIAN CUTLER
  No errata sheets submitted (Please initial)_____
21 Number of errata sheets submitted_____(pages)

22 SUBSCRIBED AND SWORN TO
  before me this _____ day
23 of_____, 2006

24 _____
      Notary Public

69

1    STATE OF ILLINOIS )
          ) SS.
2    COUNTY OF C O O K )

3

4         I, TRACI ELICE BOURBEAU, Certified
5    Shorthand Reporter and Notary Public in and for
6    the County of Cook, State of Illinois, do hereby
7    certify that on the 20th day of July, A.D., 2006,
8    the deposition of the witness, BRIAN CUTLER,
9    called by the Plaintiff was taken before me,
10   reported stenographically and was thereafter
11   reduced to typewriting under my direction.
12        The said deposition was taken at 25 East
13   Washington Street, Chicago, Illinois, and there
14   were present counsel as previously set forth.
15        The said witness, BRIAN CUTLER, was first
16   duly sworn to tell the truth, the whole truth and
17   nothing but the truth, and was then examined upon
18   oral interrogatories.
19        I further certify that the foregoing is a
20   true, accurate and complete record of the
21   questions asked of and answers made by the said
22   witness, BRIAN CUTLER, at the time and place
23   hereinabove referred to.
24        The signature of the witness, BRIAN

70

1    CUTLER, was reserved by agreement of counsel.
2         The undersigned is not interested in the
3    within case, nor of kin or counsel to any of the
4    parties.
5         Witness my official signature and seal as
6    Notary Public, in and for Cook County, Illinois,
7    on this 28th day of July, 2006.
8
9
10
11

12        _Traci Elice Bourbeau_
          TRACI ELICE BOURBEAU, CSR
13        C.S.R. No. 084-004281

14        OFFICIAL SEAL
          TRACI ELICE BOURBEAU
15        NOTARY PUBLIC, STATE OF ILLINOIS
16        MY COMMISSION EXPIRES 3-9-2009
17
18
19
20
21
22
23
24

# EXHIBIT E

experian :  **Personal Services**

Member login | About Experian | Contac

Search for: [          ]

Credit education  Products  Disputes

**Credit education home**

< Back to Ask Max home

**Credit report basics**

# Ask Max credit advice

**Credit score basics**

**Preventing fraud**

Our most recent column

**Life events and credit**

Select a topic from our most recent column — January 26, 2005

▶ **Ask Max credit advice**

- National Consumer Protection Week is February 6-12
- Family members committing fraud
- Using two Social Security numbers
- Collection accounts and the "seven-year period"

**Preapproved credit offers**

**Maxin**

Experian's
of public at

**Frequently asked questions**

**Collection accounts and the "seven-year period"**

**Glossary of credit terms**

Have a c

**Ask**

- - - - - -

Dear Max,

A collection agency informed me that the "seven years of adverse information" really doesn't apply, because before the seven years end, they sell the account off to another agency and the seven-year period starts all over. So, for all intents and purposes, the negative information never comes off as long as your account keeps getting sold to another agency. Is this true?

- CKO

**Consum**

VA data se
assistance

Beware of
web site fo
personal in

Important i
accuracy o

Dear CKO,

It's not true.

Negative information is deleted seven years from the original delinquency date. That is the date that the very first late payment was reported after which the account was never again current. That date does not change, even when the account is sold.

Federal law requires collection agencies to maintain and report the original delinquency date. That ensures that when the seven-year period ends, all negative information will be deleted, beginning with the original account and including any associated collection accounts that followed.

The date the account was opened has nothing to do with when information is deleted. As an uncollected debt is resold, each collection account probably will have a different account opening date. However, the original delinquency date must remain the same.

Likewise, the last activity date doesn't have anything to do with when negative information is deleted. The activity or status date is just a record of when the account information was most recently updated. It doesn't change when the information will be deleted.

If a collection agency changes the original delinquency date, it violates federal law. I'm afraid the collection agency representative you spoke to either didn't know the law, or was trying to scare you into paying a debt you owe.

Thanks for asking.



E-1

Experian worldwide | Legal terms | Careers | Press room
© Experian 2006. All rights reserved.
Experian and the marks used herein are service marks or registered trademarks of Experian.
Other product and company names mentioned herein may be the trademarks of their respective owners.

£-2

# EXHIBIT F





Equifax Learning Center

# Your Credit Rights
# Key Rights Contained in the Fair Credit Reporting Act (FCRA)

The Fair Credit Reporting Act (FCRA) is a federal law that regulates how credit reporting agencies use your information. Enacted in 1970 and substantially amended in the late 1990s and again in 2003, the FCRA restricts who has access to your sensitive credit information and how that information can be used.

## Summary of Key Rights

The FCRA is a complex piece of legislation and contains numerous provisions not discussed on this page. Below are several important features of how the FCRA that are designed to help consumers (for the complete text, visit the Federal Trade Commission). The FCRA protects you by ensuring that credit reporting agencies:

**Disclose your credit report to you upon request.** Credit reporting agencies must give you the information in your file if you ask for it and provide the agency with proper identification. See "To Receive Your Credit Report" below for more information.

**Limit access to your information.** A credit reporting company may not provide your credit report to any party that lacks a permissible purpose, such as the evaluation of an application for a loan, credit, service, or employment. Permissible purposes also include several business and legal uses. For details, see the full text of the summary of your rights.

**Get your consent before providing your information to an employer.** An agency may not give your credit information to an employer or potential employer unless you first give that employer written permission to request your credit.

**Investigate disputed information.** If you tell a credit reporting company that your file contains inaccurate information, the agency must promptly investigate the matter with the source that provided the information. If the investigation fails to resolve the dispute, you may add a statement explaining the matter to your credit file. For more information, see Fixing Errors on Your Report.

**Correct or delete inaccurate information.** A credit reporting company must correct or, as the case may be, delete from your credit file the information that is found to be inaccurate or can no longer be verified from your credit file. The credit reporting company is not required to remove accurate data from your file unless it is outdated or cannot be verified.

F-1

**Delete outdated information.** In general, negative information that is more than 7 years old (10 years for bankruptcies) must be removed from your file.

**Remove your name from marketing lists upon request.** Creditors and insurers may share information in your credit file with marketers who send you unsolicited offers. To request that the three credit reporting agencies not share your information with marketers, call 888-567-8688.

**Disclose your credit score to you upon request.** For a fee, you may get your credit score. In some mortgage transactions, you will get credit score information without charge. See "To Obtain Your Credit Score" below for more information.

**Add identity theft and active duty alerts.** Identity theft victims may place fraud alerts and active duty military personnel serving away from their regular duty station may place "active duty" alerts to help prevent identity theft.

**Remedying the Effects of Identity Theft.** If you are, or believe that you are, the victim of identity theft, you have specific rights under the FCRA. These rights will help you deal with the effects of identity theft. Click here to view a brief summary of the rights designed to help you recover from identity theft.

**Place a Security Freeze on your Credit File.** If you reside in select states you have the right to place a security freeze on your Equifax credit file. To determine the availability of a security freeze for your state and to determine the fees for placing and temporarily lifting a security freeze, please see the State Security Freeze Requirements and Fees. A security freeze will prevent us from reporting your Equifax credit file to third parties, such as credit grantors and other companies and agencies, except those exempted by law or those for whom you contacted us and requested that we temporarily lift the security freeze.

A security freeze will require you to plan ahead for all your credit applications as you will need to contact us to request that we temporarily lift your freeze to allow us to report your Equifax credit file to the credit grantor you identify. Under the laws of most states, it may take up to three business days to process your request to temporarily lift the security freeze. It may take longer if you have lost the security freeze confirmation number which we provided to you when you first requested the security freeze be placed on your Equifax credit file. You may not be able to request a temporary lift of a security freeze during non-business hours or on weekends. A security freeze may hinder your ability to immediately obtain credit to make major purchases. Again, if you are credit active and apply for credit on a regular basis and have a security freeze on your Equifax credit file you need to be especially mindful of the need to plan ahead and contact us in advance to request a temporary lift of the security freeze on your Equifax credit file.

Only you can request a security freeze be placed on your Equifax credit file and only you can request the security freeze be removed or temporarily lifted. A security freeze will remain on your Equifax credit file until you request the security freeze be permanently removed or you request a temporary lift of the security freeze for a specific credit grantor/credit file user, or date range.

If you choose to request a security freeze on your Equifax credit file you must write to us. Your written request must be sent via certified mail and include the following information:

*F-2*

1. Name
2. Address
3. Date of Birth
4. Social Security Number
5. Proof of current address such as a current utility bill
6. Payment of applicable fees to request a security freeze of your credit file ( click to determine fees for your state). We accept personal checks, American Express, Mastercard, VISA, and Discover Cards for payment of fees. If you are paying by credit card, please include the following information:

> a. Name of the person as it appears on the credit card
> b. Type of credit card (American Express, Mastercard, VISA, or Discover Card)
> c. Complete account number
> d. Expiration data (month and year)
> e. For American Express – 4 digit Card Identification Number (on front of card above the account number)
> f. For Mastercard, VISA, or Discover Card – 3 digit Card Identification Number (on back of card at the end of the account number)

Please do not send cash through the mail.

7. If you are an identity theft victim and are requesting a security freeze you must also include a copy of a police report, Identity Theft report, or other government law enforcement agency report, such as a DMV report.

Please send your security freeze request information via certified mail to the address below.

Equifax Security Freeze
P.O. Box 105788
Atlanta, Georgia 30348

Once we receive your security freeze request information and place a security freeze on your Equifax credit file we will send you via US mail a confirmation letter that contains a 10 digit security freeze confirmation number. You will need to provide us your security freeze confirmation number to request temporary lifts of your security freeze or permanent removal of your security freeze. Please store this confirmation letter in a safe place to prevent delays when requesting a temporary lift or removal of your security freeze.

## To Receive Your Credit Report

This chart outlines fees by state for requesting one or more copies of your credit file within one calendar year (unless otherwise stated).

| State | Free | Fees |
|---|---|---|
| California | | $ 8.00 |
| Colorado | 1 per calendar year | $ 8.00 |
| | | |

F-3

| Connecticut | | $ 5.00 for the first report,  $ 7.50 for each additional report within 12 months |
| --- | --- | --- |
| Georgia | 2 per calendar | $ 10.00 |
| Maine | 1 within 12 months | $ 5.00 |
| Maryland | 1 within 12 months | $ 5.00 |
| Massachusetts | 1 per calendar year | $ 8.00 |
| Minnesota | | $ 3.00 for the first report,  $ 10.00 for each additional report within 12 months |
| Montana | | $ 8.50 |
| New Jersey | 1 within 12 months | $ 8.00 |
| US Virgin Islands | | $ 1.00 |
| Vermont | 1 within 12 months | $ 7.50 |
| All other states | | $ 10.00 |
| *Unemployed | 1 within 12 months | |
| *Welfare | 1 within 12 months | |

You are entitled to one free report during any 12-month period no matter where you live, if you:

- Are unemployed and intend to apply for employment in the next 60 days
- Are on public welfare assistance
- Believe your file contains inaccurate information due to fraud
- You are also entitled to a free report if you have received notice of an adverse decision (such as denial of credit, insurance, or employment) within the past 60 days

To request a copy of your credit file from Equifax, please contact:

Equifax Information Services LLC
P.O. Box 740241 Atlanta, GA 30374
or call
800-685-1111

When requesting a credit report by mail, be sure to include your full name, current address, Social Security Number, and most recent former address for file-matching purposes. Also include a personal check made payable to Equifax Information Services LLC, based on the state rates above.

For immediate access to your online Equifax Credit Report™, click here. A $10.00 service fee applies.

Under the FACT Act amendments to the Fair Credit Reporting Act you are entitled to one free credit report disclosure in a 12 month period. To request this free annual disclosure you

F-4

must contact the Central Source. To contact the Central Source on-line, please <u>click here</u> to www.annualcreditreport.com. You can also contact the Central Source to request this free annual disclosure by calling toll free (877) FACTACT or by using the mail request form available at the central source website by clicking the following link www.annualcreditreport.com

## To Obtain Your Credit Score

By law, you are entitled to obtain your credit score. There is a fee of $7.95 to obtain your credit score from Equifax Information Services. To request your credit score, please contact:

Equifax Information Services LLC
PO Box 105252
Atlanta, GA 30348

or call 1-877-SCORE-11

If you are in the process of obtaining a mortgage, you may be entitled to free credit score information. Contact the person making or arranging your loan for further information.

Copyright Equifax 2006 | <u>Privacy Policy</u> | <u>Terms of Use</u> | <u>FCRA</u> | <u>Become An Affiliate</u>

F-5

# EXHIBIT G

**United States Government Accountability Office**

# GAO

## Report to Congressional Committees

March 2005

# CREDIT REPORTING LITERACY

## Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts



GAO-05-223

G-1

consumers from deceptive and unfair business practices in the marketplace, FTC engages in several activities, including maintaining a Web site that features educational information on credit reporting and other financial topics and a toll-free number for complaints and questions.[25] Some private sector initiatives include the Federal Home Loan Mortgage Corporation's (Freddie Mac) CreditSmart® Program, which is devoted exclusively to promoting credit literacy and features modules on interpreting credit reports. Fair Isaac Corporation maintains a Web site to disseminate information on credit education.[26] In addition, all three nationwide CRAs engage in educational efforts through their Web sites and partnerships with national organizations or schools.

GAO has also addressed the issue of financial literacy among consumers. The most recent effort was a forum hosted on July 28, 2004, on the role of the federal government in improving financial literacy.[27] Forum participants included experts in financial literacy and education from federal and state agencies, the financial industry, nonprofit organizations, and academic institutions. During the course of the forum, credit experts agreed that consumers would benefit from more education on credit, including the cost of credit, how to use credit, and how to manage credit responsibly. Forum participants also advocated targeting low-and moderate-income individuals and families, immigrant populations, and young people in these education efforts. Similarly, a Federal Reserve study on financial education found that successful financial education programs target specific groups, such as youth or minority populations.[28]

## Results in Brief

Our survey showed that most consumers understood the basic concepts of credit reporting and had seen their credit reports but that many lacked knowledge of some credit report contents, uses, and other impacts. Based on our survey responses, we found that many consumers knew how to

---

[25] Commenting on a draft of this report, FTC said that in FY 2004, it distributed more than 4 million print copies of credit publications in English and Spanish. Consumers also accessed more than 5.7 million copies using the Internet. In addition, the consumer information page dealing with credit is consistently one of the most viewed pages on FTC's Web site.

[26] Fair Isaac Corporation's Web site is at www.myFICO.com.

[27] GAO-05-93SP.

[28] Fox, Lynn, Joy Hoffmann, and Carolyn Welch. "Federal Reserve Personal Financial Education Initiatives." *Federal Reserve Bulletin*, Autumn 2002.

G-2

obtain their credit reports, most of the information reports contained, some impacts of their credit history—including its effect on their ability to obtain loans and the interest rate on loans—and some of the rules governing access to their reports. However, many consumers lacked other important information, such as how long information stayed on their reports and how their credit history could affect insurance premiums and employment. For example, about two-thirds of consumers did not know that their credit history could impact their insurance premiums and employment, and about half (53 percent) did not know that information could stay on their report for 7 or 10 years. We found that many consumers (almost 60 percent) had viewed their credit reports, most often because they were making a large purchase or refinancing a loan, and most of these consumers said that they understood their reports.

The results of our survey also showed that most consumers had a basic understanding of credit scores and that around one-third had obtained them. While many consumers (70 percent) correctly identified the definition of a credit score and understood many of the factors that could impact credit scores, only 28 percent could provide a number within a range of possible credit scores. In addition, consumers were more familiar with some of the factors that affected credit scores than with others. For example, while most consumers knew that skipping loan payments or making late credit card payments had a negative effect on credit scores, about half did not know that using all the credit available to them, such as reaching the maximum limit on a credit card or home equity loan, had a negative effect. Also, when asked about information that had no effect on credit scores (such as a low checking account balance), about half of consumers answered the questions incorrectly or said that they did not know.

Most consumers (around 90 percent) knew that they could dispute inaccurate information on their credit reports, and approximately 18 percent said that they had initiated a dispute. However, we found that over half of consumers did not fully understand their rights in the dispute process or the responsibilities of the CRAs in responding to disputes. For example, relatively few consumers—about one-third—knew that CRAs investigate disputed information for free. In addition, the majority of consumers (94 percent) did not name FTC as the federal agency they would contact with a complaint about a CRA—for example, about an unresolved dispute—although FTC is the federal agency primarily responsible for enforcing consumers' rights with respect to credit reporting by CRAs. The types of information consumers disputed varied, but among the items most

G-3

frequently mentioned were information that did not belong to the individual and incorrect payment histories—for example, late payments. We also found that of those who had disputed information, most (69 percent) reported that they had information removed from their report.

Many factors are associated with consumers' knowledge of credit reporting issues. We found that some demographic factors and types of experiences appeared to affect consumers' scores on our survey. For example, less educated, low-income, and Hispanic consumers scored lower on our survey than other demographic groups. Additionally, we found that having experience with credit—for example, obtaining an automobile loan or a mortgage—and the credit reporting system appeared to raise consumers' scores. In contrast, we found that other factors and experiences, such as having been a victim of identity theft, gender, or living in one of the seven "free report states," had little effect on consumers' credit reporting knowledge. The factors that appeared to affect consumers' knowledge of credit issues had a cumulative impact. For example, a consumer with a college degree, credit experience, and a high income could score much higher than a consumer with less than a high school education, relatively low income, and no credit experience.

This report makes recommendations to the Secretary of Treasury and the Chairman of FTC that are designed to promote efforts to improve the credit reporting literacy of U.S. consumers. We provided a draft of this report to the Department of the Treasury and FTC for comment and they provided written comments that are reprinted in appendixes VII and VIII, respectively. Both agencies generally agreed with our findings and outlined efforts underway to improve credit reporting literacy. A summary of their written comments and our response are presented at the end of this report.

## Consumers Generally Understood Credit Reports and Had Viewed Their Reports, but Many Lacked Specific Knowledge

On the basis of responses to our questionnaire, we found that consumers generally understood credit reports and had viewed their reports but that many lacked specific knowledge about what their credit reports contained, how they were used, and other potential impacts of their credit history. Correct responses to individual questions varied widely, ranging from a high of 95 percent who knew that their credit history could affect their ability to get a loan to a low of 7 percent of consumers who knew that the credit reporting system was voluntary. We found that basic questions generated the most correct answers. For example, most consumers could correctly choose a description of a CRA and were aware that credit reports contained information such as credit card balances. But many consumers

G-4